UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 20-144-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| SUBHADARSHI NAYAK, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

*** *** *** ***

Defendant Subhadarshi Nayak pleaded guilty on August 30, 2021, to one count of conspiring to commit wire fraud (Count 1) in violation of 18 U.S.C. § 1349 and two counts of wire fraud (Counts 2 and 3) in violation of 18 U.S.C. § 1343. [Record Nos. 46 and 47] He was sentenced on December 13, 2021, to six months' incarceration, six months of home detention (to be served during the first six months of supervised release), and three years of supervised release. [Record No. 57, pp. 1-2] The Court reserved a final restitution determination pending a separate hearing on the issue. The parties presented their respective evidence at the restitution hearing held on April 8, 2022. Thereafter, the defendant submitted a supplemental brief.[1] [Record No. 70]

Having considered the evidence presented by the parties and relevant authorities on the pertinent issues, the Court finds that the defendant is liable for the full amount of grant funding awarded by the Department of Energy ("DOE") and Environmental Protection Agency

---

[1] The United States was given the opportunity to file a post-hearing brief but specifically declined to do so.

("EPA").  As set forth below, the defendant's judgment shall be amended to reflect this ruling and the Court will issue a monthly installment payment plan upon the commencement of his term of supervision.

## I.  Background

### A.  General Background

Nayak and his then-wife, Jyoti Agrawal, founded ScienceTomorrow, LLC, in 2009. [Presentence Investigation Report ("PSR"), ¶ 9]  ScienceTomorrow applied for, and received, $153,696.00 in Phase I Small Business Innovation Research ("SBIR") program grant funding from the DOE for a quantitative secondary electron detector ("QSED") project for scanning electron microscopes.  [*Id.*]

After Phase I concluded in late 2013, the couple applied for more substantial Phase II funding.  [*Id.* at ¶¶ 10-11.]  They had been in contact with the University of Tennessee regarding a potential Phase II subcontract and received a provisional letter of commitment from that university for a subcontract worth $221,576.00.  [*Id.* at ¶ 11.]  However, Nayak and Agrawal composed a different letter, which indicated that the University of Tennessee had agreed to a $300,006.00 subcontract.  They then submitted this forgery and a corresponding false budget to the DOE as a part of their Phase II application.  [*See id.*; Defendant's Exhibit 1.][2]

The DOE awarded ScienceTomorrow a $999,266.00 Phase II grant based, in part, on the falsified letter.  [PSR, ¶ 11]  The grant contemplated the $300,006.00 subcontract with the University of Tennessee.  [*Id.*]  University personnel performed some, albeit very little, work

---

[2] The exhibits referenced herein were admitted during the defendant's final restitution hearing.

on the QSED project but were never paid from the $300,006.00 allocated for the institution in Phase II. [*Id.*] Additionally, Nayak and Agrawal did not finalize an actual subcontract with the university and failed to disclose this issue (or their actions in falsifying the letter) to the DOE. [*Id.* at ¶ 12.] Nayak and Agrawal drew down grant funds in increments of $50,000.00 on at least two occasions prior to August 2014. [*Id.* at ¶ 13.]

Unfortunately, Nayak and Agrawal's personal and professional relationship deteriorated, and Nayak left ScienceTomorrow in August 2014. [*See id.*] Nayak later ceded his ownership and intellectual property interests in ScienceTomorrow to Agrawal in a 2016 divorce property settlement agreement. [Defendant's Exhibit 4, ¶ 7] Despite the inharmonious nature of their relationship, however, Nayak performed additional work on the QSED project as a consultant in 2016. [*Id.* at ¶ 9.]

Agrawal continued ScienceTomorrow's work on the QSED project following Nayak's departure. But in doing so, she used a portion of the DOE Phase II funds to pay tuition for a University of Chicago Master of Business Administration program. [*Id.* at ¶¶ 17-18.] She also made false representations to the DOE regarding project costs and expenditures in her final project certifications submitted in early 2017 and retained over $300,000.00 in DOE grant money after the project had ended in contravention of SBIR program guidelines. [*Id.* at ¶ 16.]

Nayak operated other businesses after he left ScienceTomorrow, including QMetry Corporation. QMetry applied for a Phase I SBIR grant from the EPA to fund a project concerning a remediation technique for perfluoroalkyl substance ("PFAS") contaminants in soil. [*See id.* at ¶ 20; Defendant's Exhibit 12.] Nayak falsely claimed in the December 19, 2017, Phase I application that he had an agreement with a University of Kentucky soil science professor to perform work on the PFAS project because he knew that such a representation

would significantly increase QMetry's chances of receiving the grant.  [*Id.* at ¶¶ 20-22; Government's Exhibit 3, p. 1.]

The EPA awarded a $100,000.00 Phase I grant to QMetry based, in part, on this fraudulent representation.  [PSR, ¶ 23.]  Nayak proceeded to draw down funds from the Phase I grant on six occasions between December 2018 and June 5, 2019, "submitting claims in the form of invoices supported by reports to EPA contracting officers [he] knew contained material falsities or relied upon false pretenses."  [*Id.* at ¶ 24.]  And despite his certification to the contrary, he kept $46,564.61 in EPA grant funding after the conclusion of Phase I in violation of his agreement with the EPA.  [*Id.* at ¶ 25.]

Nayak pleaded guilty to three counts of a fifteen-count Indictment on August 30, 2021. [Record No. 46]  Counts 1 and 2, charging a conspiracy to commit wire fraud and substantive wire fraud, concern Nayak's SBIR activities on behalf of ScienceTomorrow.[3]  [*See* Record No. 1.]  Count 3, charging substantive wire fraud, relates to his QMetry conduct.  [*See id.*] Notably, Nayak's plea agreement includes a "five-year exclusion from participating in or receiving benefits from any federal procurement or non-procurement transaction in accordance with Federal Acquisition Regulation (FAR) 48 C.F.R. § 9.4 and 2 C.F.R. § 180.1020."  [Record No. 46, ¶ 11.]  "This means that the Defendant will be barred from participating in most procurement and non-procurement programs and activities unless such program is exempted under 2 C.F.R. § 180.215 and 2 C.F.R. § 417.215."  [*Id.*]  The Court sentenced the defendant

---

[3]  Agrawal was recently convicted in a separate matter on conspiracy and substantive wire fraud charges for her role in the ScienceTomorrow scheme.  *See United States v. Agrawal*, Criminal Action No. 5: 21-047-DCR, Record Nos. 1 and 74 (E.D. Ky.).  Additionally, she was convicted of a money laundering charge relating to her use of SBIR funds for a tuition payment under 18 U.S.C. § 1957.  *Id.* at Record Nos. 1 and 74.

on December 13, 2021, reserving the issue of restitution for hearing at a later date pursuant to

18 U.S.C. § 3664(d)(5) and the agreement of the parties.[4]

## B.  Final Restitution Hearing Evidence

During the final restitution hearing held on April 8, 2022, the government introduced

the declaration of Manny Oliver, the SBIR/STTR Programs Director for the DOE.[5]   In the

declaration, Oliver states:

> The statutory purpose of the SBIR program is to strengthen the role of innovative small business concerns (SBCs) in Federally-funded research or research and development (R/R&D) . . . . Specific program purposes are to: (1) stimulate technological innovation; (2) use small business to meet Federal R/R&D needs; (3) foster and encourage participation by socially and economically disadvantaged SBCs (SDBs), and by women-owned SBCs (WOSBs), in technological innovation; and, (4) increase private sector commercialization of innovations derived from Federal R/R&D, thereby increasing competition, productivity and economic growth . . . . The statutory purpose of supporting the commercialization of innovation technologies is stated in each Phase I and Phase II DOE SBIR/STTR Funding Opportunity Announcement (FOA).

[Government's Exhibit 1, ⸿ 2 (citations omitted).]  Oliver indicates that the DOE achieves this

statutory purpose "by providing financial assistance to small businesses to perform early

---

[4]  The final restitution hearing was initially scheduled for February 25, 2022 [Record No. 54], in accordance with the statutory provision that the "court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."  18 U.S.C. § 3664(d)(5). During a status conference held on January 28, 2022, counsel for the United States indicated that she would not be able to attend the hearing scheduled for February 25, 2022. After the Court raised the issue of the statutory deadline, counsel for Nayak stated that he had no objection to a continuance.  The parties and the Court accordingly settled on April 8, 2022, as the new date of the final restitution hearing.  It has been clear to all parties that restitution is mandatory in this action [*see*, *e.g.*, Record No. 57, p. 6; PSR, ⸿ 28], and the Court maintains the authority to order restitution outside the ninety-day window.  *See generally Dolan v. United States*, 560 U.S. 605 (2010).

[5]  "STTR" refers to the Small Business Technology Transfer program, which is similar, albeit not identical, to the SBIR program.  *See* 18 U.S.C. § 638.

research and development on innovations with commercial potential."   [*Id.* at ¶ 3.]   There is considerable competition for limited funding, and the DOE must turn away "numerous meritorious applicants" every year based on the funds available.   [*Id.*]

In addition to including award budgets (and subaward budgets) in an SBIR application, Oliver states that "each applicant is asked to describe its staff, equipment, and facilities necessary to carry out the [project] effort."   [*Id.* at ¶¶ 9-10.]   "Each application is reviewed for information that shows the Recipient will carry out the project in a cost effective manner as evidenced by the qualifications of the Principal Investigator, other key staff, consultants and subcontractors, if any, and the level of adequacy of equipment and facilities."   [*Id.* at ¶ 9 (cleaned up) (citation omitted).]

The DOE "places great value in the signed certifications of an applicant to fairly represent both its capabilities and resources as well as its plans to commercialize its innovations," and "[a]n applicant who obtains an award by misrepresentation denies another qualified applicant the opportunity to advance its innovations."   [*Id. at* ¶ 3.]

Oliver also offers the following significant insights regarding the nature of the award at issue:

> ScienceTomorrow, LLC's DOE SBIR award was a grant, which is a financial assistance instrument.  A financial assistance instrument is used when the principal purpose of the transaction is the transfer of money or property to accomplish a public purpose of support or stimulation as authorized by Federal statute.  31 U.S.C. § 6304.  A financial assistance instrument is different from a procurement contract, the latter being for the direct benefit or use of the United States Government.  31 U.S.C. § 6303.

[*Id.* at ¶ 5.]

After such a grant is awarded and the project has been completed, an awardee must submit progress reports and a final technical report.   [*Id.* at ¶ 12.]   The DOE received

ScienceTomorrow's final technical report and disclosed the existence (but not the substance) of that report online. [*Id.* at ⁋⁋ 13-14.] This website reporting the existence of the final technical report documents an August 31, 2016, publication date. *See Quantitative Secondary Electron Detection (QSED)*, UNITED STATES DEPARTMENT OF ENERGY OFFICE OF SCIENTIFIC AND TECHNICAL INFORMATION, https://www.osti.gov/biblio/1341788-quantitative-secondary-electron-detection-qsed (last visited May 5, 2022).

Oliver represents that he is unaware of any interest in, or use of, the final technical report apart from a DOE Office of the Inspector General ("OIG") request for a copy of the report. [*Id.* at ⁋ 14.] Further, he believes that "the scientific credibility of the final technical report is suspect," considering the fraudulent representations contained in the Phase II application, which are now known to the public. [*Id.* at ⁋ 15.] He doubts that potential users are "able to trust that the reported research was completed or that the results are truthful." [*Id.*] Oliver concludes that, "[b]ecause . . . Mr. Nayak deprived other applicants of the opportunity to pursue their innovations and deprived the public of its financial assistance purpose of commercialization of those innovations, the DOE has suffered a loss of $999,266.00, which is the full amount of the DOE SBIR Phase II grant . . . ." [*Id.* at ⁋ 16.]

Along the same lines, Oliver's April 5, 2022, economic impact statement offered by the government requests $999,266.00, although it also ambiguously "defers to the Court" to determine the proper amount of restitution. [Government's Exhibit 2, p. 1] This economic impact statement notes: "ScienceTomorrow, LLC would not have received an award had DOE known of the misrepresentation in its Phase II application." [*Id.*]

The defendant introduced a prior economic impact statement from Oliver dated January 4, 2022. [Defendant's Exhibit 1] This earlier statement requests $260,679.00. [*Id.*] The

figure represents the amount that ScienceTomorrow "may have received" had it submitted the "true provisional letter" from the University of Tennessee. [*Id.* at pp. 1-2.] Still, this earlier economic impact statement asserts that the DOE would not have awarded any Phase II funding had reviewers known that the letter submitted by Nayak and Agrawal was fraudulent. [*Id.* at p. 2.] Thus, the "$999,266 in SBIR funds would have been devoted to a different project altogether." [*Id.*] This statement qualifies that it requests $260,679.00 "[b]ecause [the United States] will seek to recover the loss of the entire award from Jyoti Agrawal . . . ." [*Id.*]

The United States also offered the testimony of EPA SBIR Program Manager April Richards during the final restitution hearing.  Richards' testimony shared many of the points made by Oliver in his declaration.  She stated that the EPA SBIR applications include a certification regarding the truthfulness of the information provided by the applicant and that Nayak falsely represented that certain personnel would work on the project.  This was significant to Richards because reviewers consider the proposed project team when evaluating SBIR applications.  She testified that such a misrepresentation impacts the selection of an untruthful applicant at the expense of other deserving applicants who are denied access to the limited government funding for their projects.

Richards also indicated that the EPA likely would not have funded QMetry's PFAS project had it known about the falsities in the application.  Additionally, she testified on direct and cross examination that it is difficult to know what is truthful in the substantive technical reports produced by Nayak after learning of the misrepresentations in the Phase I EPA SBIR application.  Richards also noted that a high-level summary of the project is available on the

EPA's website, a copy of which was admitted as Defendant's Exhibit 14.[6]  [*See* Defendant's Exhibit 14.]

Richards has submitted an economic impact statement requesting the full amount of the $100,000.00 Phase I SBIR award to QMetry in restitution.  [Government's Exhibit 3]  This economic impact statement asserts that the full value of the grant should be repaid because: (1) Nayak lied about the partnership with the University of Kentucky soil science professor in his grant proposal; (2) he falsely certified that he spent the grant money in accordance with the grant and provided false progress reports to incrementally collect SBIR funds from the award; and (3) "it is difficult to believe anything submitted during the . . . period of performance" because Nayak was untruthful at the project's inception when he applied for Phase I EPA SBIR funds.  [*Id.* at p. 1.]

The defendant offered additional evidence during the final restitution hearing.  First, patent agent Peter Willis testified regarding his work with ScienceTomorrow in obtaining a patent for the QSED technology.  According to Willis, some of his work on behalf of ScienceTomorrow was done in conjunction with Nayak while the defendant still worked for the company.  The eventual publication of the patent, Patent No. US 9,966,224 B2 issued on May 8, 2018, was also admitted.  [Defendant's Exhibit 2]

The publication of patent, and Willis' testimony, confirm that the government maintains certain rights in the QSED invention because it was made with the support of DOE grant funding.  [*See id.* at p. 9.]  Willis testified that these rights are set forth in 37 C.F.R. §

---

[6]  This summary is available at https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.abstractDetail/abstract_id/10910/report/F#content (last visited May 5, 2022).

401.14,[7] and include, *inter alia*: (1) a nonexclusive use right; and (2) the right to step into the shoes of the patent holder should it decide to no longer pursue the patent at any point. Consistent with the use right, Willis opined that the government could create and use the QSED technology for its own electron microscopes. However, he was not certain whether the government (or any other person or entity) had utilized the patented QSED technology.

Willis also performed a patent search for QMetry's PFAS project, determining that Nayak's soil remediation invention was patentable. However, this patent was never pursued. Willis indicated that the United States should have the same rights in the PFAS soil remediation invention as it has in the QSED invention because it was funded through a government grant.

Willis agreed that he had no reason to question the validity of Nayak's work on the QSED project and that he found Nayak's PFAS work useful and legitimate. He presumed that the QSED project would increase the value of existing electron microscopes but did not specifically quantify the value of the invention when asked on cross examination.

---

[7] Part 401 of Title 37 of the Code of Federal Regulations concerns the "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements." It is "applicable to all Federal agencies" and generally "applies to all funding agreements with business firms regardless of size . . . ." 37 C.F.R. § 401.1(b). The "General Terms and Conditions for DOE SBIR and STTR Phase I and Phase II Grants" include "SBIR/STTR-GTC-0024 PATENT RIGHTS," a provision that largely tracks the relevant portions of 37 C.F.R. § 401.14 and supports Willis' testimony regarding the government's rights in the QSED invention. *See About SBIR: General Terms and Conditions for DOE SBIR and STTR Phase I and Phase II Grants*, UNITED STATED DEPARTMENT OF ENERGY OFFICE OF SCIENCE, https://science.osti.gov/sbir/About/about-sbir (last visited May 5, 2022).

Nayak also presented testimony from Jonathan Snyder, an electrical engineer who worked for him at QMetry for approximately three months in 2019. Snyder testified that he had no reason to doubt the veracity of the PFAS project data generated before he worked for QMetry or during his tenure with the company. Snyder also stated that there is always value in scientific experiments, even those that fail, because they provide data points that direct future inquiries.

At the conclusion of the restitution hearing, Nayak testified regarding his work with ScienceTomorrow and QMetry. He described the involvement of University of Tennessee professor Dr. David Joy in the QSED project. Dr. Joy, "a pioneer . . . with 60 years of experience in the [scanning electron microscope] field," was listed as a co-investigator for the QSED project in the ScienceTomorrow Phase II application submitted to the DOE in accordance with the purported $300,006.00 subcontract. [Record No. 68, pp. 4:12-24, 9:22-10:1; Defendant's Exhibit 3A, pp. 11, 95-96] The application specifically reports that Joy "[would] assist and work with Dr. Nayak for conducting experiments, testing QSED functionality, and evaluating QSED feasibility." [Defendant's Exhibit 3A, p. 11]

Nayak indicated on cross examination that, while Joy was involved in both Phase I and Phase II of the project, the professor told him not to worry about paying him. [*Id.* at p. 54:13-15.] The defendant also stated that he visited the University of Tennessee once between Phase I and Phase II or at the beginning of Phase II to test detectors that ScienceTomorrow had built. [*Id.* at pp. 55:13-56:1.] Joy visited ScienceTomorrow's Lexington, Kentucky facility once with a graduate student and/or postdoctoral student to do experimental work for "probably a couple of days" during Phase II. [*Id.* at p. 56:1-14.]

The defendant further described ScienceTomorrow's Phase II efforts.  Nayak asserted that ScienceTomorrow: (1) was working toward developing a QSED prototype and commercializing its innovation during his time with the company in Phase II; and (2) the company's reported research results from Phase II were truthful.  [*Id.* at pp. 23:12-24:17.]

Regarding external interest in the QSED project, Nayak noted that "we were actually talking to a number of national [governmental] laboratories who would be interested in this kind of technologies and some of them were very interested to use this and they could use it without paying any licensing because of the government rights in this technology."  [*Id.* at p. 25:8-12.]  However, he could not recall the particular government departments, laboratories, or scientists who had expressed this interest.  [*Id.* at p. 25:22-25.]

Nayak also testified regarding his Phase I work on the PFAS project, which involved "buil[ding] a benchtop setup in which we pass[ed] some specific kind of electricity, like pulse electricity with [the] appropriate chemical environment on a very small scale to destroy th[ese] chemicals [*i.e.*, PFAS]."  [*Id.* at p. 36:2-7.]  This was done on a small scale, and the resulting samples were sent to third-party laboratories who independently tested how many of the chemicals were actually destroyed.  [*Id.* at p. 36:8-13.]  According to the defendant, these Phase I tests produced data showing that the project's soil remediation method "was able to destroy [the] chemical[s] within 17 minutes of the experiment."  [*Id.* at p. 36:20-22.]

Nayak indicated that several individuals had reached out to him regarding the PFAS project after the EPA posted the summary on its website, although he did not elaborate on this point.  [*Id.* at pp. 42:24-25, 43:14-15.]  Ultimately, Nayak agreed that the falsehoods contained in the ScienceTomorrow and QMetry applications had no impact on his scientific work on the QSED and PFAS projects.  [*Id.* at pp. 14:7-10, 32:23-25.]

Finally, Nayak testified regarding his financial circumstances.  He currently works as a Door Dash driver and Panera Bread food preparer.  [*Id.* at p. 2:14-15.]  He has unsuccessfully applied for dozens of science and engineering-related jobs and agreed that the five-year federal program exclusion in his plea agreement substantively limits his ability to obtain these positions.  [*Id.* at pp. 44:7-45:14.]  Nayak maintains health savings and IRA accounts that collectively hold about $12,000.00.  [*Id.* at pp. 45:22-46:7.]  His other assets include a 2014 Toyota Camry and "a couple hundred books."  [*Id.* at p. 46:11-16.]  He stated that he has little money left over each month after paying his bills.  [*Id.* at p. 47:5-7.]  Those bills include, *inter alia*, child support payments in the amount of approximately $206.50 per month according to his PSR.  [*See* PSR, ⁋ 68; *see also* Defendant's Exhibit 11, p. 8.]

## II.  Legal Standards

The Mandatory Victims Restitution Act requires that the Court order a defendant convicted of any Title 18 "offense against property . . . committed by fraud or deceit" to pay restitution to identifiable victims who have suffered pecuniary loss.  18 U.S.C. § 3663A(a)(1), (c)(1).  "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1).  "A district court therefore may 'consider ability to pay *only* when establishing the schedule of payment.'"  *United States v. Bogart*, 576 F.3d 565, 573 (6th Cir. 2009) (emphasis in original) (quoting *United States v. Ellis*, 522 F.3d 737, 739 (7th Cir. 2008)).

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).  "Any dispute

as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." *Id.*

"Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid." 18 U.S.C. § 3664(f)(2). In doing so, the Court must consider "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled," "projected earnings and other income of the defendant," and "any financial obligations of the defendant; including obligations to dependents." 18 U.S.C. § 3664(f)(2)(A)-(C). "A restitution order may provide that the defendant pay the amount owed in a lump sum, in periodic payments, or in nominal payments until it is paid in full." *United States v. Poynter*, No. 5: 17-CR-140-JMH, 2019 WL 4923950, at *1 (E.D. Ky. Oct. 4, 2019) (citing 18 U.S.C. § 3664(f)(3)(A) and (B)).

Additionally, "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h).

### III.   Amount of Restitution

The parties have conflicting views about how to ascertain the amount of loss for the purposes of restitution. The United States argues that Nayak should owe the full amount of the grants at issue, *i.e.*, $999,266.00 and $100,000.00, to the DOE and EPA regardless of the work that was performed on the QSED and PFAS projects because the grants were awarded as a result of false representations in Nayak's applications.

- 14 -

The defendant contends that such an award would be an "unlawful windfall." [Record No. 70, p. 5] He asserts that the Court should use $360,679.00 as a starting point because that amount accounts for the $100,000.00 sought by the EPA plus the $260,679.00 initially sought by the DOE in the January 4, 2022 economic impact statement. [*Id.* at p. 2] The defendant claims the $260,679.00 figure is appropriate because it "is calculated in a concrete way" and the DOE indicated that "ScienceTomorrow would have been awarded substantial phase II funds" without the false representations in the application.[8] [*Id.* at p. 2.]

Nayak then argues that the $360,679.00 figure should be reduced to account for the value of work and benefits conferred on the DOE and EPA, including the scientific results of the relevant projects, reports concerning those results, and patent rights. [*Id.* at pp. 1, 3.] He cites several cases in support of this proposition. *See United States v. Skowron*, 529 F. App'x 71 (2d Cir. 2013); *United States v. Leahy*, 464 F. 3d 773 (7th Cir. 2006); *United States v. Sapoznik*, 161 F. 3d 1117 (7th Cir. 1998); *United States v. Napout*, 15-CR-252 (PKC), 2018 WL 6106702 (E.D.N.Y. Nov. 20, 2018); *United States v. Fiorentino*, 149 F. Supp. 3d 1352 (S.D. Fla. 2016). Ultimately, the defendant argues that the Court should limit the restitution awards to $8,873.98, which represents the amount of funds seized by the government in connection with this case. [Record No. 70, pp. 2-3]

---

[8] This characterization of the January 4, 2022, economic impact statement does not entirely encapsulate the substance of the document. First, the earlier statement explicitly states that ScienceTomorrow "may have received" a smaller award had it actually submitted the provisional letter of commitment. Further, it asserts that knowledge of the false letter would have resulted in no grant funding. Finally, it qualifies the request for the $260,679.00 amount by stating that it is sought "because" the government plans to seek the full amount of the grant award from Agrawal. At any rate, consistent with the authorities outlined below the undersigned concludes that Nayak should pay the full amount of the DOE Phase II award in restitution, consistent with the later position of the DOE.

The overarching thrust of Nayak's argument is that the DOE and EPA received the benefits of their respective bargains.  But the cases Nayak cites involve contracts rather than grants like those at issue in this matter.  And these grants are different in nature from the contracts discussed in those cases.

Similar to the purposes cited by Oliver, the statute authorizing the SBIR program states: "[i]t is the policy of the Congress that assistance be given to small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy."  18 U.S.C. § 638(a).  Thus, consistent with Oliver's declaration, SBIR grants are not "standard procurement contracts where the government order[s] a specific product or good."  *United States ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009); *see also* 31 U.S.C. § 6303 (noting that an executive agency must use a procurement contract when, *inter alia*, its "principal purpose . . . is to acquire . . . property or services for the direct benefit or use of the United States Government.").  Instead, the government receives an "intangible" benefit of the bargain by "award[ing] money to eligible deserving small businesses."  *Longhi*, 575 F.3d at 473.  This benefit is lost, despite work performed by the awardee, if the awardee is not eligible and deserving and obtains grant funding by false representations.  *See id.*; *United States v. Anghaie*, 633 F. App'x 514, 519 (11th Cir. 2015).

Courts have applied this principle in the criminal restitution context.  In *United States v. Aldissi*, 758 F. App'x 694 (11th Cir. 2018), the district court ordered the defendants to pay thirteen victim agencies $10,654,969.00, which constituted the aggregated total amount of SBIR and STTR funds that were actually awarded by those agencies.  *Id.* at 710-11, 714.  On appeal,

- 16 -

> Defendants concede[d] that they forged letters of support; misrepresented their eligibility for funding; lied about their relationships with the research institutions and commercial partners, number of employees, facilities, their access to lab space and equipment; and fabricated price quotes from consultants and subcontractors that they never used or intended to use. Nevertheless, they maintain[ed] that the government received exactly what it paid for: license-free access to technical data. Defendants argue[d] that they always intended to perform, and actually did fully perform, as evidenced by their research projects that were published in peer-reviewed scientific journals.

*Id.* at 701.

In other words, the defendants in *Aldissi* made the same argument as Nayak, *i.e.*, "the restitution amount [wa]s miscalculated because the agencies received the benefit of their bargain and that to further impose restitution would essentially result in a windfall to the agencies." *Id.* at 714. The United States Court of Appeals for the Eleventh Circuit disagreed, finding that "[t]he government did not get what it bargained for" because the defendants' fraudulent conduct deprived the agencies of their "ability to consider and award money to eligible deserving small businesses that could realistically bring a product to commercialization." *Id.* at 713-14 (emphasis omitted); *see also United States v. Jha*, 613 F. App'x 212, 215 (4th Cir. 2015) (per curiam) (rejecting the restitution argument that there was no loss where the defendant "provided technical research reports in exchange for the award of grant money" because, *inter alia*, "the grant money was not paid to [the defendant] in exchange for his research reports, but rather to promote collaborative research between small businesses and research facilities.").

The circumstances of this case are somewhat distinguishable from those of *Aldissi* because the defendants in that case were ineligible and unqualified for the grants they received. *See Aldissi*, 758 F. App'x at 713. But this distinction is largely one of degree. ScienceTomorrow and QMetry may have been eligible for their awards, but Nayak overstated

the qualifications of the companies as they related to the projects at issue. QMetry falsely represented that it had a partnership with a soil science professor at the University of Kentucky. And ScienceTomorrow proceeded as if it had a subcontract with the University of Tennessee through which Dr. Joy, a world-renowned scientist, would oversee approximately thirty percent of the work compensable under the Phase II DOE grant. These qualifications-based representations are significant, as they ostensibly inflated both the scientific research potential and commercialization potential of the relevant projects. Along these lines, Oliver and Richards each indicated that their agencies considered project teams when making grant funding decisions.

The *Aldissi* defendants were also "unintended recipients" of their grants "because they were lying to receive the award[s]." *Id.* at 713 n. 13. This is consistent with the evidence from Oliver and Richards that the DOE and EPA would not have awarded funding to Nayak's companies had they known he lied in the respective applications.

Moreover, many of the SBIR/STTR application misrepresentations in *Aldissi* were similar to those in this case. The defendants in *Aldissi* "forged letters of support using cut and paste methods and Photoshop," "falsely inflated price quotes from consultants and subcontractors they did not intend to use and, in fact, did not use," and "mischaracterized their relationships with research institutions and commercial partners." *Id.* at 699. Here, ScienceTomorrow forged a letter of commitment from the University of Tennessee, inflated the university's proposed provisional budget, and generally mischaracterized the extent of its relationship with the university and Dr. Joy. QMetry likewise misrepresented a partnership with the University of Kentucky and its soil science professor.

- 18 -

These similarities further indicate that the principle described above should apply. The DOE and EPA did not receive the benefits of their bargains because they were deprived of the ability to award the relevant funds to other eligible and deserving small businesses. Thus, Nayak will be accountable for the full amounts of the relevant DOE and EPA awards.

But even if the Court were to consider tangible benefits conferred on the DOE and EPA, those benefits would be negligible. The declaration of Oliver and testimony of Richards suggest that the victim agencies do not view the work performed on the QSED and PFAS projects as having significant value, inasmuch as the projects' scientific results are suspect due to Nayak's evident willingness to engage in fraudulent conduct to obtain the funding awards. Of course, the defendant has testified that his application misrepresentations did not affect the substantive research on the projects, and Willis and Snyder offered some support on this issue to the extent of their limited involvement with Nayak's companies. However, the DOE and EPA's concerns about the veracity of the results are reasonable. And the publicly known fact that the SBIR funds were obtained by false pretenses could deter parties from utilizing any reports and/or data generated during the projects, thereby reducing any value the work may have.

Similarly, there is little indication that the DOE, EPA, or any third-party entity (commercial or otherwise) is particularly interested in using the results produced by the QSED and PFAS projects. For example, Oliver is aware of only one inquiry regarding the QSED project's final technical report, and that inquiry came from the DOE's own OIG (presumably in connection with the criminal proceedings against Nayak and Agrawal). This is true despite the fact that the QSED project final report was published nearly *six years ago*. And while

Nayak testified regarding some previous interest in both projects, he did not provide any specific details such that the Court could conclude that this interest is (or was) significant.

Finally, there is the issue of value in the patent rights that the government retains in the QSED (and potentially PFAS) project. Those rights, while limited, may have some value consistent with Willis' testimony. But neither Willis nor any other witness quantified that value. And the government's ostensible lack of substantive interest in the projects would appear to render the current value of these patent rights insignificant.

In summary, the Court concludes that the amount of loss for restitution purposes should equal the amount of funding awarded to ScienceTomorrow for Phase II of the QSED project ($999,266.00) and QMetry for Phase I of the PFAS project ($100,000.00). Despite the work performed on these projects, the victim agencies did not receive the benefit of their relevant bargains. And even if the Court were to consider tangible benefits conferred on the agencies through performance of the projects, the value of those benefits would be negligible. Accordingly, the defendant shall owe in restitution $999,266.00 to the DOE and $100,000.00 to the EPA.

### IV.  Method of Payment

The defendant's financial circumstances discussed above demonstrate that he currently has a limited ability to pay restitution and that this will likely be the case for the foreseeable future. Mindful of this issue, restitution shall be paid in accordance with a monthly installment payment plan established upon the commencement of his term of supervision and after receiving additional input from the United States Probation Office regarding Nayak's resources and ability to pay during the period of supervison.

Additionally, the Court observes that the United States Court of Appeals for the Sixth Circuit has upheld an order for joint and several liability between a defendant and other defendants in a companion case that "involved the same home health agencies, the same type of crime, the same co-conspirators, and was overseen by the same judge." *United States v. Eggleston*, 823 F. App'x 340, 347-48 (6th Cir. 2020). Nayak's circumstances are comparable in that Agrawal has been convicted for the same ScienceTomorrow conduct in what is essentially a companion case before the undersigned, No. 5: 21-cr-047-DCR. Thus, Nayak will be jointly and severally responsible with Agrawal for the $999,266.00 owed to the DOE, subject to rulings on any objections by Agrawal, who has yet to be sentenced.

## V. Conclusion

Based on the foregoing, it is hereby

**ORDERED** as follows:

1.      Defendant Subhadarshi Nayak shall pay $999,266.00 in restitution to the United States Department of Energy. This restitution obligation shall be imposed jointly and severally with that of Defendant Jyoti Agrawal, No. 5: 21-cr-047, and subject to rulings on any objections that Agrawal may successfully pursue during her sentencing proceeding.

2.      The defendant shall pay $100,000.00 in restitution to the United States Environmental Protection Agency.

3.      The Court finds that the defendant has limited means to pay his restitution obligations. Therefore, the Court will impose a monthly installment payment schedule upon the commencement of Nayak's term of supervision.

4.      An Amended Judgment consistent with this Memorandum Opinion and Order shall issue forthwith.

Dated:  May 5, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky