1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION AT LEXINGTON


 3                              - - -

 4   UNITED STATES OF AMERICA,      .   Case No. 5:20-CR-144
                                    .
 5            Plaintiff,            .
                                    .   Lexington, Kentucky
 6         - v -                    .
                                    .   Monday, December 13, 2021
 7   SUBHADARSHI NAYAK,             .   1:00 p.m.
                                    .
 8            Defendant.            .
                                    - - -
 9
                  TRANSCRIPT OF SENTENCING PROCEEDINGS
10              BEFORE THE HONORABLE DANNY C. REEVES
                 UNITED STATES DISTRICT COURT JUDGE
11
                              - - -
12

13   For the United States:      TASHENA A. FANNIN, ESQ.
                                  Assistant U.S. Attorney
14                                United States Attorney's Office
                                  260 West Vine Street, Suite 300
15                                Lexington, Kentucky  40507

16   For the Defendant:          PATRICK F. NASH, ESQ.
                                  Nash Marshall, PLLC
17                                129 West Short Street
                                  Lexington, Kentucky  40507
18
     Court Reporter:             LINDA S. MULLEN, RDR, CRR
19                                Official Court Reporter
                                  101 Barr Street
20                                Lexington, Kentucky  40507

21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23

24

25
```

```
 1        (Proceedings in open court, December 13, 2021, 1:00 p.m.)
 2        THE COURT:  Thank you.
 3        Madam Clerk, would you call the matter scheduled for 1:00,
 4   please.
 5        THE CLERK:  Yes, Your Honor.  Lexington Criminal Action
 6   Number 20-144 United States of America versus Subhadarshi
 7   Nayak, called for sentencing.
 8        THE COURT:  Thank you.  Would counsel state their
 9   appearance please.
10        Ms. Fannin.
11        MS. FANNIN:  Good afternoon, Your Honor.  Tashena Fannin
12   for the United States.  And directly behind me are EPA OIG
13   agents, Special Agent Jimmie Culbreth and Special Agent DOE OIG
14 ^ Sarah Hendricks.
15        THE COURT:  All right.  Thank you.
16        Mr. Nash.
17        MR. NASH:  Good afternoon, Your Honor.  Patrick Nash, and
18   to my right is Mr. Nayak.
19        THE COURT:  Thank you.
20        This matter is scheduled for a sentencing hearing this
21   afternoon.  Previously, there was a motion to continue
22   resolution of the issue of restitution in the case with the two
23   identified victims, and that motion has been sustained.  So we
24   will not be determining finally today the issue of restitution.
25   But, of course, matters regarding the loss amount are outlined
```

1   in part in the -- not only in the plea agreement, but also in

2   the presentence report, and the parties may certainly refer to

3   those matters during the course of the hearing.

4        There were a couple of objections made to the presentence

5   report, but they do not affect the guideline calculations and

6   it's not necessary that the Court further address those issues

7   as outlined in the addendum to the report.

8        Let me begin by asking Mr. Nayak if he's had the

9   opportunity to review his presentence report and to discuss it

10  with his attorney.  Is that correct, Mr. Nayak?

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  Mr. Nayak, your presentence report will be

13  filed in the record under seal.  It's available if the parties

14  should need it for any reason, but it's not available for the

15  general public to review.

16       And you can be seated.  Thank you.

17       Inasmuch as there are no objections that affect the

18  calculation of the guidelines in the case, I will adopt the

19  findings contained in the report, as well as those

20  calculations.  I will review those with the parties in just a

21  moment.

22       Before I do so, let me remind counsel that if there are

23  any additional factors that you would like to call to my

24  attention that are relevant to sentencing under Title 18,

25  Section 3553, please do so during allocution in the case.

1          I'll also note for the record, I have received the

2     sentencing memorandum filed on behalf of the defendant.  It

3     does have a number of emails attached, and I have reviewed

4     those materials.

5          Mr. Nash, I think you know that if you want me to address

6     the specific matter in any of those attachments, if you will

7     call that to my attention, I'll certainly do so at your

8     request.

9          MR. NASH:  Yes, sir.

10          THE COURT:  All right.  Now, turning to the presentence

11     report.  The guideline calculations in this case begin at

12     page 7, paragraph 31 with the manual that's been applied in the

13     case.

14          Technically, there is a 2021 guideline manual.  It does

15     not have any changes to the calculations.  There's not been a

16     quorum of commissioners of the sentencing commission since the

17     2018 manual was adopted.  And so there is some updated

18     information with regard to some statutory and guideline

19     provisions, but there is no changes.  So the 2018 manual is

20     effectively used in the case.

21          The base level in this matter is a level 7.  There is a

22     12-level increase based upon the amount to which the parties

23     have agreed, being between $250,000 and $550,000.

24          There is also a two-level reduction based upon the

25     defendant's role in the offense as being a minor participant

1    under 3B1.2 of the sentencing guidelines.

2        There is also a three-level reduction shown for acceptance

3    of responsibility.  Before the Court may apply the third level

4    of acceptance credit under Section 3E1.1(b) of the sentencing

5    guidelines, it does require a motion from the United States.

6        Ms. Fannin, are you making that motion at this time?

7        MS. FANNIN:  Yes, Your Honor, I am.  If I may go ahead and

8    dismiss, pursuant to our plea agreement, Counts 4 through 15 as

9    well, Your Honor.

10       THE COURT:  All right.  Well, first, the motion for the

11   third level of acceptance credit is sustained, and that has the

12   effect of reducing the total offense level in the case to a

13   level 14.

14       The United States' motion to dismiss other counts, with

15   the exception of the counts of conviction as to this defendant

16   will be sustained, and that will be effective upon entry of the

17   judgment in the case.

18       The information regarding criminal history is contained in

19   part B of the report.  Mr. Nayak does not have any criminal

20   history points, and that would place him in Criminal History

21   Category I for purposes of calculating his nonbinding guideline

22   range in this case.

23       And it would be for a range of incarceration, based upon a

24   total offense level of 14, Criminal History Category I, it

25   would constitute a range of 15 to 21 months under the

1  guidelines.

2      The range for supervision in the case is a range of one to

3  three years, with three years being the maximum period of

4  supervision that could be imposed in the case.

5      The fine range in the case is contained in paragraph 83.

6  The bottom of the fine range is $7,500, which is determined

7  according to the total offense level.  The upper end of the

8  range is two times the loss amount that is set forth in the

9  report, which is listed in paragraph 27, $305,181.11.  And then

10  two times that amount would be the upper end of the fine range,

11  which would be $610,362.22.

12      Again, the issue of restitution for the two identified

13  victims has been delayed at the request of the parties and has

14  been scheduled for further hearing.  But those are the

15  guideline calculations that have been adopted in this case.

16      So we've addressed additional counts.  Are there any other

17  motions to be taken up before we proceed with allocution in the

18  case?  Ms. Fannin, anything by the government?

19      MS. FANNIN:  None for the United States, Your Honor.

20  Thank you.

21      THE COURT:  Mr. Nash, in your sentencing memo, I know

22  toward the end of your memo, you have essentially requested

23  what I would call a hybrid request, which would be a part

24  variance, and then essentially a one-level variance under the

25  guidelines, which would then place the defendant in Zone C for

1   purposes of imposing perhaps a split sentence in the case.

2        I understand that to be the nature of your request,

3   although not captioned as a motion, would effectively be a

4   motion for a variance, I believe, in this matter.

5        MR. NASH:  That's accurate, Your Honor.

6        THE COURT:  All right.  Thank you.

7        We will proceed with allocution.  Mr. Nash, I'll hear from

8   you first.  And Mr. Nayak, if you would like to add anything

9   after your attorney has spoken on your behalf, you may do that

10  as well.

11       Mr. Nash.

12       THE DEFENDANT:  Thank you.

13       MR. NASH:  Thank you, Your Honor.  I know Your Honor has

14  read the sentencing memorandums and the materials attached.  I

15  just it would like to hit some of the highlights, if I may.

16       THE COURT:  Yes, sir.

17       MS. FANNIN:  You know, Mr. Nayak, Subu, we call him Subu,

18  is 49 years old.  And I would submit to the Court that for much

19  of his life, he has demonstrated some very good qualities, some

20  admirable qualities.  He has an intense intellectual curiosity

21  and a respect and places a high value on education and pursuing

22  intellectual endeavors.

23       He has been a tireless worker throughout his life.  He

24  has -- and particularly, once he started his career after his

25  education, he had a very strong commitment which remains to

1   intellectual and research endeavors that he perceives to be

2   beneficial to really to society as a large -- at large,

3   especially environmental issues and issues in that area.

4        The letters indicate that, you know, if you're his friend,

5   if you're his family member, friend, particularly friend, you

6   know, he has a very strong commitment to his friends.  He's

7   described as kind and compassionate to the people that are

8   close to him.

9        You know, throughout his career, he has worked in several

10  industries and has done some valuable research in some areas

11  that are important.  For instance, he's done work in areas that

12  would allow manufacturing processes to be done without the use

13  of lead, therefore minimizing lead in the environment.

14       He's worked to minimize organic pollutants throughout the

15  manufacturing process and minimize those on the environment.

16  He's worked on making airplane parts safer and better.  He's

17  worked on soil decontamination projects.  Those are just a few.

18  But certainly, he has done worthwhile work throughout his life.

19       But as he got into his 40s and his mid 40s there, as I

20  described in the sentencing memorandum, he lost his way.  It's

21  kind of hard to put a finger on exactly how and when that

22  happened.  It certainly happened in the midst of a really ugly

23  divorce that included child custody proceedings and just, you

24  know, the whole spectrum there of things that can be bad as

25  part of a divorce.

1      You know, he's always had this very intense desire to be

2 able to research and be able to work on these projects.  And

3 certainly that burning desire, I submit to the Court, played at

4 least some role in his going too far and losing his way.

5      He got to the point where it was more difficult for him to

6 obtain the projects that he was wanting to work on and so he

7 took shortcuts.  He put falsities in his grant applications and

8 committed fraud, and he just went off the rails.

9      He has asked me to express, and I think he probably will

10 express in his own words, how embarrassed he is, how sorry he

11 is, how remorseful he is of his conduct, and the turn his life

12 has taken based on his own choices.  He fully accepts personal

13 responsibility for what he did and the blame for what it did is

14 his, and he knows that.

15      I think and I submit to the Court that it is hopeful and

16 encouraging that, you know, his thoughts now are what his life

17 is going to be like after this case is over with.  And again,

18 he continues to turn his thoughts towards trying to make things

19 better.

20      He's very interested most recently in these -- researching

21 these agricultural practices that minimize carbon emissions.

22 He remains interested in remediating polluted soil.

23      He is sort of -- his thoughts and his plans have returned

24 somewhat to his native India.  He thinks a lot about the youth

25 and how to encourage his passion of education in a newer

generation, especially studies of environmental issues and
sustainability and self-reliance.  So those are all things that
he really wants to use his talents and his education towards in
the future when this case is behind him.

As Your Honor mentioned, we are requesting, based on the
history and characteristics of Subu, that you consider the
variance that we have suggested, and that would allow you, if
you were to grant that request, sort of the split sentence idea
of Zone C.

If Your Honor is contemplating the propriety of an
incarcerated sentence, perhaps consider splitting that
incarcerated sentence so that half of it would be spent on home
incarceration rather than in an institution.

The last thing we mentioned, Your Honor, and then I'm
going to mention our sentencing memorandum, was a
self-surrender date.  He is enrolled in an MBA.  You know,
going back to his intellectual curiosity and sort of constant
pursuit of education, he is enrolled in an MBA program that
he's been in since spring of 2020.  He's gone through six
semesters of that, and he is due to complete it at the end of
April.

And I know that's a more -- you know, if Your Honor is
considering a self-surrender date, that would certainly be an
extended one.  If he could obtain a self-surrender date, I
think the last day that -- the day he would graduate would be

1   April 21st.  Make that request of Your Honor to think about, a

2   self-surrender date after April 21st, that would allow him to

3   finish that MBA program.

4        And Subu has written his own statement.

5        THE COURT:  I do have two questions for you before I hear

6   from the defendant.

7        MR. NASH:  Yes, sir.

8        THE COURT:  One relates to the self-surrender date and

9   then the other relates to an issue of restitution.  And it's

10  really tied to one of the 3553 factors.

11       3553(a)(7) indicates that the Court should consider -- in

12  determining a particular sentence, should consider the need to

13  provide restitution to any victims of the offense.

14       And the suggestion you've made essentially for a split

15  sentence would allow the defendant to begin working sooner

16  toward paying off the restitution amount, which hasn't been

17  determined yet, but based upon the loss amount, it would seem

18  to be a fairly significant number.

19       So that would be one issue.  And that is, we have a

20  defendant that's spending time getting his MBA, and that's

21  great, but he really needs to be working, getting himself in a

22  position where he can pay off this restitution.  Education is

23  great and it should be encouraged.  But at this point, I'm

24  looking toward the defendant to make a pretty significant dent

25  in the amount of restitution that's going to be owed in the

1   case.

2        So that's one issue.  And that is if I do shorten the

3   sentence, even with a split sentence, it does give the

4   defendant the opportunity to pay his restitution.  But if he's

5   just going to be going to school to get another degree, I'm not

6   sure that really satisfies Subsection (a)(7)., I suppose it

7   would be.  That's the first issue.

8        The second is, in terms of a delayed report date, I

9   believe that related case involving the defendant's ex-wife is

10  currently scheduled for trial, I believe the week of

11  April 18th.  I don't know if the defendant intends to testify

12  or be involved in that case, but that would be another reason

13  to delay the report date.  If, in fact, you would expect that

14  he would be testifying in the case.  That might be another

15  reason to delay the report date perhaps to June 1st in this

16  matter.

17       MR. NASH:  So starting with the second point first, Your

18  Honor.  He has not yet received a subpoena from either side.

19  So you know, whether he's going to be a witness or not --

20       THE COURT:  So that's not really a factor.

21       MR. NASH:  -- remains to be seen.

22       THE COURT:  All right.

23       MR. NASH:  Certainly there is that possibility.  But I

24  can't represent to the Court that he's scheduled to be a

25  witness.

1      THE COURT:  Right.

2      MR. NASH:  On the first issue, Your Honor, I would say two

3  responses really.  Number one is, the MBA program that he's

4  doing is an online program, so it's something that he does at

5  night.

6      THE COURT:  Maharishi University.

7      MR. NASH:  Which is based in Iowa.

8      THE COURT:  Uh-huh.

9      MR. NASH:  So he's been doing that online.  And he has

10  been working at -- now what he's been working at mostly is Door

11  Dash.

12      THE COURT:  Right.

13      MR. NASH:  And I can tell the Court that almost every time

14  I call him, since his guilty plea, he's on the road making some

15  deliveries.  So he is working.  Now, is that the maximum

16  employment that he can get?  I'm sure it's not.

17      And I know that he does intend to make every effort,

18  whatever restitution we're able to determine and the Court

19  ultimately imposes, he is committed to doing everything he can

20  for that.

21      And you know, completing the MBA on some level could make

22  him more employable at a better level, if he could have a

23  couple more, three or Four months to complete that.

24      THE COURT:  Yes, sir.

25      MR. NASH:  So I understand the Court's concern there, and

1    that would be my response.

2         THE COURT:  All right.  Thank you.

3         Mr. Nayak, if you would like to add anything to what

4    Mr. Nash has said on your behalf, you can certainly do so at

5    this time.

6         THE DEFENDANT:  Yes.

7         THE COURT:  Do you have a statement that you want to read

8    from?  If you're more comfortable being seated as you read

9    that, I might be able to hear you a little bit better, closer

10   to that microphone.

11        THE DEFENDANT:  Thank you, Your Honor.  I have a statement

12   I would be more comfortable to read.

13        Since childhood, I struggled to find meaning in anything I

14   do.  When I started science,  started to learn about Big Bang,

15   understanding that the observable universe is 46 billion light

16   years big.  I find it hard to believe anything that I do has

17   any consequence.  If I, this building, this continent or this

18   planet, for that matter the solar system disappears at this

19   moment, it won't even cause a ripple in the universe.

20        Those kind of thoughts disturb my mother.  She was barely

21   schooled but very well self-taught, self-educated.  She used to

22   take care of us, used to cook everything from scratch.  And the

23   way she resourced, cooked and served us food and took care of

24   us with other things going on in our family.

25        She used to call Satyam Sivam Sundaram - bona fide,

1   beneficial, beautiful.  She inspired me to create something,

2   that is Satyam Sivam Sundaram.  We are what we create.  I was

3   driven in my life, throughout my life by this mantra.

4       Almost exactly 21 years ago, I had the distinctive

5   opportunity to see atoms.  At the University of Tennessee,

6   during my first semester of graduate program, I had the

7   privilege to work on a new microscope in Professor David Joy's

8   lab.  With a laser beam and with the microscope nano-beam, I

9   poked and prodded and played with atoms for hours.  I was

10   entranced by that vision and experience and I still remember

11   that vividly today.

12       Perhaps I came to the US for that kind of opportunities

13   and privilege.

14       The phrase, rather the cliche "standing on the shoulders

15   of giants" had a deeper and new meaning for me from that day.

16       Since that day, I thought that my personal identity, my

17   personal calling lies in science and research.  Science and

18   research have been my mainstay and essence of my existence.  I

19   was proud to embrace my personal calling.  I had the

20   opportunity to create something real, something valuable,

21   something beautiful, what my mother used to call Satyam Sivam

22   Sundaram.

23       That pride morphed into vanity.  I came across a Latin

24   phrase, obit surfeit vanitatis, which means death by surfeit,

25   vanity.  I have squandered my opportunity and privilege with

1 | this vanity.

2 |     With this conviction, I bid farewell to that self, that
3 | identity, that ego.  I will never be able to do scientific
4 | research.  Over the last year or so, I have come to terms that
5 | I cannot get a respectable engineering job either.

6 |     I understand with the label of convicted -- convicted
7 | criminal, perhaps it will be impossible to get a teacher's job,
8 | the last refuge of science.

9 |     Santiago, in the book Alchemist, was thinking about the
10 | sheep.  Most of that start to stir when he wakes up.  Santiago
11 | thought that these animals are so used to him that they know
12 | his schedule.  Then it occurred to him that it could be the
13 | other way around, that it was he, Santiago, who learned to
14 | become accustomed to their schedule.  My vanity kept me from
15 | accepting this truth.

16 |     Instead of getting accustomed to the outcome, I was
17 | forcing the project outcome to get accustomed to my desire.
18 | And I was not transparent about it.

19 |     I wanted very little.  I needed very little.  All I wanted
20 | was to be needed.  I grew up learning to be happy and fulfilled
21 | with very little, by doing, not by having.  Somewhere I buried
22 | that wisdom, the wisdom that creation and creator are
23 | inseparable.

24 |     The foundation of quantum physics is based on particles
25 | and electrons, also create a probability cloud.  The atoms that

1   we see on a microscope are actually mathematical presentations
2   of probability of encountering electrons in space.
3       When I was working on the electron technical project, I
4   understood that electrons are inseparable from that waveform
5   they fear.  The creation is inseparable from creator.
6       My vanity, my ego separated me from and prioritized me
7   over what I was expected to prepare.  My need to be needed
8   became my greed to be needed.  I allowed my pride, my purpose,
9   my passion, my personal calling to prevail in my principles.
10      I have stopped taking Adderall.  I resumed daily
11  meditation practice.  I am enrolled in the MBA program with
12  sustainability focus.  I resumed my reading habit.  I dig
13  garden when possible.  I went through yoga teachers training
14  and I am continuing my yoga journey.
15      During countless hours driving for Door Dash or dicing
16  onion at my current job, I have done deep soul search.  With
17  the death of my previous identity, I accept my refined personal
18  calling, to fear something, that is satyam sivam sundaram,
19  something that is pure, productive and pleasant.
20      I am a convict.  It's not my place and it is very above my
21  paygrade to ask you what to do.  I am confident that your
22  wisdom and discernment will lead you to a judgment that will be
23  satyam sivam sundaram.  Whatever you decide here today, in the
24  fire I shall forge, will glitter like gold.
25      THE COURT:  Thank you.

1      Ms. Fannin.

2      MS. FANNIN:   Thank you, Your Honor.   To respond initially

3  to the question of restitution that you posed, as well as the

4  need for him to testify at the follow-on trial, we do plan to

5  subpoena him at this point.   That may change for strategic

6  reasons, but for what it's worth, standing here today, I plan

7  to subpoena him.

8      THE COURT:   All right.   Thank you.

9      MS. FANNIN:   Also, with respect to restitution, there has

10 been a certain amount seized in this case.

11     THE COURT:   127,000?

12     MS. FANNIN:   Yes, Your Honor.   On the fence, but I do know

13 that having an MBA would make him more marketable thereafter.

14 And I think all victims understand that restitution is going to

15 be a very long-term situation, potentially, Your Honor,

16 depending on what loss is determined.

17     That said, the United States does still believe that a

18 guideline sentence, in full concurrence with the details and

19 calculations presented by probation in its PSR, is necessary

20 but not any more than is sufficient in this case.

21     And I would like to also credit probation for going

22 through a large amount of data in a very efficient time to get

23 this to paper and us finding very -- well, zero unresolved

24 issues over that PSR, Your Honor.

25     Also support, of course, probation's recommendation that

1    restitution is mandatory, and appreciate the Court scheduling

2    this sole unresolved issue overall to be heard at a later date,

3    for the victim's benefit especially.

4         I don't know if the government -- if the Court wants to

5    hear the logic behind the loss amount, but suffice it to say

6    that the loss amount that was determined in this case by

7    working together -- thank you, Mr. Nayak, for being so good

8    across the aisle and working together on this -- I feel like

9    this was a very difficult but very professional plea that we

10   met with and I really appreciate his cooperation in coming

11   forward.

12        THE COURT:  Well, it certainly saved the government a

13   significant amount of time and money.

14        MS. FANNIN:  Yes, Your Honor, that is an understatement.

15        But that being said, I wanted to shed some light on the

16   color of that amount.  And then also the mitigating role, that

17   the government decided to reduce the overall level as a result.

18        So of course, there is a forensic accountant in this case

19   that works with the DOE.  And the logic was essentially because

20   Dr. Nayak was a part of this conspiracy on the front end, it

21   was a difficult situation to determine what loss was on the

22   front end for the DOE project.  How do you determine what was

23   lot when he was only in the conspiracy, per se, for a few

24   amount of months?  And not much of the money was even drawn

25   down from DOE prior to his leaving or being fired from this

1    project.

2         THE COURT:  So he's in the project, initially he gets

3    fired by his ex-wife for '14 to '16, he gets rehired as a

4    consultant at some point later on but a significant amount of

5    loss occurs during that period of time.

6         MS. FANNIN:  Your Honor, it's -- what the forensic

7    accountant essentially determined was he gained very little

8    from the whole course of this, perhaps around 30K total for a

9    million dollar contract, a contract that Science Tomorrow

10   relied on to get an additional grant for additional 500,000.

11   So a $1.5 million DOE grant.  The benefit that he actually

12   incurred from that being significantly less overall.

13        So we determined a loss amount, because he was involved on

14   the front end.  We projected, you know, the difference

15   between -- there are many ways we could do this, but the

16   projection was because there was a legitimate letter, had they

17   just settled with that letter, then he may not be sitting today

18   for that charge.

19        However, because there is a fabricated letter and he

20   admitted to not bringing that DOE's attention and also not

21   returning any money, what we did was project the difference

22   from the original out toward the total amount of contract that

23   was granted.

24        THE COURT:  That's the University of Tennessee portion of

25   this?

1          MS. FANNIN:   Correct, the subcontract.   But the

2     subcontract is the largest part of the overall grant.

3          And so had they just stuck with the first letter,

4     conceivably, right?   I can't -- obviously, nobody here from DOE

5     is going to say we would have issued X amount had they just

6     stuck.   But logically, for the purposes of determining a

7     sentencing loss for Mr. Nayak sitting before you here today, we

8     decided to project that out, more than likely, the grant would

9     have been about $260,000 less overall.   So that's how we came

10    to a reasonable assessment for the loss amount for Science

11    Tomorrow and then also the minor participant role.   It's much

12    easier to calculate the loss amount on the EPA side because it

13    wasn't a grant.   It was his own company 100 percent of the

14    time.   It was just him sitting there doing this.   And from the

15    very onset, saying he had a partnership with UK when he did

16    not, and that that professor was tasked to do X, Y and Z when

17    she was not.

18         And then, however, under the *Kozerski* case, in a contract,

19    if you give the defendant -- it's a Sixth Circuit case, Your

20    Honor.   When you're determining loss, you inure to the benefit

21    of the defendant any legitimate expenses that did go towards

22    that contract.   And arguably there were legitimate expenses.

23    It's just that he certified at the end that everything was

24    spent as the contract said as all these claims said, when it

25    was in fact not.   There's a little bit of a simpler case, but

1   so you understand a little bit of the color and the logic

2   behind where we fell, that's why.

3          THE COURT:  All right.  Thank you.

4          MS. FANNIN:  So with respect to 3553(a) factors in this

5   case, the nature and circumstances of the offense, the Court

6   has plenty of facts that are not disputed with respect to

7   Mr. Nayak.

8          But this is a white collar fraud case.  It is nonviolent,

9   Your Honor.  It's a financial deception case.  In fact, there's

10  even evidence that Mr. Nayak, as I said, made some, albeit

11  legitimate, little legitimate efforts in his work, he did make

12  those efforts on the projects in issue.  And we feel that we

13  have given him credit with respect to for our loss calculation

14  for that.

15         He knew the rules, he broke them.  He knew the laws, he

16  violated them.  But what is significant, I think, that weighs

17  in favor of a guideline sentence is while he was in his role in

18  Science Tomorrow, is minor, he went on to submit what I would

19  say is more egregious falsities in his second endeavor.

20         So it wasn't just an increase of an amount on a

21  subcontract in order to maximize a grant award.  He went on to

22  fabricate a partnership with the university and use a

23  professor's name that she was not aware was happening.  She

24  didn't even know what the details of the proposal were.

25         However, the history and characteristics of the defendant

1   certainly weigh in favor of the Court imposing a lesser

2   sentence in this case.  The United States understands the need,

3   you know, for a sentence to be imposed that must reflect the

4   seriousness of the offense, but also promote the respect for

5   the law.

6       In speaking with the victims, you routinely -- grant money

7   to support scientific and technological innovation in this

8   country, there is a trust between these agencies that these

9   scientists and these proposals, they're going to do what they

10  say they're going to do.

11      They're not questioning these proposals on the front end.

12  They find out later, like through OIG, that something is wrong,

13  then you face those consequences.

14      But there is a need to innovate.  There is a lot of money

15  spent and given to people who are just as qualified as

16  Mr. Nayak, more qualified maybe.  But bottom line is, these

17  agencies give a lot of money for this purpose.  And the

18  expectation, of course, is that everything they do is honest in

19  their dealings with this government money.

20      And to that effect, the biggest loss as these victims see

21  it, and while they are determining what the actual financial

22  loss is, they have advised that this money could have been

23  devoted to another innovative endeavor instead with folks who

24  abide by the law and do the work that they promise to do.

25      So there was another project, you know, right behind

1  Science Tomorrow's scan electron microscope project.  There was

2  another project standing in line waiting for funding right

3  behind his ^ P Fast Soil Science Project, right, that failed to

4  be funded.  So that's the loss that to society, Your Honor.

5      I think with respect to deterrence, the government has no

6  doubt that Mr. Nayak is not going continue in this vein.  It's

7  a general deterrence sentence that the United States is asking

8  for.  It's critical that others are deterred from this sort of

9  fraud, to know that when they certify that they are obtaining

10  and spending this money lawfully, that there is a criminal a

11  punishment for intentionally and through fraudulent means

12  violating these grant and contract agreements with U.S.

13  agencies.

14      Taking all these factors into consideration, among others

15  that have been taken into account, the government recommends

16  15 months' imprisonment, one year supervised release is

17  sufficient, no fine.

18      The government does not object to the request that

19  Mr. Nayak self surrender.

20      While there is no basis to support a downward departure,

21  the 15-month imprisonment is the lowest option still within in

22  the guideline range determined by probation.  I mean, it also

23  is in the mid-range of the highest Zone C that the defense is

24  asking for for a variance.

25      However, you know, understanding the Court may exercise

1    its discretion to consider the requested variance, if the Court

2    grants the variance, the United States would like to see the

3    sentence of imprisonment have some form of incarceration, Your

4    Honor.  I know it's difficult to find similar cases.  These are

5    so unique when it comes to fraud and grants and contracts and

6    the mixed bag that we have here.

7         I have seen no incarceration in some.  But it was also a

8    case that had no determined loss, whereas here we clearly have

9    a very high loss amount, Your Honor, relatively speaking.

10        So I would like to see a sentence of imprisonment be

11   adjudged.  If there is a grant of a variance for 18 months, and

12   then half of that potentially be imprisonment or some variation

13   of that, although not really opposed to a mixed bag.

14        He's not a violent criminal, Your Honor.  He has been

15   extremely cooperative.  No doubt he's not going to do this

16   anymore.  So the government is committed to the recommendation

17   of a guideline sentence in Mr. Nayak's case.

18        Thank you, Your Honor.

19        THE COURT:  All right.  Thank you.

20        Of course, the Court begins the analysis of an appropriate

21   sentence by considering the guideline range, but then also

22   consider the factors of 3553, and I do want to put this in some

23   context as I go through these factors.

24        The request by the defendant is what I referred to earlier

25   as essentially a hybrid sentence where the Court would consider

1  all of the factors that have been mentioned and arguments that

2  have been made, positive characteristics of the defendant.

3       And in doing so, if the Court were to go down one offense

4  level, I believe that would put the defendant in Zone C.  One

5  offense level would also, I believe, create a guideline range

6  of 12 to 18 months, if I am a remembering my numbers correctly.

7  Yes.  Offense level 13 would create a Zone C range of 12 to

8  18 months.

9       So is there support for that?  And if there is, then what

10  would be an appropriate sentence?  Because as I indicated,

11  effectively what's being argued by the defendant is a variance

12  first, and then essentially a split sentence under the

13  guidelines.

14       In this particular case, we do have, although undetermined

15  loss, we do have a significant loss amount.

16       We have a defendant that has some very positive

17  characteristics.  The first is he doesn't have any criminal

18  history.  Mr. Nash has heard me talk many times about how

19  important criminal history is when we look at issues of

20  recidivism.

21       Criminal history is the best indicator of whether a person

22  is likely to commit another offense once they are released from

23  any period of incarceration.

24       Of course, recidivism is a defined term.  Many people use

25  it differently.  But if we only look at issues of rearrest,

1    it's often used when we define recidivism and when we look at

2    statistical information, as I'm sure the defendant likes to do.

3         A person of his age and a person with no criminal history

4    doesn't have a strong likelihood of recidivism.  When we look

5    at the 2016 report, I think he's probably in the range of 30 to

6    33 percent likelihood of being a recidivist going forward.

7         Same thing for the age.  I think his age of 49 would be

8    about the same numbers, I'll look at those numbers here in a

9    moment.

10        I think really what we're dealing with here, so the risk

11   of recidivism is not great, and the type of offense committed,

12   while serious, individuals that commit these offenses don't

13   have a high recidivism risk going forward.  So that certainly

14   is to his benefit.

15        Let's look at some of the numbers now.

16        A person at sentencing, if we only look at the issue of

17   age at sentencing, that's 41 to 50 years, there's about a

18   36 percent chance of recidivism looking at only that factor.

19        Then if we look at individuals in Criminal History

20   Category I, the rearrest rates are almost 34 percent.  But then

21   individuals with no criminal history points, it's about

22   30 percent.

23        So all those factors would indicate that the defendant is

24   not -- there is not a strong likelihood -- certainly compared

25   with others that I usually see, there is not a strong

1   likelihood that he would reoffend.

2       He is also educated in the higher educational levels we

3   see, that's also an indication of lower risk of recidivism.  So

4   he does have a number of factors that are in his favor working

5   going forward.  And that certainly also addresses an issue of

6   3553, that is providing not only general deterrence but also

7   specific deterrence.

8       Another factor that weighs in favor of the request for the

9   slight variance that has been requested is the 3553 factor that

10   I mentioned to Mr. Nash earlier, and that is the need to

11   provide restitution to victims of the offense.  My concern is

12   that the longer that this defendant would have to serve a

13   period of incarceration, it would reduce his chances of being

14   properly employed, and also would reduce the ability of victims

15   in the case to receive significant restitution.

16       So my big concern at this point going forward is issues of

17   restitution.  I certainly do understand that the defendant is

18   currently underemployed, but I hope that does not continue.  I

19   hope that he's able to be employed in a position that certainly

20   would be suitable for his educational level and experience and

21   would allow him then to provide payments in restitution.

22       That fact, and the fact that the defendant has, I believe,

23   fully cooperated with the government to this point, he's

24   lessened the cost to the United States certainly.  The time and

25   expense in prosecuting the matter as it relates to him has

1   certainly been reduced as a result of his cooperation.

2        Now, it's true that he certainly gets credit for

3   acceptance of responsibility in the case, but you can also get

4   acceptance credit without the extent of cooperation that this

5   defendant has demonstrated.

6        So for those reasons, I do believe the defendant's request

7   for a slight variance, basically one-level variance, is

8   appropriate and it will be sustained.  So that places the

9   defendant in Zone C.  The guideline range is 12 to 18 months.

10        Now, what would be the appropriate sentence?  The United

11   States make some very good arguments in support of a higher

12   period of incarceration.  The question for the Court is whether

13   that would be sufficient but not greater than necessary to meet

14   all the factor of 3553.

15        Again, listening to the defendant, I do believe that he's

16   remorseful for his conduct.  It's not likely to be repeated.

17   While the nature and the circumstances of the offense would

18   certainly support the United States' argument, the history and

19   the characteristics of the defendant would support an argument

20   for a split sentence that has been advocated.

21        Would it reflect the seriousness of the offense and would

22   it promote respect for the law?  And would it also provide just

23   punishment?  I believe that it would.

24        I also believe that it would provide specific deterrence

25   for this defendant.  I am concerned about whether this would

1   provide general deterrence to others that might be inclined to

2   engage in similar conduct.

3       A split sentence in the range we're looking at here, if a

4   person believes that he or she may be able to acquire $300,000,

5   that someone may be willing to take a risk to do that.  I've

6   seen bank robbers take a bigger risk with a lot less to

7   benefit, others as well.  But that's just one example.  So that

8   does provide me some concern.

9       I do not believe that Mr. Nayak is in need of any type of

10  substance abuse treatment, medical care, or other

11  rehabilitative services that may be provided or should be

12  provided.

13      As I go down the factors of 3553, perhaps a split sentence

14  would be a bit of a disparity, but I also believe, again, that

15  it would provide the victims in the case with a greater

16  opportunities for restitution.

17      So when I consider all of those matters, as well as the

18  arguments that have been made by the defendant, I do believe

19  that it would be appropriate in this particular case to impose

20  a split sentence.  I also agree with the United States that

21  some period of incarceration is needed to satisfy that issue of

22  general deterrence.  Not just -- again, we talk about

23  deterrence, not only in general terms but also in specific

24  terms for the party that's appearing before the Court.  And I

25  do believe that a split sentence would be appropriate in this

1    particular case.

2        The other thing I will advise the parties I'm planning to

3    do in this case is I am going to provide for a delayed report

4    date of June 1st in this particular case, I don't know if

5    Mr. Nayak intends to or would testify voluntarily or by a

6    subpoena, whatever his position is, it is, it will be that.

7        But if does testify in the trial of the matter, which is

8    currently scheduled for April, and if it would be warranted,

9    then of course that would also give the Court the opportunity

10   to revisit some of these issues under Rule 35 if the government

11   makes an appropriate motion.

12       So that will give Mr. Nayak the greatest opportunity to

13   work, pay restitution and address those matters prior to the

14   time that he would be required to report for a period of

15   incarceration.

16       In terms of the period of incarceration, I'm going to go

17   to the bottom of that range that I just calculated of 12 to

18   18 months.  It's 12 months in Zone C when I look at 5C1.1, and

19   while that's not binding on the Court, guidelines are not

20   binding, 5C is not binding, but I do believe it would be

21   appropriate here, and it would be consistent with the request

22   that has been made by the defendant.  So I'll go to the bottom

23   of the range for all of the positive characteristics

24   demonstrated by the defendant.

25       Impose a split sentence, which would be six months -- it

1    will be a 12-month sentence, but six months would be

2    incarceration and then six months would be home detention.   And

3    I believe that that would a sentence that would be, first,

4    sufficient but not greater than necessary to serve all of the

5    purposes that I've outlined.

6        Also I do believe that a three-year period of supervision

7    would be appropriate in the case as well.

8        So for those reasons let me announce the sentence in the

9    case.

10       It will be the sentence of the Court pursuant to the

11   Sentencing Reform Act of 1984, as modified by the decisions in

12   *Booker* and *Fanfan*, and I do believe the following sentence

13   would be sufficient but not greater than necessary to comply

14   with the purposes of Title 18, Section 3553(a):

15       Therefore, it will be the judgment of the Court that the

16   defendant, Subhadarshi Nayak, will be committed to the custody

17   of the Bureau of Prisons to be imprisoned for, the total

18   sentence will be a term of 12 months, but it will be

19   satisfied -- and that will be as to Counts 1, 2 and 3, but it

20   will be satisfied by a split sentence under the guidelines with

21   six months being a period of incarceration and six months being

22   a period of home detention, which would be the first six months

23   of the term of supervision to be imposed in the case.

24       Upon release, the defendant will be placed upon

25   supervision for terms of three years on Counts 1, 2 and 3 all

1    to run concurrently, for a total term of three years.  Again,

2    the first six months of supervision will be home detention.

3        Within 72 hours of release from the custody of the Bureau

4    of Prisons, Mr. Nayak must report in person to the probation

5    office in the district in which he is released.

6        While on supervision, he may not commit another federal,

7    state or local crime.

8        He must comply with the mandatory and the standard

9    conditions adopted by the Court and that will be set forth in

10   the judgment and commitment order.

11       The drug testing condition that is ordinarily required by

12   Title 18 of the United States Code, Section 3553(a)(5) and

13   3563(a)(5) will be suspended based upon my determination that

14   Mr. Nayak poses a low risk of any substance abuse in the

15   future.

16       I will impose the following special conditions:

17       The first is that he will be required to provide the

18   probation office with access to any requested financial

19   information.

20       Next, he will be required to submit his person, as well as

21   any offices, properties, homes, residences, vehicles, storage

22   units, papers or computers, as well as any other electronic

23   communications or data storage devices, or media to a search

24   conducted by the United States Probation Officer.  The failure

25   to submit to a search would be grounds for revocation of

1    supervision.  And he must warn all occupants that his premises

2    would be subject to a search according to this condition.

3         Next, he may not incur any new credit charges or open

4    additional lines of credit without the approval of the

5    probation office, and unless he is in compliance with an

6    installment payment schedule that will be set by subsequent

7    orders of the Court.

8         As indicated earlier, the issue of restitution has been

9    deferred pursuant to Title 18 of the United States Code,

10   Section 3664(d)(5), and the Court will make a determination as

11   to restitution at that time and will outline the manner in

12   which restitution should be paid.

13        The defendant, Mr. Nayak, will be required to forfeit any

14   other interest that he might otherwise assert in the property

15   listed in the forfeiture allegation of the indictment.  It does

16   include, I believe, seven sums of money, and I'll list those in

17   just a moment.

18        Before I address the issue of forfeiture, I'll also note

19   for the record that I'm going to waive the requirement for

20   payment of a fine in the case.  Of course, Mr. Nayak will be

21   required to pay the special assessment of $100 per each count

22   of conviction, for a total of $300.  But I'm waiving the fine

23   in the case.

24        Under the provisions of 5E1.2(d) in the eight factors that

25   are listed, my overriding concern in this particular case is

1    payment of restitution, number one.  And number two, based upon

2    the financial information provided by the defendant, I do not

3    believe that at this time he would be in a position, or would

4    not be in a position during the period of supervised release to

5    pay a fine in addition to restitution.  So my overriding

6    concern is with restitution and the fine requirement will be

7    waived for that reason.

8         The items to be forfeited will include $360.53 seized from

9    Stanford Credit Union basic checking account.  I'm not going to

10   identify the checking account numbers, but they will be listed

11   in the judgment to be filed in the case.  That is the count for

12   Mr. Nayak.

13        Second would be $29,934.87 from the University of the

14   Kentucky Federal Credit Union, also a checking account in the

15   name of Science Tomorrow, LLC.

16        Third would be $63,293.93 from the University of Kentucky

17   Federal Credit Union, that's a business primary share account

18   ending -- I'll include these numbers in the judgment.  But it's

19   in the name of Science Tomorrow, LLC.

20        Fourth would be $24,923.88 from First Credit Union

21   business first checking account, also in the name of Science

22   Tomorrow, LLC.

23        Fifth would be $5.14 seized from First Credit Union

24   business savings account, also in the name of Science Tomorrow,

25   LLC.

1      And next would be $8,488.43 from the University of

2   Kentucky Federal Credit Union, basic business checking account

3   in the name of Qmetry.

4      And then finally, $25.02 from the University of Kentucky

5   Federal Credit Union business primary share account, also in

6   the name of Qmetry.

7      As indicated, I will set a report date for service of any

8   sentence that will be subject to intervening orders of the

9   Court.  And it will be set forth June 1st, 2022, prior to

10  2:00 p.m. on that date at the institution designated by the

11  Bureau of Prisons.

12     I'll also indicate in the judgment a recommendation that

13  it comply with Section 601 of the First Step Act regarding

14  placement of the defendant near his home, which would be

15  Lexington, Kentucky.

16     And that will be the judgment of the Court.

17     Also in the judgment that will be prepared and filed in

18  the case, I will note that the basis for the variance, the two

19  overriding factors that have caused the Court to impose a

20  one-level variance from the correctly calculated guideline

21  range would be, number one, the defendant's assistance to the

22  United States in saving significant costs and expenses incurred

23  in the prosecution of the case, which would otherwise be

24  incurred.

25     And number two would be 3553(a)(7) , the need to provide

1    restitution to victims in the case.

2        Those will be the two listed factors that are overriding

3    considerations for the Court.

4        Let's see.  I believe in the plea agreement there was a

5    little bit of a different language that was used with regard to

6    waiver, so let me turn to that document.

7        In paragraph-- let's see.  Paragraph 10.  In paragraph 10,

8    Mr. Nayak waived the right to appeal the guilty plea and

9    conviction, and also waived the right to appeal any

10   determination made by the Court at sentencing with the

11   exception that he reserved the right to appeal any aspect of

12   the sentence if the offense level as determined by the Court at

13   sentencing, after application of 3E1.1, meets or exceeds a

14   level 14.

15       In this particular case, the offense level did meet

16   offense level 14 prior to the variance downward one level.  So

17   I believe he has reserved the right to appeal any aspect of the

18   sentence in the case.

19       Do the parties agree with analysis, Mr. Nash?

20       MR. NASH:  You know, frankly the intent of this paragraph,

21   Your Honor, was that if the Court imposed a sentence that was

22   higher than what the guidelines computation agreed upon by the

23   parties in the plea agreement.

24       So whatever the language is in the plea agreement, that

25   was our certainly our intent when we negotiated this provision.

1          THE COURT:  All right.

2      Ms. Fannin.

3          MS. FANNIN:  Yes, Your Honor.  Poor choice of putting the

4  word "meets" in there.

5          THE COURT:  But I believe, based on this language of this

6  plea agreement, that he does have the right to appeal the

7  sentence in the case, or any aspect of the sentence.  Because

8  the guideline -- excuse me, the presentence report calculated a

9  final offense level of 14, he reserved the right to appeal the

10  sentence if the offense level calculated meets or exceeds 14,

11  it does meet 14.  And so I believe he does have the right to

12  appeal under those circumstances.

13          MS. FANNIN:  Even with the Court's determination of one

14  level downward?

15          THE COURT:  Because it refers to the way it's calculated

16  in the presentence report.  After application of 3E1.1, so we

17  look at the role adjustment in 3E1.1 -- actually, we look at

18  the role adjustment before acceptance of responsibility is

19  applied in the case.

20          So if we look at the specific language -- I'm sorry, 3E1.1

21  is the acceptance credit, it's not the role reduction.

22          After we apply the three levels for acceptance credit,

23  we're at 14.  And I believe he does have the right to appeal

24  under those circumstances, so I will ask the clerk to advise

25  him of his appellate right with regard to the sentence in the

1    case.

2         Now, before we do that, I'll ask for objections.  So I

3    usually ask three questions.

4         The first would be for the attorneys to state any

5    objections that they have to any of the findings in the case,

6    and that would also include the sentence that has been

7    announced and conditions of supervision.

8         Second would be any objections under *United States versus*

9    *Bostic*.  Under that case from the Sixth Circuit, any objections

10   not raised previously should be raised at this time so they may

11   be addressed by the Court to be properly preserved for review

12   on appeal.

13        Finally, if parties would like the Court to make

14   additional findings to support any of the matters that have

15   been announced here today, I'll certainly make those findings,

16   if requested.

17        Ms. Fannin, I'll begin with you first.

18        MS. FANNIN:  Your Honor, the United States has no

19   objections and really appreciates the Court's careful

20   consideration of all the factors in this case.

21        THE COURT:  All right.  Thank you.

22        Mr. Nash.

23        MR. NASH:  Your Honor, we have no additional objections

24   and do not request additional findings.

25        THE COURT:  All right.  Thank you.

1      Madam Clerk, if you would please advise Mr. Nayak of his

2  appellate rights with respect to the sentence in the case.

3      THE CLERK:  Yes, Your Honor.

4      (The form entitled "Court's Advice of Right to Appeal" was

5  read aloud in open court by the clerk.)

6      THE COURT:  Thank you.

7      Mr. Nash, if you wouldn't mind coming up and retrieving

8  the acknowledgment of rights that was just read?

9      Mr. Nayak, Mr. Nash is about to review with you the

10  acknowledgment of rights that was just read by the clerk.

11  Please take a moment to review that with Mr. Nash, and after

12  you have assured yourself you understand those rights, if you

13  could sign that original document?  There is a copy that you

14  can keep for your records as well.

15      Madam Clerk, if you could turn on the white noise, please.

16      THE CLERK:  Yes, Your Honor.

17      THE COURT:  Thank you.  Mr. Nayak, do you feel like you've

18  understood the reasons I've given for the sentence that's been

19  imposed in your case?

20      THE DEFENDANT:  Yes, Your Honor.

21      THE COURT:  All right.  Let's see if we have any other

22  issues that we need to take up before we recess until 3:00 this

23  afternoon.

24      MS. FANNIN:  Nothing from the United States, Your Honor.

25  Thank you.

1        THE COURT:  Mr. Nash?

2        MR. NASH:  Nothing further.

3        THE COURT:  All right.  Thank you.

4        (Proceedings concluded at 2:02 p.m.)

5

6                    C E R T I F I C A T E

7

8        I, Linda S. Mullen, RDR, CRR, do hereby certify that

9   the foregoing is a correct transcript from the record of

10  proceedings in this above-entitled matter.

11

12

13

14  /s/Linda S. Mullen              May 24, 2022
    Linda S. Mullen, RDR, CRR       Date of Certification
15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25