1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION AT LEXINGTON
                                - - -
 3
      UNITED STATES OF AMERICA,     : Docket No. 20-cr-144
 4                                  :
                         Plaintiff, : Lexington, Kentucky
 5                                  : Friday, April 8, 2022
                                    : 1:00 p.m.
 6    v.                            :
                                    :
 7    SUBHADARSHI NAYAK,            :
                                    :
 8                       Defendant. :

 9                                - - -
                      TRANSCRIPT OF RESTITUTION HEARING
10                     BEFORE DANNY C. REEVES
            UNITED STATES CHIEF DISTRICT COURT JUDGE
11                                - - -

12    APPEARANCES:

13    For the United States:     TASHENA A. FANNIN, ESQ.
                                 U.S. Attorney's Office
14                               260 W. Vine Street
                                 Suite 300
15                               Lexington, Kentucky 40507

16    For the Defendant:         PATRICK F. NASH, ESQ.
                                 Nash Marshall, PLLC
17                               129 W. Short Street
                                 Lexington, Kentucky 40507
18
      Court Reporter:            ELAINE S. HABERER, RPR
19                               Official Court Reporter
                                 101 Barr Street
20                               Lexington, Kentucky 40507
                                 (859) 469-7456
21

22

23

24
            Proceedings recorded by mechanical stenography,
25    transcript produced by computer.
```

2

1      (Proceedings held in open court at 1:00 p.m.)

2          THE COURT:  All right.  Thank you.

3      Madam Clerk, would you call the matter scheduled for

4  1:00, please?

5          COURTROOM DEPUTY:  Yes, Your Honor.

6      Lexington Criminal Action Number 20-144, United States of

7  America v. Subhadarshi Nayak, called for restitution hearing.

8          THE COURT:  Thank you.  Would counsel state their

9  appearances?

10     Ms. Fannin.

11         MS. FANNIN:  Good afternoon, Your Honor.  Tashena

12 Fannin for the United States.

13         THE COURT:  Mr. Nash.

14         MR. NASH:  Good afternoon, Your Honor.  Patrick Nash

15 on behalf of Subhadarshi Nayak, who is here to my right.

16         THE COURT:  All right.  Thank you.  As the clerk

17 announced, this matter is scheduled this afternoon for a

18 restitution hearing.  The matter was originally scheduled for

19 2:00 and we advanced the time an hour.  I understand the

20 parties have testimony and evidence to present that may extend

21 beyond the time we had originally allotted.

22     Ms. Fannin, are you ready to proceed with your

23 presentation of proof?

24         MS. FANNIN:  Yes, Your Honor.

25         THE COURT:  Thank you.

1    MS. FANNIN:  If I may, in advance of calling my first

2  witness, if there is no objection, go ahead and admit

3  Government Exhibit 1, which is the declaration of Manny Oliver

4  who's speaking for the DOE victim in this case, as well as his

5  economic impact statement, which is Exhibit 2.  That's the

6  economic impact statement.  And Exhibit 3 is an economic

7  impact statement from victim EPA, from April Richards.

8    THE COURT:  All right.  Let's see if there is any

9  objection to the admission of those documents.

10    MR. NASH:  Your Honor, I don't have an objection, but

11  I would simultaneously want to offer into evidence also an

12  economic impact statement from the same witness that she is

13  offering one from but in a different amount.

14    THE COURT:  I'm sorry.  In a different matter?

15    MR. NASH:  It's in a different amount.

16    THE COURT:  Amount, I'm sorry.

17    MR. NASH:  Different amount, Your Honor.  So I would

18  offer that at the same time as Defendant's Number 1.

19    THE COURT:  All right.  Any objection to all those

20  documents being admitted?

21    MS. FANNIN:  No, Your Honor.

22    THE COURT:  Okay.  You can pass those up if you want.

23    All right.  Thank you.

24    MS. FANNIN:  First witness is Ms. April Richards.

25    APRIL RICHARDS, GOVERNMENT'S WITNESS, SWORN

1        THE COURT:  All right.  Thank you.

2     Ms. Fannin, you may proceed.

3        MS. FANNIN:  Thank you.

4                    DIRECT EXAMINATION

5   BY MS. FANNIN:

6   Q.   Good afternoon.  Could you please state your name?

7   A.   Sure.  My name is April Richards.

8   Q.   Could you spell your last name?

9   A.   R-i-c-h-a-r-d-s.

10  Q.   Where do you currently work?

11  A.   I work for the Environmental Protection Agency.

12  Q.   In what department?

13  A.   I work -- I am the program manager for the Small Business

14  Innovation Research Program.

15  Q.   Could you briefly describe that program?

16  A.   Absolutely.  So SBIR is a program across the federal

17  government; there's 11 agencies that have it, so EPA is one of

18  those 11.  And the goal is to support small businesses to

19  develop and innovate new technologies that meet the agencies'

20  needs.

21  Q.   And what are your duties and responsibilities with

22  respect to the SBIR program in the EPA?

23  A.   What are my responsibilities?  So EPA has one of the

24  smallest SBIR programs.  I do actually a little bit of

25  everything throughout the whole process.  So I manage

1    developing the topics, so the priority areas that we ask for

2    every year.  I help usher all of the proposals that we receive

3    through the review process; I help with the selection process.

4    And then, once companies are selected for award, I end up

5    being the project officer on a lot of those projects as well.

6    So really, from start to finish.

7    Q.   And are you familiar, in the course of your employment,

8    with the company Qmetry?

9    A.   I am.

10   Q.   How so?

11   A.   So Qmetry is a small business that we funded with the

12   *Phase I* award -- so I didn't say this, but the program is

13   designed in a phased approach.  So *Phase I* is the initial

14   funding that we can give small businesses for proof of

15   concept.  So we did provide Qmetry with a *Phase I* award

16   several years back.

17   Q.   Do you know approximately the time frame of that award?

18   A.   I do.  I have it written right here.  Can I look?

19        It's 2018 -- right? -- I think we funded it the end of --

20   they're six-month awards, so yeah, I think it was late 2018 to

21   early 2019.

22        MS. FANNIN:  Defense, do you have any objection to

23   her reviewing her notes?

24        MR. NASH:  No, no objection.

25        THE WITNESS:  Yeah, sorry.  So I know all the

1    high-level stuff really well, but I am just -- yeah, 10/18 to

2    3/19, I think, was the *Phase I* project.

3    BY MS. FANNIN:

4    Q.   And was there a proposal that was submitted for the

5    receipt of that award?

6    A.   Indeed.

7    Q.   And can you talk about, briefly, the application

8    procedure?

9    A.   Sure.  So small businesses have to respond to the

10   solicitation that we put out, and they have to submit their

11   proposals through a portal called FedConnect, which is

12   literally just a portal that allows a small business to submit

13   a proposal to the federal government.

14        Those go into our -- once they're submitted and they're

15   seen that they are responsive, then they go into our review

16   process.

17        And do you want me to go through the steps of that review

18   process?

19   Q.   We could just focus on the application process first.

20   A.   Okay.

21   Q.   So in the course of that application process, talk to me

22   about the integrity of the application process.  As the SBIR

23   program manager for EPA, do you -- is there any certification

24   that everything contained in that document should be truthful?

25   A.   Yes, of course.  I mean, we would hope that everyone

1    would submit truthful proposals regardless, but we actually do

2    have a certification that we require that says that the

3    information contained in the proposal is true.

4    Q.   And have you had the opportunity to review the specific

5    proposal that Qmetry submitted for *Phase I*?

6    A.   I have.

7    Q.   And was there a signed certification there?

8    A.   There was.

9    Q.   And talk to me about the end of the process, when a

10   project closes out -- well, let me take a step back.

11        What was the period of performance for this particular

12   project?

13   A.   So the period of performance is that six-month period

14   that I mentioned before.  So during that six-month period --

15   so we -- we fund projects by contracts, and so as part of the

16   contractual requirements, companies have to submit monthly

17   reports and draw down the contract value.  It's a firm, fixed

18   price contract in our case.  And so they submit monthly

19   reports and monthly invoices for progress achieved on the

20   project.

21   Q.   And what was the specific project period for Qmetry's

22   *Phase I* proposal?

23   A.   It was that 10/1/18 to 3/31/19.

24   Q.   And was that *Phase I* funded?

25   A.   It was.

1   Q.   For how much?

2   A.   For $100,000.

3   Q.   On the tail end, what happens after a project moves

4   through the selection process?

5        I assume they're working on the project, and then what

6   happens at the close of the performance period?

7   A.   So at the close of the performance period, they would owe

8   us a final report, and they would draw down the final amount

9   of their contract, whatever was left, because it is a firm,

10  fixed-price contract.  And then they also submit -- similar to

11  with the proposal, they submit a final report certification.

12  Again, sort of saying that all the work we've done is in

13  compliance with the SBIR agreement and with the terms of the

14  contract.

15  Q.   And did Mr. Nayak certify on behalf of *Phase I* that the

16  money had, in fact, been expended?

17  A.   Yes, because he would have billed it all down monthly to

18  the end, and so would have billed it all by the end of the

19  period of performance.

20  Q.   How much of that $100,000 award was actually paid out to

21  Qmetry?

22  A.   My understanding is the full award was paid out.

23  Q.   Did you ever receive anything in return from Qmetry?  Any

24  reimbursements?  Any return money?

25  A.   No.

1  Q.   And now I'm going to fast forward to -- you understand

2  that Mr. Nayak has pled guilty --

3  A.   I do.

4  Q.   -- to a certain number of charges, and now you're here

5  today for what purpose?

6  A.   I am here for -- to discuss the restitution; right?  We

7  are asking for restitution in this case as the EPA.

8  Q.   And could you now explain what the amount of the

9  restitution is that you're asking for and explain why?

10  A.   Sure.  So we're asking for the full award back, it's

11  $100,000.  You know, as the EPA, we received a proposal that

12  had false information in it, probably wouldn't have funded it

13  in the first place.

14      We get lots of quality proposals every year and we have a

15  pretty modest budget, so it's really a tough decision to

16  decide what to fund, so that money could have gone to another

17  company, another deserving company that had applied.

18      I don't know, we just -- it just feels like we don't

19  really know what we got for that investment.  And it's, you

20  know, I have a lot of ownership for the program, so it doesn't

21  feel good to me to be saying that we funded this program or

22  even put their final report on our website like we're supposed

23  to do to let people know what we funded.  It's just -- yeah,

24  so we feel like we should get the full value back.

25  Q.   Have you posted the final report to your website?

1    A.   I think we have, actually.  We always post a summary

2    report.  Obviously, we're not going to disclose any

3    proprietary information, but we usually do.  And it lets the

4    taxpayers know what we've done with their money, right?  This

5    is the federal money, and this is how we spent it.

6    Q.   And in the course -- you mentioned that there was false

7    information.  What did you base that on?

8         Did you look at something or read something in the course

9    of this case that told you that there was some false

10   information, and what was that document that you reviewed?

11   A.   Right.  Well, I reviewed a couple of things.  I

12   reviewed -- well, I went back and reviewed the proposal, and I

13   reviewed the indictment and the plea agreement.  And in those

14   documents, it talked about the fact that the experts that he

15   referenced, that were referenced in the proposal, were unaware

16   of their ability to perform under that contract.  So some of

17   the expertise that was in that proposal obviously were not

18   really used and were not aware that they were listed in the

19   proposal.

20   Q.   Well, wouldn't you agree that sometimes projects change

21   and needs change, so why is that a problem?

22   A.   Yeah, so we just need to know that.  That's how we

23   evaluated the proposal, right?  We have a pretty thorough

24   review process, and one of the criteria, certainly, is the

25   team that they propose.  So we're looking at the holistic

RICHARDS - Direct                                          11

1   nature of the team, so that impacts their selection.  So that

2   seems unfair to other applicants.

3   Q.   What about the time of the performance period?  Would you

4   agree that you should give some leeway for the time period

5   when these small businesses incur these costs, or actually do

6   the work, and in your review, what is your reasonable leeway?

7   A.   Yeah.  Are you saying, like, so since they submitted

8   monthly reports, do we think they did anything?  I mean, it's

9   hard to know.  Like, once something is false, how do you know

10  what to believe in the monthly reports?

11        And I personally, you know, I'm an engineer, I'm looking

12  for the technical merit, the commercial potential, all of the

13  goals of the program.  I am not -- I am not an investigator.

14  I am not looking for fraud.  So I, you know, I just -- it's

15  just hard to know what's truthful.

16  Q.   If there were facts that there was, in fact, some work

17  done on this project, maybe it wasn't within the period of

18  performance, maybe it wasn't for exactly the full amount, does

19  that change your opinion?

20  A.   No, it almost makes it worse 'cause they must have -- if

21  they drew down the contract, then, to me, they're saying,

22  we've done all the work we said we were going to do in this

23  six-month period of performance that we laid out in the

24  proposal.  And so if there's -- and apparently there was money

25  that they still hadn't spent afterwards -- that kind of makes

*RICHARDS - Direct*                                                        12

1    it worse to me.

2    Q.   And you're speaking on behalf of the Environmental

3    Protection Agency, the SBIR program in this case; correct?

4    A.   Correct.

5    Q.   And it's your belief and request that that restitution be

6    paid back in the amount of $100,000?

7    A.   It is.

8         MS. FANNIN:  No further questions, Your Honor.  Oh, I

9    apologize.

10        THE COURT:  Yes, ma'am.

11        MS. FANNIN:  One more thing.

12   BY MS. FANNIN:

13   Q.   Ms. Richards, did you complete a victim economic impact

14   statement in this case?

15   A.   I did.

16   Q.   And did you have a chance to review it before coming in

17   here and speaking to the Court today?

18   A.   I did.

19        MS. FANNIN:  And Your Honor, if I may approach?

20        THE COURT:  Yes, ma'am, you may.

21   BY MS. FANNIN:

22   Q.   I'm handing you what's been admitted as Government's

23   Exhibit 2, if you could take a moment and look at that,

24   please.

25        Is that the victim impact statement that you created and

RICHARDS - Cross                                                        13

1   signed?

2   A.   Sorry.  This is the energy one.

3   Q.   Oh, is it?  Sorry.

4        THE COURT:  I believe number 3 is for Doctor --

5   A.   I actually do have a copy of the EPA one.

6   Q.   That's okay, I'll give you the marked version.

7   A.   Yeah, this is a little more money.

8   Q.   Thank you for pointing that out.

9        I've handed Government's Exhibit 3 to Ms. Richards.  Take

10  a moment and see if I've given you the right one this time.

11  A.   Yes, this is the right one.

12  Q.   Okay.  And did you complete that?

13  A.   I did.

14  Q.   And do you need to make any updates or any changes?

15  A.   No, I think this adequately addresses our standpoint.

16       MS. FANNIN:  If I may retrieve the exhibit.

17  Thank you, ma'am.

18  No further questions, Your Honor.

19       THE COURT:  All right.  Thank you.

20  Mr. Nash.

21                       CROSS-EXAMINATION

22  BY MR. NASH:

23  Q.   Good afternoon, Ms. Richards.  Is it Dr. Richards or Ms.?

24  A.   It's Ms.

25  Q.   Ms. Richards, my name is Pat Nash.  I represent

1    Dr. Nayak, who is sitting over here.  You all have never met

2    face to face, I take it, or have you?

3    A.   We have.

4    Q.   At the training session?

5    A.   Yeah, at the kick-off meeting, um-hmm.

6    Q.   Okay.  Just for clarity of the record, you are testifying

7    on behalf of the EPA project.  There's been some reference to

8    another project, but that's not within your area of testimony;

9    correct?

10   A.   Correct, just the EPA.

11   Q.   And as I understand it, the EPA project was centered

12   around a substance that is known as P-F-A-S, or PFAS?

13   A.   Perfluoroalkyl substances; right.

14   Q.   Okay.  And that is a substance that is a contaminant?

15   A.   It is.  It's a group of contaminants.

16   Q.   Okay.  In soils sometimes?

17   A.   Yeah, they're everywhere.

18   Q.   But also in soils?

19   A.   In soils, um-hmm.

20   Q.   And so for this particular project, the area of research

21   and development was designed to figure out a way to remediate

22   these substances in soil; is that --

23   A.   Correct.

24   Q.   That's probably an oversimplification.

25   A.   No, that's adequate.

RICHARDS - Cross                                                      15

1    Q.   Okay.  And so the research and the development that the

2    EPA expected to get for its money related to that subject

3    area?

4    A.   Yes.

5    Q.   Now, are you familiar with the qualifications of

6    Dr. Nayak?

7    A.   At a high level.

8    Q.   Okay.  So, for instance, are you familiar that he has a

9    Ph.D. in material sciences and engineering?

10   A.   Yes.

11   Q.   And also a master's in electrical engineering?

12   A.   Yes.

13   Q.   Okay.  And those are adequate qualifications for someone

14   to work on a project like this; correct?

15   A.   Sure.

16   Q.   All right.  Now, the falsehoods that you've talked about,

17   and that Dr. Nayak has readily admitted to, occurred in the

18   application for the funds for this project; correct?

19   A.   Yes, there were falsifications in the proposal.

20   Q.   Yeah.  And you mentioned that at the end of the work or

21   at the end of the project, your agency is owed a final report?

22   A.   Um-hmm.

23   Q.   And that's for every project like this; correct?

24   A.   Right.

25   Q.   And you, in fact, received a final report on this

1    particular project?

2    A.   Correct, but those are the deliverables that are required

3    from the contract.

4    Q.   Right.  And that final report contained data?

5    A.   It did.

6    Q.   Description of research and description of experiments?

7    A.   It did.

8    Q.   Results of those research and experiments?

9    A.   Yes.

10   Q.   All right.  And that report has been received, and I

11   think I heard you testify, it was posted on the EPA's website,

12   or at least a portion of it?

13   A.   Yeah, the summary, the executive summary would be posted.

14   Q.   And that's a website that is available, as you said,

15   that's available to the general public?

16   A.   It is.

17   Q.   And I would presume that if other scientists had an

18   interest in PFAS remediation, they might look at the EPA's

19   website to see if there were other studies in that topic area;

20   correct?

21   A.   That's possible.

22   Q.   And these other scientists, future scientists can read

23   and understand what sort of experiments have previously been

24   done and the results of those experiments; correct?

25   A.   Yes.

1    Q.   And there's value to that -- correct? -- there's

2    scientific value to that?

3    A.   If it's truthful.

4    Q.   Yes.  So have you audited the final report here to

5    determine whether the science was valid?

6    A.   Have I audited it?  I have looked through the reports.

7    Again, I find it hard to know what's true or not true.  They

8    have data but, again, it's hard for me to know.

9    Q.   Okay.  So the answer is no, you don't know that that is

10   invalid?

11   A.   I'm sorry.  So I don't know --

12   Q.   Can you testify today that anything in the final report

13   was not valid?

14   A.   Yeah, I guess I can't tell either way if it's valid or

15   invalid.

16   Q.   Okay.  And as you said, there is data, there's charts,

17   there's graphs, there's photographs all contained in that

18   final report; correct?

19   A.   There are.

20   Q.   Okay.  The innovation that was being tested in this

21   particular instance, that was an innovation of Dr. Nayak's;

22   correct?

23   A.   Apparently.

24   Q.   And do you have reason to question the idea that this

25   innovation could be successful in remediating PFAS?

1   A.   I mean, I think that's the reason we funded it.  Based on

2   what he presented, we believed it was a viable alternative to

3   treat this important environmental issue.

4   Q.   Okay.  Now, you mentioned that proof of concept is sort

5   of the goal of *Phase I* in these projects.  So the concept here

6   would be this instrument being able to remediate PFAS;

7   correct?

8   A.   Right.  Some demonstration that it works.

9   Q.   That it could work, yeah.  And all the projects that you

10   all fund in *Phase I*, that's sort of the general hope for a

11   *Phase I* is that you could prove the concept?

12   A.   Correct.

13   Q.   But that doesn't always happen, does it?

14   A.   No.  It is research so we expect some failure rate.

15   Q.   And in any scientific research, there often are failures;

16   correct?

17   A.   Correct.

18   Q.   And people learn from those failures?

19   A.   Correct.

20   Q.   And other scientists learn from those failures?

21   A.   Could be.

22   Q.   And so the work, even when sometimes it results in a

23   failure, has scientific value?

24   A.   Agreed.  But I guess there's a difference between failure

25   and untruthful.

1  Q.   Okay.  But again, you're not testifying today that
2  anything in the final report was untruthful?
3  A.   I don't know.
4  Q.   All right.  Ms. Fannin was asking you about the
5  performance period and running from October of '18 to March of
6  '19; correct?
7  A.   Yes.
8  Q.   And she asked some questions about the idea that those
9  performance periods may or may not be strictly adhered to; is
10 that accurate?
11      Are they always strictly adhered to or do some projects
12 take a little longer than originally anticipated?
13 A.   The majority of projects stick to that six-month period
14 of performance because we just have one annual cycle and so
15 they kind of have to stick to that if they're going to be
16 eligible to apply to the next phase --
17 Q.   Okay.
18 A.   -- and stay on time.
19 Q.   But do some projects sometimes take a little longer?
20 A.   Rarely, but occasionally.
21 Q.   Okay.  And do you remember during this particular time
22 period whether there was a government shutdown in the midst of
23 this time period we've talked about?
24 A.   I do not recall.
25 Q.   Okay.  You don't remember whether there was?

1    A.   There could have been.

2    Q.   And then lastly, you've testified that your agency seeks

3    the full amount of the award to be repaid, the $100,000.  So

4    has that taken into account that some of the money was paid to

5    employees of Qmetry who were doing work?  Do you want that

6    money back as well?

7    A.   I think we want all the money back.  We just feel like we

8    didn't get what we paid for and --

9    Q.   Okay.

10    A.   Yeah.

11    Q.   So whether or not the money went to Dr. Nayak, even if it

12    went to other people, even if some of that money went to the

13    government in payroll taxes, you still want all that money

14    back?

15    A.   Yes.  I don't know all the nitty-gritty of where that

16    money has gone, but in principle, yes, we would like the

17    amount back.

18    Q.   So you have not tracked where the money went, the

19    $100,000?

20    A.   Not me personally.

21    Q.   Okay.  And you're not testifying that that money went

22    solely and exclusively to Dr. Nayak?

23    A.   I am not saying that.

24         MR. NASH:  Your Honor, that's all the questions I

25    have.

1    THE COURT:  All right.  Any other questions for

2  Ms. Richards?

3    MS. FANNIN:  Yes, Your Honor.

4                    REDIRECT EXAMINATION

5  BY MS. FANNIN:

6  Q.   Ms. Richards, if there were to be a delay in a project,

7  what would you expect or what would the terms of the contract

8  require a recipient to do?

9  A.   So if they do want to go beyond the original six-month

10  period of performance, they can ask for a no-cost extension

11  and we can modify the contract.  Again, we just rarely do that

12  in *Phase I* -- almost never -- because companies, what they

13  really want to do is apply for *Phase II*.  So they really want

14  to have their results ready and stay on track to apply to this

15  one chance they have to apply for *Phase II*.

16  Q.   And -- I'm sorry.

17  A.   I was going to say, which is the larger effort --

18  right? -- that's the bigger sum of money and the larger time

19  frame for research.

20  Q.   And again, when you were -- when I say you -- when the

21  program was funding this and these invoices were being sent to

22  you and money was being drawn down, was it the program's

23  understanding that it was progressing in accordance with the

24  initial proposal that was submitted?

25  A.   Yes, that was our understanding.

1    Q.   And you weren't notified that any of that had changed

2    during the course of the actual performance period; correct?

3    A.   That is correct.  And we do advise companies, like, we

4    understand things can change.  You need to let us know and we

5    decide whether we need to modify the contract or we can just

6    document the change.

7    Q.   So sitting here, it doesn't matter where the money went

8    necessarily, it depends -- you're sitting here, you mentioned,

9    on principle?

10    A.   Right.  To us, we funded the small business, like, we

11    provided the money to the small business.  So they decide, I

12    guess, how they spend it, and if it's not -- if it's --

13    there's some falsehood, then I don't know the details of where

14    the money went.

15    Q.   But do you expect that that money should go and fund the

16    tasks that were in the original proposal?

17    A.   Yes, that's what we are funding, what they said they

18    would do in the original proposal.

19    Q.   And if that's not the case?

20    A.   Right.  If that's not the case, then it doesn't seem like

21    they have lived up to their end of the contract.

22          MS. FANNIN:  No further questions, Your Honor.

23          THE COURT:  Mr. Nash?

24          MR. NASH:  Nothing further.

25          THE COURT:  Just for clarification.

1          Ms. Richards, you referred to, was it a cost extension,
2     was that the phrase that you used?
3               THE WITNESS:  No-cost extension.
4               THE COURT:  No-cost.
5               THE WITNESS:  It just means that they can get more
6     time without asking for more money.
7               THE COURT:  All right.  Now, as I understand, after a
8     *Phase I* project has been completed, you would receive a final
9     report.
10              THE WITNESS:  Um-hmm.
11              THE COURT:  You then post that report on a website or
12    portal, or how is that done?
13              THE WITNESS:  Yes.  So we use that final report to
14    see ourselves that the project is done and all the work is
15    completed, that lets us draw down the final amount of the
16    contract.  And then, just sort of as a matter of course, we do
17    post a summary of the project on our website.
18              THE COURT:  Now, when you post it on the website,
19    what do you represent to the public in terms of the accuracy
20    or anything else about what's been posted?
21         In other words, if I go on the website and look at this
22    report, are you going to have some type of a disclaimer that
23    says, hey, wait a minute, we've got questions about this
24    report?
25              THE WITNESS:  Well, we might need one, but I don't

1    think that there is one.  It is a summary.  It's a high

2    level -- again, because these are small businesses and they're

3    doing work to be commercialized, so we don't want to share

4    anything that's confidential business information.  So it is

5    pretty high level, but I do not believe we have a disclaimer.

6            THE COURT:  So if someone else, say scientists from

7    the University of Cincinnati, is interested in a similar

8    project, that person is going to go on the website and assume

9    that that's correct?

10           THE WITNESS:  Yeah, funded by the federal government;

11   right.

12           THE COURT:  And in fact, the report may initially be

13   based upon the project being performed by five high-level

14   scientists that you have some confidence in, when in fact,

15   maybe the taxi driver actually did all the research and

16   investigation and sent it on to you?

17           THE WITNESS:  I guess so.

18           THE COURT:  So you're just going to post the report

19   and the public is not going to ever know any of that?

20           THE WITNESS:  Well, I mean, we do fund a lot of

21   projects.  Obviously, it is research, and I think they have to

22   know, like, I mean, we do some verification of results, but

23   they have to know that, you know, we funded that research.  It

24   doesn't mean that we are taking responsibility for all of it.

25       I mean, you're making me think maybe we should have a

1    disclaimer, but I do think there is some understanding with

2    research that these are the results, and if people do reach

3    out to me, I try to tell them what I know.  And I also

4    encourage them to contact the company directly if they want

5    more information to really understand what's going on with the

6    details of the project.

7         THE COURT:  Do you post, for example, when a project

8    is submitted to you, when it's being evaluated, and whoever

9    would make the submission would list individuals that would be

10   working on the project, and you rely upon that in part in

11   making an award?

12        THE WITNESS:  We do.  It's one of the evaluation

13   criteria.

14        THE COURT:  So if I'm looking at this -- again, I'm

15   going back to what the public would know or not know.  When

16   the final report is submitted, will the public know the

17   individuals that were listed as working on the project?

18        THE WITNESS:  That's probably a depends answer.

19   It's -- usually the PI is listed and if there is a co-PI, that

20   would be listed.  I doubt the entire team is typically listed

21   there.

22        THE COURT:  The PI that's --

23        THE WITNESS:  I'm sorry, principal investigator.

24        THE COURT:  All right.

25        THE WITNESS:  Who is the lead, the lead scientist.

1      THE COURT:  So all the other information that you
2   would have considered isn't necessarily listed --
3      THE WITNESS:  Not necessarily, yes.
4      THE COURT:  It's something that you would base your
5   decision on, but the public wouldn't necessarily know all of
6   that?
7      THE WITNESS:  Right.
8      THE COURT:  All right.  Thank you.
9      THE WITNESS:  Sure.
10     THE COURT:  Any other questions, Mr. Nash?
11     MR. NASH:  No, sir.
12     THE COURT:  Thank you, ma'am.  You may step down.  If
13  you would like to hand those exhibits to our security officer
14  and she will pass those over to the clerk.
15     THE WITNESS:  She took the exhibits back, this is
16  just my notes here.
17     THE COURT:  All right.  Thank you.
18    You may call your next witness.
19     MS. FANNIN:  Your Honor, the government won't be
20  calling any other witness.  We rely on the declaration of
21  Manny Oliver and his victim impact statement.  He chose not to
22  attend today, and in lieu of attendance, submit the affidavit
23  or declaration.  I'll point you to paragraph 15 and 16 which
24  essentially summarizes his opinion on behalf of the DOE within
25  those two paragraphs.  He also defers to the Court.

1          THE COURT:  I'm sorry, he also what?

2          MS. FANNIN:  He also defers to the Court's

3    determination upon reviewing all the evidence in this case.

4          THE COURT:  All right.  Any other testimony at all

5    you'll be offering?

6          MS. FANNIN:  No, Your Honor.  I have the agents here

7    in case we may need to use them for rebuttal, but that is it,

8    Your Honor.

9          THE COURT:  All right.  Thank you.

10      Mr. Nash.

11         MR. NASH:  So, Your Honor, on that final point

12   Ms. Fannin made, Mr. Manuel Oliver, the exhibit that we

13   submitted, Defendant's 1, is the economic impact statement

14   signed by Mr. Oliver and certified back in January of this

15   year.  And at that time he calculated the loss amount for the

16   Department of Energy.  He stated in our exhibit that the

17   entity, ScienceTomorrow, may have received an award -- well,

18   let me back up.

19      He said if they had submitted a true documentation in

20   their proposal, they may have received an award of $738,587

21   and then he subtracts that from the award that they did

22   receive and comes up with a loss amount of $260,679.

23      So Mr. Oliver is not here, obviously, to be questioned

24   and to clarify all that, but that is our submission as it

25   relates to Mr. Oliver.

WILLIS - Direct                                                    28

1          THE COURT:  All right.

2          MR. NASH:  Your Honor, I have witnesses.  Do you want

3    me to proceed?

4          THE COURT:  Before you do, let me take a look, I'm

5    going to compare these two to see how to determine the reason

6    for the differences here.

7       And Exhibit 2 submitted by the United States simply

8    requests the full amount, the $999,000 amount for the DOE?

9          MS. FANNIN:  That's correct, Your Honor.  They

10   changed their mind.

11         THE COURT:  All right.  Thank you.

12      Mr. Nash, if you'd like to proceed with presentation of

13   proof.

14         MR. NASH:  I do, Your Honor, and my witnesses, I

15   believe, are out in the hallway.  First witness I would call

16   is Peter Willis.

17         THE COURT:  Willis?

18         MR. NASH:  Last name Willis.

19         THE COURT:  All right.  Thank you.

20            PETER WILLIS, DEFENSE WITNESS, SWORN

21         THE COURT:  Thank you.  And Mr. Nash, you may

22   proceed.

23                      DIRECT EXAMINATION

24   BY MR. NASH:

25   Q.   Sir, will you please state your name?

WILLIS - Direct                                                      29

1    A.    My name is Peter Willis.

2    Q.    And if you would, spell your last name.

3    A.    Willis, W-i-l-l-i-s.

4    Q.    Thank you.  Dr. Willis, my name is Patrick Nash, I

5    represent this gentleman, Dr. Nayak.  You and I have talked on

6    the phone a number of times but we've never met in person; is

7    that correct?

8    A.    That's correct.

9    Q.    Can you, sir, please state your occupation?

10   A.    I am a patent agent.

11   Q.    All right.  Do you have an office?  Where is that

12   located?

13   A.    My office is located in Bloomington, Indiana.

14   Q.    All right.  And what sort of educational background do

15   you have?

16   A.    I have a Ph.D. in organic chemistry, physical organic

17   chemistry, I've done research at Johns Hopkins University,

18   NIH, and Indiana University.

19   Q.    What is NIH?

20   A.    The National Institute of Health, specifically National

21   Institute on Drug Abuse.

22   Q.    Okay.  And you mentioned you have a Ph.D. in what kind of

23   chemistry?

24   A.    Organic chemistry or physical organic chemistry.

25   Q.    And where did you obtain your Ph.D.?

1    A.   I obtained my Ph.D. at the University of Kentucky.

2    Q.   And so you said you currently work as a patent agent?

3    A.   That is correct.

4    Q.   What does a patent agent do?

5    A.   A patent agent will work with an inventor to determine --

6    so the client will give us an idea of what they think is an

7    invention, I will do a patent search to look at the patent

8    history on this topic, and determine whether or not, in my

9    opinion, that they have a patentable invention.

10   Q.   All right.  And if you determine --

11   A.   Yeah.  And if I determine that it is patentable, we can

12   negotiate the exact invention that it is, and I will write up

13   what's called a patent application and submit that to the U.S.

14   Patent and Trade Organization, and -- which is a division of

15   the United States government.

16   Q.   All right.  And then once you submit the application --

17   A.   Um-hmm.

18   Q.   -- and hopefully, I guess the hope, obviously, is that a

19   patent would be granted by that organization?

20   A.   Yes.  So we ask for the -- for an application through the

21   USPTO, and also with the Patent Cooperation Treaty

22   Organization, which is an international treaty organization

23   that we submit to.  It allows us to ask for a patent in other

24   jurisdictions like Europe, China, Japan, et cetera.

25   Q.   I see.  So Dr. Willis, in 2014, were you employed by a

1    business called ScienceTomorrow and the principals of that

2    business in regards to an invention that was called

3    quantitative secondary electron detection?

4    A.   I was.

5    Q.   And did you all call that QSED for short?

6    A.   We did; that's a good name.

7    Q.   So when you were employed by ScienceTomorrow in regards

8    to this invention QSED, can you describe for the Court what

9    sort of work you did?

10   A.   So I went ahead and did the patent search for them.  I

11   worked with them to generate the patent application and we

12   submitted the application to the USPTO as well as later on to

13   the PCT and several other jurisdictions.

14   Q.   What is the PCT?

15   A.   Patent Cooperation Treaty Organization.

16   Q.   Okay.  And during that work, did you work with Dr. Nayak?

17   A.   Some of it.  He was involved during part of that

18   operation.

19   Q.   All right.  Now, through the work that you did, and some

20   of which you did with Dr. Nayak, did you make a determination

21   of whether this innovation, QSED, could potentially receive a

22   patent?

23   A.   I did.  And I -- that was one of the ones that I thought

24   was -- had a very good chance of getting a useful patent.

25   Q.   Are there two or three, three or four criteria that are

1    sort of the baseline for innovations being able to receive a

2    patent?

3    A.   Right.  Of course, an innovation has to be useful.  That

4    means it has to do something which is helpful and, of course,

5    this detector should improve the ability of an electron

6    microscope to detect changes in the surface of a small organic

7    sample, which is very useful.

8         It has to be novel, and from what I can tell, no one had

9    ever done this before with an electron microscope.  And it had

10   to be nonobvious.  And obvious is a little trickier to

11   explain, but essentially, the difference -- it's a little

12   harder to -- okay.  So -- sorry.

13   Q.   It's okay, take your time.

14   A.   Right.  So the ability -- obviousness measures the

15   ability of someone who has come along behind you to determine

16   whether or not a new invention should have been obvious to

17   someone else.

18        And it doesn't -- whether -- it measures whether or not

19   someone took a high degree of inventiveness to generate the

20   invention that you're trying to portray.

21   Q.   You're right, that is a tricky concept.

22   A.   It is.

23   Q.   So you made application for this innovation, QSED, and

24   ultimately, was a patent granted?

25   A.   Yes, it was.

WILLIS - Direct                                              33

1              MR. NASH:  Your Honor, may I approach the witness?

2              THE COURT:  Yes, sir.

3    BY MR. NASH:

4    Q.  Sir, if you would, please take a look at that document

5    and tell me if you recognize it.

6    A.  I do.

7              MR. NASH:  Your Honor, I have a copy for the Court,

8    would you like me to hand one up?

9              THE COURT:  Yes, sir.

10   BY MR. NASH:

11   Q.  Dr. Willis, what is this document?

12   A.  This is a copy of a publication of the patent that we

13   submitted to the USPTO.

14   Q.  All right.

15             MR. NASH:  And, Your Honor, I would ask that this be

16   admitted as Defendant's Number 2.

17             THE COURT:  Any objection?

18             MS. FANNIN:  No objection, Your Honor.

19             THE COURT:  Defendant's Exhibit 2 is admitted for

20   purposes of this hearing.

21             MR. NASH:  Yes, sir.

22   BY MR. NASH:

23   Q.  So I see at the top -- near the top, the title is what we

24   are calling QSED, the quantitative secondary electron

25   detection, is that the innovation that was patented?

1    A.   It is.

2    Q.   All right.  And it looks like, if you read on down a

3    little further, the original application was filed in October

4    of 2015?

5    A.   That sounds right.

6    Q.   Look on the left-hand side, number 22.

7    A.   Yeah.

8    Q.   Do you see that?

9    A.   I do.

10   Q.   And the patent was actually granted.  Go back up to the

11   top there, it looks like the date of the patent was not until

12   May of 2018; is that accurate?

13   A.   That sounds right.

14   Q.   Okay.  So what is the value of a patent like this?  Well,

15   first off, does a patent have value?

16   A.   It does.

17   Q.   Explain that to the Court, if you would.

18   A.   All right.  So a patent allows an inventor to have the

19   exclusive right to manufacture and sell some sort of method or

20   product to the public.  He can license it out to another

21   manufacturer for them to produce or sell.  But it allows the

22   inventor to have some sort of control over who can sell and

23   who can produce their invention.

24   Q.   Okay.

25   A.   And of course, that generally leads to a higher margin

1    for the product that they can sell.

2    Q.   And who is the owner of this particular patent?

3    A.   Right now it is ScienceTomorrow.

4    Q.   Okay.  And is this patent still a valid --

5    A.   It is valid, up until the next maintenance fees.

6    Q.   Okay.  But it is currently valid?

7    A.   Yes.

8    Q.   All right.  Now, if you would, sir, the first eight pages

9    or so of this document, Defendant's 2, are figures -- are

10    illustrations or figures?

11    A.   Yeah.

12    Q.   If you would, turn to the first page of this document

13    that has text on it.

14    A.   Oh, okay.

15    Q.   Are you there?

16    A.   Yeah.

17    Q.   Okay.  Does the patent indicate that there are some

18    measure of government rights into this patent?

19    A.   It does.

20    Q.   And if you would, that's very short, would you just read

21    into the record what it says under the heading of government

22    rights?

23    A.   Right.  "This invention was made with government support

24    under grant number DE-SC009649 [sic] reported by the

25    Department of Energy.  The United States government has

1     certain rights in the invention."

2     Q.    Okay.  Can you explain that to the Court?  What sort of

3     rights does the government retain to this patent?

4     A.    Okay.  So I had to look this up; this is not usual.  But

5     so I have -- I printed out the standard patent right clauses

6     37CFR401.14.  Okay.  So under these -- under the usual

7     standard rights clauses, the government has the right to

8     patent your invention if you decline not to as a contractor of

9     the United States government.

10         A contractor, they don't -- they don't sound like a

11    contractor, but because they received funding for this

12    project, that -- I believe that under these definitions, that

13    makes them a contractor.

14         All right.  So there's a lot of different rights that the

15    government has.  Basically any time that you decline to pursue

16    a patent right or any part of the process, you're supposed to

17    notify the government that you're declining to pursue this

18    right.  And if the government wants to, they can take over the

19    prosecution as far as I can tell --

20    Q.    Okay.

21    A.    -- from the -- this information.  So, yeah.

22    Q.    I'm sorry.  Go ahead.  I don't mean to cut you off.

23    A.    Yeah, there's a lot of different rights.  I don't think

24    we need to go over all of them.  Just suffice it to say that

25    if ScienceTomorrow were to decide not to do anything with the

1  patent, then the government would have the right to take it

2  over.

3  Q.   So they could -- the government could stand in the shoes

4  of the person who currently owns the patent?

5  A.   They do.  And they also have a right, a nonexclusive

6  right to use the patent as they would.  I can't remember

7  exactly where that was, but as far as I remember, the

8  government also has a right to use the government for their

9  purposes.

10  Q.   So the United States government can use the innovation

11  for their purposes?

12  A.   Right.  Presumably the government owns, say, 50 or 100

13  electron microscopes, they could create this for themselves if

14  they wanted to.

15  Q.   I see.  Okay.  Now, at any time during your interactions

16  with Dr. Nayak, did you have any reason to question the

17  validity of his scientific work?

18  A.   No.

19  Q.   Did you find Dr. Nayak to be a knowledgeable and

20  qualified scientist in his field?

21  A.   I did.

22  Q.   And so now switching gears, did there come a time when

23  you also worked with Dr. Nayak when he had a business known as

24  Qmetry?

25  A.   Yes, I did.

1    Q.   And specifically, did you work with him regarding a PFAS

2    or PFAS soil remediation project?

3    A.   Yeah, I did.  I did a patent search for that project.

4    Q.   So explain to the Court what you did in regards to that

5    patent search?

6    A.   Right.  So I did a patent search on it, and my expert

7    opinion was that the invention was patentable, but we never

8    actually -- they didn't decide to pursue that.

9    Q.   Okay.  So you actually did the patent search but that's

10   as far as it went?

11   A.   Yeah, that's as far as it went.

12   Q.   And the results of your patent search were that this

13   innovation was potentially patentable?

14   A.   Um-hmm.

15   Q.   Was that a yes?

16   A.   Yes.

17   Q.   She's taking it down, so we have to say yes or no rather

18   than uh-huh or huh-uh.

19   A.   Right.  I got it.  I understand.

20   Q.   So the invention that you determined was patentable, even

21   though a patent did not ever result, did that invention have

22   value?

23   A.   I believe so.  I mean, the -- according to the rights --

24   because it was -- well, was that done with a government fund?

25   Q.   Well, if it was done with a government funding --

1   A.   Well, if it was done with government funding, then

2   presumably the government would also have the same rights as

3   the -- with the QSED.

4   Q.   Okay.

5   A.   So the government could have tooken over it or whatever.

6   Q.   All right.

7   A.   And presumably the invention had value in its own as --

8   PFAS are the forever chemicals have -- are kind of an

9   environmental hazard to the public.

10  Q.   I see.  As with the work on electron microscope project,

11  when you worked with Dr. Nayak on the PFAS project, did you

12  find his science to be legitimate?

13  A.   It was.

14  Q.   And did you find him to be a qualified scientist?

15  A.   I did.

16  Q.   And did you determine that his invention could, in fact,

17  be a useful invention?

18  A.   I did.

19         MR. NASH:  All right.  That's all the questions I

20  have, Dr. Willis.  The government lawyer may have some

21  questions and the Judge may have some questions for you.

22         THE COURT:  Ms. Fannin.

23                        CROSS-EXAMINATION

24  BY MS. FANNIN:

25  Q.   Afternoon, Mr. Willis.

1    A.   Hello.

2    Q.   You mentioned that Nayak left the ScienceTomorrow QSED

3    project at one point.

4         Do you recall when that was?

5    A.   So I don't remember the date.  What Nayak did was he

6    generated a kind of a -- he gave me the proposal and there was

7    an update to that -- I believe he did, or it could have been

8    someone else in the lab -- but it was given to me, and at that

9    point he was no longer involved with the company.

10   Q.   And do you still have records of all the information that

11   Mr. Nayak provided you on the QSED project?

12   A.   Yeah, it should be in my email somewhere.

13   Q.   And again, the time frame, and I know I'm not asking you

14   for a specific date, I'm just trying to get a time frame of

15   when he actually left the project.  Is that 2014, 2015, some

16   time of year that you could potentially --

17   A.   I'm sorry.

18   Q.   Okay.

19   A.   I remember the sequence of events, I don't remember the

20   exact date.

21   Q.   Would it be helpful if you knew the project period?

22   Maybe you have something you can reference?

23   A.   All right.  So it was before October 20th of 2015.  It

24   was -- I know it was before we went ahead and applied for the

25   patent, probably about four to -- four to six months, I guess.

1    I can't remember the exact date.

2    Q.   So just to be clear, approximately four to six months

3    before October of 2015, or thereabouts?

4    A.   Yeah.  Yeah, four to six months before we applied for the

5    patent.

6    Q.   Okay.  And the underlying data that you reviewed, in

7    order to assess the possibility of the patent, right, the

8    ability to patent it, the capacity, right?

9    A.   Right.

10   Q.   What did you look at?

11   A.   So in order to do that, you have to look at the past --

12   or the patent literature.  Generally what I do is I'll do a

13   search of previous patents for secondary electron detectors,

14   find the exact match or a category, and basically look through

15   each one that has been published that is close enough to the

16   patent that there could be some way of someone making the leap

17   from it to this invention.

18   Q.   And what about information from the business itself?

19   You -- I imagine you look at -- you have the proposal?

20   A.   Yes.

21   Q.   Is there any experiential data that you look at outside

22   of the proposal itself?

23   A.   That, I mean, I use my own personal experience with

24   electron microscopes and I know how -- what the use of them

25   is.

1  Q.   Let me just ask a different way.  I'm not trying to trick

2  you.

3  A.   I know you're not, I'm just trying to determine what

4  you're asking.

5  Q.   Right.  So what information do you look at that is from

6  Qmetry, or Subhadarshi Nayak, or ScienceTomorrow in order to

7  compare that to the literature?

8  A.   It's just the -- it's just the proposal itself.

9  Q.   And so this patent is for not a physical object or the

10 ultimate invention, it's the idea?

11 A.   I don't actually look at the physical object.  They did

12 say that they actually had produced the object and had used

13 it.  So you don't actually have to actually make the product

14 in order to invent it, you just have to prove that you could

15 make it.

16 Q.   And that's what I'm asking.  Is it -- it's essentially

17 the patent of an idea, it's not actually in physical form, or

18 does it have to be in a physical form in order to patent it?

19 A.   Okay.  So an idea itself is not patentable; there has to

20 be some method or some utility to it for it to be patented.

21 Q.   But you would agree that you didn't look at any physical

22 object that actually did this.  This is just the evidence to

23 suggest that their proposal could do this?

24 A.   Okay.  So let me look at this.  Okay.  So I think I know

25 what you're asking.

1  Q.   And you'll have to forgive my layman speak; I may not be

2  using the right patent term.

3  A.   Right.

4  Q.   I'm just trying to understand the concept.

5  A.   Right.  Right.  Right.  All right.  Figure 7 is supposed

6  to be a picture of an actual detector; at least, that's what

7  they told me anyway.  And in figure 8, this is -- what we did

8  here was we determined the probability of not overloading the

9  detectors so -- and actually, it's best to not overload the

10 detectors.

11      So if you can get a single electron to pass through, it's

12 easier to detect and run the probability statistics on the

13 detector.  So figure 8 is supposedly an actual test of whether

14 or not the -- what conditions would be needed to run the

15 detector.

16 Q.   And did you run that test on the object that is

17 represented in figure 7, or did you make your determination

18 based upon these figures, these images that were provided in

19 the supporting documentation for it?

20 A.   All right.  So --

21 Q.   If you can recall?

22 A.   I'm confused.

23 Q.   Did you look at a physical object in order to help with

24 this patent or did you look at material that was provided to

25 you in a PDF or in paper?

1   A.   Oh, they didn't actually give me a physical object to

2   look at, but that's not necessary in order to make the

3   detector.

4   Q.   Okay.  So you trust that the information that you're

5   provided is all true; is that correct?

6   A.   That is true.

7   Q.   You don't take any independent acts to investigate

8   whether or not --

9   A.   No.  No.  I -- there's no way for me to do that.

10   Q.   And let's talk about government rights to the patent.

11   Can you quantify what -- I'm sorry.

12   A.   I didn't mean to do that.

13   Q.   You mentioned that the government rights are worth

14   something; right?

15   A.   Yes.

16   Q.   How do you know what that amount is?

17   A.   Okay.  All right.  So what is -- so I guess first we have

18   to figure out what the value of the invention is to determine

19   if it is worth anything to the government.

20   Q.   So is it dependent on the actual invention coming into

21   fruition?

22   A.   No.  No.  It's -- it doesn't have to come into fruition,

23   but it's dependent on whether or not it could come into

24   fruition.

25   Q.   And so what would -- do you have any experience with

1    people assigning rights or purchasing rights, waiving their

2    rights?  Is there any exchange of money for the rights to a

3    patent such as this?

4    A.   Yes, they're generally -- generally you can exchange -- I

5    don't know what the exact value of the -- of this would be,

6    but a detector for a -- so the cost of an electron microscope

7    ranges from, you know, $50,000 to tens of millions of dollars

8    depending on the complexity and the setup.

9        We would presume that the heart of the electron

10    microscope would be, you know, probably half to a quarter of

11    that so -- and the number of microscopes in the nation, just

12    United States --

13    Q.   But you're talking about existing -- and this is

14    something that would come into fruition; right?

15    A.   Uh-huh.

16    Q.   So would, perhaps, this new invention might actually be

17    worth more than the existing one?

18    A.   Yes.

19    Q.   Okay.

20    A.   Presumably, this would improve the values of existing

21    microscopes.  And as there is a lot of just like -- the method

22    of using the electron microscope could also just be used to

23    improve existing microscopes.

24    Q.   And then, finally, I just want to clarify something.  You

25    mentioned that these government rights, you said that they are

1   dependent on the people actually applying and paying for the

2   patent or waiving them or giving up their rights.

3       Could you just explain that?

4   A.   Okay.  So -- all right.  So if -- right.  So if the --

5   all right.  So presumably the person who gets the funds from

6   the government should be in contact with the funding agency

7   and they should be telling the funding agency whether or not

8   they have got a patentable invention.

9       If they do, then they should be notifying them whether or

10  not they're choosing to proceed or not with the invention.  If

11  the -- if the contractor decides not to, then those rights

12  revert to the government.

13  Q.   And in this case, do you have any reason to believe that

14  ScienceTomorrow notified anyone that they weren't going to

15  pursue this invention?

16  A.   Well, obviously, they did choose to pursue the invention.

17  Q.   Okay.  So they haven't waived that right?

18  A.   Right.  Yeah, the government rights don't end even though

19  ScienceTomorrow decided to proceed with the invention.

20  Q.   But the government rights don't start unless and until

21  the patent owners decide not to pursue it, is that -- am I

22  understanding that right?

23  A.   Okay.  So --

24  Q.   So let me put it this way.  As it stands right now, what

25  you know about this project, if the Department of Energy was

WILLIS - Redirect                                                    47

1    like, we're going to pursue this and we're going to assume all

2    rights to this invention, they couldn't do that, correct,

3    unless Jyoti Agrawal, Subhadarshi Nayak, ScienceTomorrow had

4    told them that they weren't pursuing it, then the government

5    would have a right.

6         That's just how I understood what you testified earlier.

7    A.   Yeah.  Other than the nonexclusive rights to the

8    invention itself, because they did want to pursue the

9    invention, the government sounds -- it sounds like the

10   government is subservient to what ScienceTomorrow wants to do.

11   So the government rights start at the point where

12   ScienceTomorrow decides to give up their rights.

13   Q.   Thank you.

14        MS. FANNIN:  No further questions, Your Honor.

15        THE COURT:  Mr. Nash?

16        MR. NASH:  Just on two quick follow-up points, Your

17   Honor.

18        THE COURT:  Yes, sir.

19                     REDIRECT EXAMINATION

20   BY MR. NASH:

21   Q.   In regards to the government rights to take over the

22   patent, you've just explained that, but is there also a

23   government right separate and distinct from that to use, for

24   government purposes, the innovation in the patent?

25   A.   There is.  Yes, that's what I was talking.

*WILLIS - Redirect*                                                                 48

1   Q.   The nonexclusive rights?

2   A.   Right.  The nonexclusive right to use the invention.

3   Yeah, it's --

4   Q.   So the government can use the invention without paying

5   license fees, without having to get permission, they can use

6   the invention as they see fit for government purposes?

7   A.   Yeah.

8   Q.   Is that the long and short of it?

9   A.   Yeah; um-hmm.

10  Q.   And then lastly, if you'll just look at the front page of

11  the patent again.  Ms. Fannin was asking you about when did

12  Dr. Nayak leave the project and you were estimating some

13  months prior to the application of the patent?

14  A.   Yes.

15  Q.   So there are actually two application dates on the front

16  page there.  There's the one that, number 22, and then one at

17  number 60.

18       Do you see it, number 60?

19  A.   60?

20  Q.   I'm on the front page, left-hand column.

21  A.   I'm sorry.  I don't see a 60 on this here.

22       MR. NASH:  Your Honor, may I approach the Elmo and

23  put it up?

24       THE COURT:  Yes, sir.

25  ///

49

1    BY MR. NASH:

2    Q.   So look on your screen there, Dr. Willis.

3    A.   Oh, okay, I see it now.  It's not in order.

4    Q.   Right.

5    A.   Oh, okay.  Yes, the provisional, yes, that's the one that

6    I was talking about.

7    Q.   Okay.

8    A.   So it would be probably about four to six months before

9    then.

10   Q.   So that date is October of 2014, so it was some months

11   before October of 2014?

12   A.   Yes.

13            MR. NASH:  That's all I have, Your Honor.

14            THE COURT:  I have just a couple of follow-up

15   questions for you, Dr. Willis.

16            THE WITNESS:  Yeah.

17            THE COURT:  To your knowledge, has this patent been

18   utilized by any person or entity, including a governmental

19   entity?

20            THE WITNESS:  I have no idea.

21            THE COURT:  So you don't know that this has ever been

22   utilized by anyone?

23            THE WITNESS:  Right.  That's -- that's -- I'm not

24   involved in any of the business operations of ScienceTomorrow.

25            THE COURT:  But you are familiar, I believe you said,

1    with electron microscopes across the country?

2              THE WITNESS:  Yeah, um-hmm.

3              THE COURT:  And you said this could improve the value

4    of those microscopes --

5              THE WITNESS:  Yes, it could.

6              THE COURT:  -- if utilized.  But based upon all the

7    information available to you, you're not aware of any

8    microscope, any electron microscope utilizing this patent or

9    any separate operation utilizing the patent at the current

10   time?

11             THE WITNESS:  I haven't followed the -- that since I

12   started working as a patent agent.

13             THE COURT:  All right.  In your work as a patent

14   agent, I would assume that you receive payment for the

15   services that you render?

16             THE WITNESS:  I do.

17             THE COURT:  And I would assume that you receive

18   those -- you receive payment regardless of whether you

19   recommend that a patent is viable or you say that it's not

20   viable; is that fair?  You get paid regardless of what your

21   opinion might be?

22             THE WITNESS:  That's true.

23             THE COURT:  But do you also receive additional monies

24   or payments if, in fact, you do assist in submitting a patent

25   application that is successful?

1          THE WITNESS:  I do, yeah, that's true.  But it's

2     not -- I don't recommend every -- I recommend less than

3     50 percent of the -- of the proposals that I get.  So it's not

4     like every single one is a winner.  Sometimes I'll be able to

5     identify the exact invention in the patent literature, or it's

6     just not a very useful patent.

7          THE COURT:  Now, with regard to the parties that

8     we've been discussing here, which would include those listed

9     as inventors in paragraph 72 --

10          THE WITNESS:  Um-hmm.

11          THE COURT:  -- as well as ScienceTomorrow and Qmetry

12     that was referenced earlier, separate business.

13          THE WITNESS:  Right.

14          THE COURT:  On how many occasions have you been

15     involved in either reviewing a possible application or in

16     submitting paperwork for an application for a patent?

17        This is one.  Are there any others?  You told me about

18     the second one from Qmetry.

19          THE WITNESS:  Oh, of the patent searches?  I did

20     another one for Qmetry, or for Mr. Nayak, but it's not related

21     to any of this information.

22          THE COURT:  Did that relate to the PFRS?

23          THE WITNESS:  It's not related to the PFAS, yeah.

24          THE COURT:  PFAS?  It is or is not?

25          THE WITNESS:  It is not.  It was not; it was

52

1    something else.

2           THE COURT:  Would that have been before or after this

3    patent application?

4           THE WITNESS:  That was after.  He came to me, like,

5    in 2020, that was --

6           THE COURT:  All right.  Ms. Fannin, Mr. Nash,

7    anything else?

8           MS. FANNIN:  Nothing from the United States, Your

9    Honor.

10          MR. NASH:  No, Your Honor.

11          THE COURT:  Thank you.  If you would, if you could --

12   if there's an exhibit that you have that was marked Exhibit 2,

13   Defendant's Exhibit 2?

14          THE WITNESS:  Yes.

15          THE COURT:  The patent itself, you could provide that

16   to the security officer.

17          THE WITNESS:  Here you go.

18          THE COURT:  And you can step down at this time.

19   Thank you, sir.

20      Mr. Nash, do you have an additional witness?

21          MR. NASH:  May this witness be finally excused, Your

22   Honor?

23          THE COURT:  Unless he's subject to subpoena by the

24   United States, he can be excused.

25          MR. NASH:  Dr. Willis, you can be finally excused.

SNYDER - Direct                                                    53

1      Your Honor, my next witness who is in the hall is
2   Jonathan Snyder.
3           THE COURT:  Snyder?
4              JONATHAN SNYDER, DEFENSE WITNESS, SWORN
5           THE COURT:  Thank you.
6       Mr. Nash.
7                        DIRECT EXAMINATION
8   BY MR. NASH:
9   Q.  Sir, will you please state your name?
10  A.  Jonathan Snyder.
11  Q.  And if you would, for the benefit of the court reporter,
12  spell your first and last name.
13  A.  J-o-n-a-t-h-a-n, S-n-y-d-e-r.
14  Q.  Mr. Snyder, my name is Patrick Nash, I'm the attorney for
15  Dr. Nayak.
16      Do you recognize Dr. Nayak?
17  A.  I do.
18  Q.  And you and I have spoken on the phone several times but
19  we've never met face to face; is that correct?
20  A.  Correct.
21  Q.  All right.  Sir, can you please describe your educational
22  background?
23  A.  I have a degree in electrical engineering with some
24  software focus, and an MBA.
25  Q.  All right.  And where did you obtain your degrees?

SNYDER - Direct                                                          54

1   A.   Both at University of Kentucky.

2   Q.   Okay.  And sir, what sort of work have you had following

3   your education?

4   A.   I was employed with Cypress Semiconductor for 16 years

5   after my degree, and that was electrical engineering and

6   programming kind of thing, more support of electrical

7   engineering process.

8   Q.   All right.  And were you in the United States Navy?

9   A.   I was.

10  Q.   What was your job in the United States Navy?

11  A.   I was a nuclear reactor operator on the USS Enterprise.

12  Q.   And at some point, Mr. Snyder, did you work with and for

13  Dr. Nayak?

14  A.   I did.

15  Q.   And approximately when was that?

16  A.   That was about three months in 2019.

17  Q.   Do you remember which three months?

18  A.   Not exactly, I know it was around August.

19  Q.   Okay.

20  A.   Give or take.

21  Q.   All right.  Give or take a few months, one direction or

22  the other?

23  A.   Yeah, I can't recall right now.

24  Q.   And what was your job when you worked for Dr. Nayak?

25  A.   He basically liked that I was an electrical engineer and

1    project manager, so I was -- he wanted me to take the idea

2    that he had already had and, you know, make sure that it

3    seemed feasible and scale it up to a larger scale to see if we

4    could move it into production kind of thing.

5    Q.   Okay.  And what was the idea?

6    A.   He was trying to do PFAS removal in the soil and that was

7    like using concrete and electricity to kind of destroy the

8    molecules.

9    Q.   Okay.  And you understand that -- and we've heard some

10   testimony that PFAS is a pollutant?

11   A.   Yes.

12   Q.   And so you all were working on ways to destroy this in

13   soil?

14   A.   That's correct.

15   Q.   All right.  So just -- so you were there for three

16   months.  What kind of work did you do for those three months?

17   A.   I verified the electrical engineering design, I kind of

18   took the idea and we had a tiller that we were trying to test

19   and make a small -- larger scale test of what he was trying to

20   do with that.  And that was basically what I was doing, as

21   well as giving him a roadmap of things we could do in the

22   future if this worked out.

23   Q.   All right.  And where were you doing this work?  Where

24   was the physical location?

25   A.   It was here in Lexington, north side of Lexington.  I

SNYDER - Direct                                                        56

1   don't remember the exact addresses.

2   Q.   So was it some sort of facility?

3   A.   Yeah.   Yeah.

4   Q.   Okay.   And did -- were you the first person to work on

5   this project or did people work on this project before you?

6   A.   No, there was -- he had an electrical engineer design the

7   initial idea with him prior to me, and I had never met him.

8   Q.   You never met him?  Did you ever see that person's work?

9   A.   He did have notes that I was able to review, yes.

10  Q.   So you reviewed that prior employee's work?

11  A.   Yes.

12  Q.   All right.   Now, based on your review of that data and

13  your own data, did the idea that you all were working to

14  develop seem scientifically sound?

15  A.   I had no reason to doubt otherwise.   I mean, I didn't do

16  the tests myself, but it looked good.

17  Q.   Okay.   And you worked with Dr. Nayak?

18  A.   Yes.

19  Q.   Did you find him to be a competent and qualified

20  scientist?

21  A.   Yes.

22  Q.   Now, the three months that you were there, were you able

23  to generate data?

24  A.   Yes, I mean, as much as there was.   It was basically just

25  trying and testing out and trying to make things work and

1   seeing that this didn't work or that didn't work kind of

2   thing.

3   Q.   Did you generate data that indicated that through some of

4   your efforts the PFAS were actually being destroyed?

5   A.   I personally did not do that.  We never got to that stage

6   even though we wanted to.

7   Q.   Okay.  So that was what you were working towards?

8   A.   Yes.

9   Q.   And you were making efforts to achieve that; correct?

10  A.   Yes.

11  Q.   And some of the things that you tried didn't work?

12  A.   Correct.

13  Q.   Okay.  And record was made of that and data was generated

14  about that?

15  A.   Yes.

16  Q.   All right.  Now, were you paid for your work?

17  A.   Yes, I was.

18  Q.   And were you paid at a market rate, or above market,

19  below market?

20  A.   Market rate.  It was basically an agreement that if

21  things worked out that things would move in a better

22  direction, I'd get some extra compensation, but --

23  Q.   But you were paid for the work that you performed?

24  A.   Definitely, yes.

25  Q.   Was it by Dr. Nayak or by the business Qmetry?

1    A.   I believe he had it paid through Qmetry, yes.

2    Q.   Now, the facility where you all were working -- and you

3    were working for three months -- were those facilities

4    adequate?

5    A.   Yes.

6    Q.   All right.  And were there supplies that were necessary

7    to do the work that you were doing?

8    A.   Yes.

9    Q.   Were you provided the necessary supplies?

10   A.   Either he got them for me or I picked them up and he

11   reimbursed me for them, so yes.

12   Q.   Okay.  And during the project that you were working on

13   with Dr. Nayak, I guess the initial idea was Dr. Nayak's; is

14   that correct?

15   A.   Yes.

16   Q.   Did you contribute any to some of the ideas and offer

17   your own insights?

18   A.   I recall a couple of discussions we had about it, but I

19   don't remember any more specifics.  I'm sorry.

20   Q.   So based on your experience as an electrical engineer and

21   the areas that you've worked in, is there value to scientific

22   experiments that don't ultimately succeed like you hope?

23   A.   Oh, there's always value, just like Einstein tried a

24   thousand different ways and failed, you know, the last one

25   works.

*SNYDER - Cross*                                                          59

1    Q.   So what is the value of a failure?

2    A.   Well, it's a data point, it basically tells you that's

3    the direction that doesn't work and you need to go try

4    something else.

5    Q.   So it redirects you in a different -- to a different goal

6    or to a different method?

7    A.   Sure.

8    Q.   Is that accurate?

9    A.   Yes.

10   Q.   All right.

11        MR. NASH:  Your Honor, that's all the questions I

12   have of this witness.

13        THE COURT:  All right.  Thank you.

14   Ms. Fannin.

15        MS. FANNIN:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17   BY MS. FANNIN:

18   Q.   Good afternoon, Mr. Snyder.  You mentioned that you

19   reviewed a prior employee's work.  What was the name of that

20   employee?

21   A.   I'm sorry.  Could you direct the microphone down a little

22   more?

23   Q.   Oh, sorry.  You said you reviewed a prior employee's

24   work.  What was the name of that employee?

25   A.   I don't recall.

SNYDER - Cross                                                      60

1   Q.   Have you worked on any SBIR projects?

2   A.   No, I have not.

3   Q.   And just to be clear, you were working for Qmetry in the

4   August of 2019 time frame, or thereabouts?

5   A.   Yes.

6   Q.   It's fair to say you did not work on this project March

7   of 2019 or previous to that?

8   A.   That is correct.

9   Q.   And you said you never got to the PFAS stage, you never

10  got to the testing stage, it wasn't successful.  Could you

11  just elaborate on that a bit?

12  A.   Well, I know that Subu had done the testing in a small

13  scale and he showed me those results.  I don't recall them

14  very much, but I did see that they were done.  I didn't do any

15  further testing as far as that's concerned, because the

16  material science is his specialty rather than -- mine was just

17  looking at the electrical aspect and looking at the scaling

18  abilities.

19  Q.   So you don't remember if the previous results that you

20  reviewed -- you don't remember what time frame that was?

21  A.   It was before me, that's all I can tell you.

22  Q.   You don't remember if there was any indication if PFAS

23  were removed or not?

24  A.   I was told that they were, yes.

25  Q.   But you don't have a recollection of reviewing the

1    records and seeing for yourself whether or not that data

2    showed that PFAS was removed from those testing specimens?

3    A.   I do recall looking at data, but whether or not I

4    interpreted it correctly, I would not know.

5           MS. FANNIN:  No further questions, Your Honor.  Thank

6    you.

7           THE COURT:  Mr. Nash, anything else?

8           MR. NASH:  No, sir.

9           THE COURT:  Thank you.  Do you have any documents

10   that were given to you?  I don't think so.

11          THE WITNESS:  I don't have anything.

12          THE COURT:  All right.  Thank you, sir.  You may step

13   down.  You're excused.

14          MR. NASH:  Your Honor, my final witness is Dr. Nayak

15   which is going to take some time.  Would it be possible maybe

16   to take a short break at this point before we start with him?

17          THE COURT:  Ten minutes sufficient?

18          MR. NASH:  That would be fine, Your Honor, thank you.

19          THE COURT:  We'll take a ten-minute recess.

20      (A recess was taken at 2:27 p.m. until 2:38 p.m.)

21          THE COURT:  We'll continue with the restitution

22   hearing scheduled in Lexington Criminal Action 20-144, United

23   States v. Nayak.

24      Mr. Nash, are you ready to call your next witness?

25          MR. NASH:  Yes, Your Honor, I would call Dr. Nayak.

1          SUBHADARSHI NAYAK, DEFENSE WITNESS, SWORN

2          THE COURT:  All right.  Thank you.

3      Mr. Nash, you may proceed.

4                    DIRECT EXAMINATION

5   BY MR. NASH:

6   Q.   Sir, state your name, please, and spell both your first

7   and last name.

8   A.   Subhadarshi Nayak, S-u-b-h-a-d-a-r-s-h-i, last name

9   N-a-y-a-k.

10  Q.   And sir, in what city do you reside?

11  A.   Lexington.

12  Q.   And what is your current occupation?

13  A.   I drive for DoorDash, and I also work in Panera Bread as

14  a preparer.

15  Q.   Okay.  And Dr. Nayak, you have an accent, obviously, so

16  let me just remind you and ask you to speak very slowly.  The

17  court reporter is taking down everything and she needs to be

18  able to understand everything that's said, okay?

19  A.   Right.

20  Q.   All right.  Just very briefly, what sort of degrees do

21  you have?

22  A.   I have Ph.D. in material science, I have an undergrad

23  degree in metallurgical engineering, and I'm about to complete

24  an MBA in sustainability.

25  Q.   All right.  And what sort of job -- we've heard today

1    about the business of ScienceTomorrow and the business of

2    Qmetry.

3         What sort of jobs did you hold prior to those businesses?

4    A.    I worked in Caterpillar for five years as a plant

5    metallurgist and I did -- I worked for Intel Corporation as a

6    senior engineer doing research in interconnect.

7    Q.    Okay.  And then, is that the point at which you started

8    to work for ScienceTomorrow?

9    A.    Yeah.

10   Q.    Okay.  So we'll get to that in just a second.

11        During your education and your work history, did you

12   develop a scientific interest in scanning electron

13   microscopes?

14   A.    Yes.

15   Q.    What is a scanning electron microscope?

16   A.    SEM is a very important tool in physical [indiscernible]

17   pyrolytic sciences.  It is used for magnifying objects so we

18   can see and study material under microscope.  It has a source

19   of electron, either thermal or electronic, and then the

20   electron beam is [indiscernible], accelerated and focused into

21   a small area on the sample.  And as it is scanned from point

22   to point, we get three dimensional photographic image of the

23   sample and that way we can understand the material or the

24   organism better, which cannot be possible in any other

25   methods.

1    Q.   Okay.  Now, you started that answer and you said an SEM,

2    is that shorthand for --

3    A.   Scanning electron microscope.

4    Q.   Okay.  So when you say SEM, you mean -- that's what you

5    mean?

6    A.   Yes.

7    Q.   Okay.  Now, through your education and your work and your

8    scientific interests, did you develop ideas about how an SEM

9    could be improved?

10   A.   Yes.

11   Q.   And we'll talk about that just in a minute, but is there

12   a particular scientist that you worked with in your career

13   that sort of facilitated your interest in SEM?

14   A.   Yes, I did my Ph.D. in University of Tennessee,

15   Knoxville, I had of professor David Joy who was a pioneer in

16   SEM field.

17   Q.   Now, let me -- you said David, and the last name is Joy,

18   J-o-y?

19   A.   Yes.

20   Q.   Go ahead.

21   A.   He is -- he was a pioneer in this field with 60 years of

22   experience in the SEM field, and he happened to be my Ph.D.

23   examiner.  I worked with him closely on the print aspects of

24   microscope, and that is what we developed interest in this

25   field.

1   Q.   I see.  Okay.  Now, this business, ScienceTomorrow, who

2   did you start that business with?

3   A.   With my ex-wife, Dr. Jyoti Agrawal.

4   Q.   Okay.  And at some point, ScienceTomorrow was located

5   here in Kentucky; is that correct?

6   A.   Yes.

7   Q.   Where was it located prior to Kentucky?

8   A.   We started in original Phoenix, yeah, Phoenix, Arizona

9   then we moved to Washington, DC suburb in Northern Virginia,

10  and then in 2013 December we moved to Lexington, Kentucky.

11  Q.   And did you have a physical location?  Did

12  ScienceTomorrow have a physical location in Lexington,

13  Kentucky?

14  A.   Yes, we had a facility within University of Kentucky

15  building, it's called ASSTeC.

16  Q.   It's called what?

17  A.   ASSTeC.

18  Q.   Can you spell that?

19  A.   A-s-s-t-e-c.

20  Q.   Okay.  And was this a facility that allowed for

21  scientific experimentation?

22  A.   Yes.

23  Q.   All right.  Other than yourself and your ex-wife, were

24  there other employees from time to time with ScienceTomorrow?

25  A.   Yes, we hired a number of interns, hired during

*SUBHADARSHI - Direct*                                                          66

1   summertime and other time, and in 2014 I believe we hired two

2   Ph.D. engineers and an undergrad engineer started working with

3   us.

4   Q.   Okay.  So those folks were Ph.D. level people, some of

5   them?

6   A.   Two were Ph.D. and one was undergrad.

7   Q.   And when you said you had the interns that worked in the

8   summertimes and at other times, what typically was the

9   educational level of your interns?

10  A.   They were usually in engineering programs or science

11  program, some of them were undergrad and couple of them were

12  in graduate programs.

13  Q.   Okay.  So undergraduate and graduate students?

14  A.   Yes.

15  Q.   Is that right?  Okay.  Now, did there come a time that

16  the business, ScienceTomorrow, sought a Small Business

17  Innovation Research grant to research and develop improvements

18  to the SEM?

19  A.   That's correct.

20  Q.   And was there a *Phase I* proposal for this sort of

21  improvement?

22  A.   Yes.

23  Q.   Okay.

24        MR. NASH:  Your Honor, may I hand the witness a

25  document?

1          THE COURT:  Yes, sir.

2          MR. NASH:  Your Honor, I have one for the Court as

3    well.

4          THE COURT:  Yes, sir, thank you.

5    BY MR. NASH:

6    Q.   Dr. Nayak, do you recognize this document?

7    A.   Yes.

8    Q.   Tell the Court what this document is.

9    A.   This is the *Phase I* proposal for the said project

10   submitted to the Department of Energy.

11   Q.   All right.  And the title of this project, or I'm sorry,

12   the title of this proposal on the first page is Direct Digital

13   Secondary Electron Signal Acquisition Probe for Scanning

14   Electron Microscope.

15   A.   That is correct.

16   Q.   Can you tell us what that means in layman's terms?

17   A.   Sure.  An SEM has three major functional unit.  One is

18   the source of electron, then there is a series of lenses that

19   accelerate and refine the primary electron beam that comes and

20   hits or impinges on the sample, and when the primary beam of

21   electron hit the sample, it knocks off some electrons from the

22   material itself, and there is a secondary -- the secondary

23   electrons and then a signal [indiscernible] system, a

24   detector, acquiesce signal from this -- acquiesce the

25   secondary electron and that is how you form a point-by-point

1   map of the sample, and that gives a topographic image of the

2   sample.

3   Q.   So was this proposal that you have in front of you a

4   proposal to begin the development of some sort of a device to

5   improve on the collection of the secondary electrons?

6   A.   Yes.  So the existing technology is based on 1967

7   invention called Everhart-Thornley --

8   Q.   Let me stop you right there.  Hold on.  Hold on just a

9   second.  So you said that this, the current technology was

10  from the '60s; is that right?

11  A.   1967.

12  Q.   1967?  And so the innovation in this proposal is designed

13  to improve upon that 1960's era technology?

14  A.   It was -- what is -- what I would call a substantial leap

15  from that technology.

16  Q.   Substantial leap?

17  A.   Yes.

18  Q.   Okay.  And was this proposal, the idea that is outlined

19  in this proposal, was this your idea?

20  A.   Yes.

21  Q.   All right.  And this proposal is a number of pages long,

22  does it describe the idea?

23  A.   Yes.

24  Q.   And does it describe your plan for developing that idea?

25  A.   That's correct.

*SUBHADARSHI - Direct*                                                          69

1    Q.   All right.

2              MR. NASH:  Your Honor, I would ask this be admitted

3    as Defendant's Exhibit 3-A.

4              THE COURT:  Any objection?

5              MS. FANNIN:  No objection, Your Honor.

6              THE COURT:  Defendant's Exhibit 3-A is admitted for

7    purposes of this hearing.

8    BY MR. NASH:

9    Q.   So, Dr. Nayak, this application was made to get research

10   and development money; is that right?

11   A.   Yes.

12   Q.   Who is the applicant for this research and development

13   money?

14   A.   ScienceTomorrow.

15   Q.   All right.  And in the body -- and I'm not going to ask

16   you to flip through this lengthy document, but we've heard

17   testimony today about a thing called a principal investigator?

18   A.   Yes.

19   Q.   Who is the principal investigator in this project?

20   A.   I was.

21   Q.   And does this document contain the identity of a

22   co-investigator or a collaborator?

23   A.   Yes.

24   Q.   Who was the collaborator?

25   A.   My professor Dr. David Joy.

1    Q.   Okay.  And does this document identify who is the

2    authorized representative of the applicant?  The applicant

3    being ScienceTomorrow, who is the authorized representative?

4    A.   President Dr. Agrawal.

5    Q.   And that is your -- can you spell that?  Doctor what?

6    A.   J-y-o-t-i, A-g-r-a-w-a-l.

7    Q.   So that person is identified as the authorized

8    representative and president of ScienceTomorrow; correct?

9    A.   Yes.

10   Q.   All right.  So as a result of this application, was the

11   grant obtained?

12   A.   Yes.

13   Q.   And did the work proceed?

14   A.   Yes.

15   Q.   And what -- how long did it proceed?  What was -- this

16   application is dated December 13th -- I'm sorry.

17             THE COURT:  10th.

18             MR. NASH:  Your Honor, I've handed the wrong

19   document, may I --

20             THE COURT:  Switch?

21             MR. NASH:  Well -- so, is Exhibit 3-A which is in

22   front of you, which phase application is this for?  And if you

23   flip -- you can flip to the one, two, third, fourth page and

24   you'll see.

25   A.   I believe --

SUBHADARSHI - Direct                                          71

1   Q.   I'm sorry, fifth page.

2   A.   This is *Phase II*.

3   Q.   This is *Phase II*.

4          MR. NASH:  So I have mis-numbered them, Your Honor,

5   so the record will reflect that 3-A is *Phase II* application.

6   May I, Your Honor, hand the witness Exhibit 3-B?

7          THE COURT:  Yes, sir.

8          MR. NASH:  Thank you.  And one for the Court as well,

9   Your Honor.

10  BY MR. NASH:

11  Q.   Dr. Nayak, have I handed you now the *Phase I* application?

12  A.   Yes.

13  Q.   All right.  They look quite a bit alike, the *Phase I* and

14  *Phase II* application on the cover; is that correct?

15  A.   The cover page are the same, yeah.

16  Q.   Okay.  So Exhibit 3-B, Dr. Nayak, the *Phase II*

17  application, it is dated October of 2012; correct?

18  A.   Yes.

19  Q.   So, over what time period did the *Phase I* work cover?

20  A.   I don't exactly remember the dates, I believe this was a

21  proposal submission.  It takes few months for the proposal to

22  be awarded and for DOE it was -- I believe it was nine months

23  period of performance of the project.

24  Q.   All right.  So this project, the *Phase I* went on for

25  about a nine months, is that what you're saying?

*SUBHADARSHI - Direct*                                                          72

1    A.   Yeah.

2    Q.   And what sort of work was accomplished in those nine

3    months?

4    A.   So the *Phase I* goal was to come up with a proof of

5    concept.  So it was a bench-top or desktop setup where we

6    prove that our idea could actually work.  So we made silicon

7    or semiconductor detector and we put within the microscope to

8    see if it can actually collect the secondary electron signal.

9    And we proved that -- we found that to be working and that was

10   the goal of *Phase I*, which was accomplished.

11   Q.   Okay.  And then did ScienceTomorrow, and yourself

12   included, seek to move onto *Phase II*?

13   A.   That is correct.

14   Q.   And so is that the application in front of you that's

15   labeled 3-A, Exhibit 3-A?

16   A.   Yes.

17   Q.   This is a *Phase II* application?

18   A.   Yes.

19   Q.   All right.  Now, were you instrumental in putting

20   together both of those applications?

21   A.   At least the technical parts, yes.

22   Q.   So you were instrumental in writing the technical parts

23   of both of those applications?

24   A.   Yeah.

25   Q.   Okay.  And did somebody else work on other aspects of

1   those applications?

2   A.   Yes.

3   Q.   Who was that?

4   A.   Dr. Agrawal.

5   Q.   Okay.  So if you look at Exhibit 3-A, it looks like it

6   was submitted in December of 2013; is that accurate?

7   A.   Yes.

8   Q.   And this was a continuation -- this proposal outlined a

9   continuation of the research and development that had been

10  accomplished as part of *Phase I*?

11  A.   Yes.

12  Q.   All right.  And are all the applicants and investigators

13  the same?

14  A.   Yes.

15  Q.   And the authorized rep and the president are all the

16  same?

17  A.   Yes.

18  Q.   Is that right?

19  A.   Yes.

20  Q.   Okay.  Was this grant awarded, this *Phase II* grant?

21  A.   Yes.  Yes.

22  Q.   Now, as everybody here is aware, and as the Judge is

23  aware, this application contained some falsehoods; correct?

24  A.   Yes.

25  Q.   And you've pled guilty to knowing about those and not

*SUBHADARSHI - Direct*                                                    74

1    correcting those falsehoods; correct?

2    A.   Yes.

3    Q.   And you've been convicted of wire fraud and conspiracy as

4    a result of that; correct?

5    A.   Yes.

6    Q.   Okay.  Now, let me ask you this, did the falsehoods in

7    the application have any impact on the work that you did

8    subsequent to the application?

9    A.   Not at all.

10    Q.   All right.  So what work did you do on *Phase II* of this

11    project?

12    A.   We started building a detector that could actually fit

13    inside the microscope to collect and process the secondary

14    electrons and eventually which can be used to make images, or

15    build images based on that signal.

16    Q.   All right.

17         MR. NASH:  Your Honor, if I failed to do so, I would

18    move to admit both 3-A and 3-B.

19         MS. FANNIN:  No objection, Your Honor.

20         THE COURT:  Both documents will be admitted for

21    purposes of this hearing.

22         MR. NASH:  Your Honor, may I hand the witness another

23    group of documents?

24         THE COURT:  Yes, sir.

25         MR. NASH:  And Your Honor, may I question from the

1    Elmo on these documents?

2            THE COURT:  Yes, sir.

3            MR. NASH:  Thank you.

4    BY MR. NASH:

5    Q.   Dr. Nayak, I have handed you what has been marked as

6    Defendant's Exhibits 4 through 10, you can unclip those.  And

7    are you familiar with these photographs?

8    A.   They look very familiar, yes.

9    Q.   Okay.  I'm going to put up here on the screen what has

10   been marked as Defendant's Exhibit 4 and you can either look

11   on the screen, Doctor, or look at the document in front of

12   you.

13       Do you recognize what's depicted in this photograph?

14   A.   Yes.

15   Q.   What is depicted in this photograph?

16   A.   This is the silicon wafer which was used to build this

17   detector.

18   Q.   Okay.  And when you say the silicon wafer, is that -- I'm

19   pointing now.  There is a black object in the lower part of

20   this photograph and then an orange object in the upper part.

21   A.   So the black part is actually there are a number of

22   wafers, they are standing up, and the red one, or the brown

23   one, is the actual wafer.

24   Q.   Okay.  And are these wafers -- how do these wafers relate

25   to the collection of these secondary electrons we've heard

*SUBHADARSHI - Direct*                                                    76

1    about?

2    A.   We build the circuit on this wafer, there's a process

3    semiconductor process, very similar to how the computer chips

4    are made.  We build that circuit on the top of this detectors

5    on this wafer, and then we take this semiconductor or silicon,

6    then put -- we have to connect that to electrical system to

7    [indiscernible] the signals -- secondary electron signals.

8    Q.   Okay.  I'm going to show you now, Dr. Nayak, what's been

9    marked as Defendant's Exhibit Number 5.  Take a look at that

10   and, if you would, tell the Court what that photograph

11   depicts.

12   A.   These, I believe, were the circuits printed on the

13   wafers.  So every big squares within that is supposed to be a

14   detector or heart of detector.  So there are a number of

15   circuits printed on the wafer.

16   Q.   I see.  All right.  Take a look, if you would, at

17   Defendant's Exhibit Number 6.  Does that essentially depict

18   the same thing as number five?

19   A.   Yeah, it looks like a different iteration so you have to

20   go through multiple trial and error to see which one work

21   better.  It looks like a different iteration.

22   Q.   I see.  All right.  Doctor, if you would, take a look at

23   Defendant's Exhibit Number 7 and tell the Court what that is,

24   what that depicts.

25   A.   That is the whole wafer and each square is -- each square

1  within that round wafer is supposed to be a detector.  Circuit

2  for detector rather.

3  Q.  So we heard earlier Ms. Fannin asked a witness a question

4  about whether there was any physical item developed as a

5  result of your work.  Are these the sorts of physical items

6  that were developed during the course of your work?

7  A.  Yes.  This is just one step towards that, yes.

8  Q.  Okay.  And during the course of your work at

9  ScienceTomorrow, how many different physical items like this

10  do you think were developed and tested?

11  A.  I don't exactly remember, but there were many.  So

12  sometime, like, new idea comes up, we just start doing

13  different things.  So I can't really give you a number.

14  Q.  Okay.  When you say many, are we talking five or six, or

15  are we talking a hundred?

16  A.  I would say hundred.

17  Q.  Okay.  Take a look, if you would, Dr. Nayak, at

18  Defendant's Exhibit 8 and tell the Court, if you would, what

19  that depicts.

20  A.  So the detector -- the green square you see, that is --

21  the green rectangle, that is the substrate, the little square

22  within that is the detector.  So the detector or the silicon

23  is sitting on the green substrate.  That substrate has

24  additional electrical -- electrical circuit that takes this

25  signal and process it so that we can -- we can do -- we can

*SUBHADARSHI - Direct*                                                      78

1    see things with that.

2        So there's, like, we call this second level interconnect.

3    So the first level interconnect is within the silicon and this

4    is the second level interconnect which is on the green

5    substrate.

6    Q.   All right.  Take a look, if you would, Dr. Nayak, at

7    what's been marked as Defendant's Exhibit Number 9 and tell

8    the Court what that depicts.

9    A.   So this is the substrate again with the physical support

10   and electrical connection that would be used for creating

11   signal from within the microscope, because the microscope is

12   isolated.  It's a vacuum chamber.  So you have to have some

13   kind of physical interface between the detector and external

14   world, so this is the step towards that.

15   Q.   I see.  And then, lastly in this group, Doctor, take a

16   look at Defendant's Exhibit 10.  What does that depict?

17   A.   This, I don't exactly remember, but this looks like a

18   part from the microscope through which we put the detector.

19   So it's basically a port of one of the microscope we used.  I

20   can't recall.  I can't place which microscope exactly it is,

21   but one of the microscopes we have used.

22   Q.   I see.

23       MR. NASH:  Your Honor, I would move to admit exhibits

24   4 through 10.

25       MS. FANNIN:  No objection, Your Honor.

*SUBHADARSHI - Direct*                                           79

1       THE COURT:  Those exhibits will be admitted for

2   purposes of this hearing.

3       MR. NASH:  Thank you.

4   BY MR. NASH:

5   Q.  So, Dr. Nayak, these photographs that we've just looked

6   at, are these all physical objects that were developed as part

7   of your SEM research in both *Phases I* and *Phase II*?

8   A.  Yes, but it shows only a small portion of the work we

9   did.  The background work is obviously not here.

10  Q.  Okay.  So this was a representative sample of the work

11  you did?

12  A.  (Nodding affirmatively.)

13  Q.  Is that right?

14  A.  Yes.

15  Q.  Okay.  Did there come a time when you ceased working on

16  *Phase II* of the SEM project?

17  A.  Yes.

18  Q.  When was that?

19  A.  I believe it was August 2014.

20  Q.  And why did you cease work?

21  A.  I was fired from the company.

22  Q.  Who fired you?

23  A.  Dr. Agrawal.

24  Q.  And was there something else going on at the time that

25  she fired you?

1    A.   Yes, there was marital conflicts.

2    Q.   You were married to her?

3    A.   Yes.

4    Q.   At the time?

5    A.   Yes.

6    Q.   And were you all subsequently divorced?

7    A.   Yes.

8    Q.   All right.  And you were one of the owners of

9    ScienceTomorrow, how was she able to fire you?

10   A.   She controlled everything related to the business.

11   Q.   Was she the majority owner?

12   A.   Yes.

13   Q.   So you were a minority owner?

14   A.   Yes.

15   Q.   I see.  All right.  Now, after you were fired in August

16   of 2014, did you do -- did you ever come back and do any other

17   work on the SEM project?

18   A.   Yes, there was a lengthy divorce process and I walked

19   away from this baby; this idea that was my baby for years, but

20   I could not walk away from my other baby, my son.  And there

21   was custody issues and I was hoping that if I help in the

22   project that will facilitate the custody issues we were going

23   through.  And that is the reason, I believe, it was in 2016,

24   September, I came back to help ScienceTomorrow continue this

25   work.

*SUBHADARSHI - Direct*                                                   81

1   Q.   So you came back in around September of 2016 because you

2   thought it would help in the custody issues?

3   A.   Yes.

4   Q.   And when you came back in September of 2016, how long did

5   you stay?

6   A.   A few months, maybe.

7   Q.   All right.

8   A.   A couple of months maybe.

9   Q.   In regards to *Phase II*, do you remember -- we saw the

10  application was in December of 2013 for *Phase II*.

11       Do you remember when work started on *Phase II*?

12  A.   I don't exactly remember; I think it was June 2014.

13  Q.   So approximately June of 2014?

14  A.   Yes.

15  Q.   And then you were fired in August of 2014?

16  A.   Yes.

17  Q.   And then so that's June, July, so you worked about three

18  months on *Phase II*; does that sound right?

19  A.   Yes.

20  Q.   All right.  And then you say you went back in September

21  of 2016 and worked for how many more months?

22  A.   Maybe a month or two or three months, maybe.

23  Q.   Okay.  So maybe maximum, the total that you worked on

24  *Phase II* was about six months?

25  A.   I didn't actually work full time.  Second time I was

1    helping them I did not work full time; I was just working a

2    few hours a week, something like that.

3    Q.   All right.  Do you know how long in total *Phase II*

4    lasted?

5         You say it started in about June of 2013.  Do you have an

6    idea of when it concluded?

7    A.   I believe they got a no-cost extension.  Originally it

8    should be two years, but I thought they got a extension beyond

9    two years.

10   Q.   Okay.  So the normal *Phase II* length is two years?

11   A.   Yes.

12   Q.   Is that right?

13   A.   Yes.

14   Q.   And so you think this *Phase II* went on a little longer

15   than two years?

16   A.   Yes.

17   Q.   And you worked during that two-year-plus project, you

18   worked maybe six months of that?

19   A.   Yeah.  I mean, not full time, but yeah.

20   Q.   Okay.  All right.  Now, earlier today an exhibit was

21   introduced into the record that was a declaration of a person

22   named Manuel Oliver, and the Court either has already or will

23   soon review this, but there is a statement in Mr. Oliver's

24   declaration and it -- specifically at paragraph 3 -- that the

25   statutory purpose of these grants that you obtained, one of

*SUBHADARSHI - Direct*                                                        83

1    the purposes is to perform early research and develop -- and

2    development on innovations with commercial potential, okay?

3         Did the work that you did accomplish those purposes?

4    A.   Yes.

5    Q.   So the work, you did, in fact, perform early research and

6    development on an innovation; correct?

7    A.   Yes.

8    Q.   And you did believe and still believe that this is an

9    innovation with commercial potential?

10   A.   Yes.

11   Q.   All right.  Mr. Oliver's declaration in paragraph four

12   also states that applicants are encouraged to build a

13   functional prototype or process that can be demonstrated to

14   potential investors.

15        Did your work accomplish that?

16   A.   At least we were working towards that, I don't know what

17   happened in the end, but we were working towards that, and it

18   was possible.  Where I was, it was possible that we achieved

19   that.

20   Q.   All right.  So some of the photographs that we saw, was

21   that your work that was designed to help build a functional

22   prototype?

23   A.   Yes.  Yes.

24   Q.   All right.  Mr. Oliver says at paragraph 12 of his

25   declaration, that commercialization of the innovation supports

*SUBHADARSHI - Direct*                                                    84

1    the principal and public purpose of the financial assistance

2    provided.

3          Were you all working towards the commercialization of

4    this?

5    A.   Yes.

6    Q.   And that was the type of work that you were doing while

7    you were there?

8    A.   Yes.

9    Q.   Okay.  And then finally, at paragraph 15, Mr. Oliver says

10   that the results of *Phase II* may not be able -- that people

11   may not be able to trust that the reported research was

12   completed or that the results were truthful.

13         During your time, was the reported research completed?

14   A.   Yes.

15   Q.   And were the results that were reported truthful results?

16   A.   Yes.

17   Q.   All right.  We heard from Peter Willis, Dr. Willis, about

18   the patent that resulted.  Are you familiar with that patent?

19   A.   Yes.

20   Q.   And you worked with Dr. Willis getting that patent?

21   A.   I did provide some technical inputs for that, yes.

22   Q.   All right.  And was it your work and your idea that was a

23   very large part of that patent?

24   A.   Yes.

25   Q.   And do you -- you heard the value that Peter Willis

1   assigned to that patent.  Do you believe that patent has

2   value?

3   A.   Yes.

4   Q.   All right.  And as far as the government rights go, was

5   it your understanding and your agreement that the government

6   would have rights with that patent?

7   A.   Yes.  And we were actually talking to a number of

8   national laboratories who would be interested in this kind of

9   technologies and some of them were very interested to use this

10  and they could use it without paying any licensing because of

11  the government rights in this technology.

12  Q.   So the government laboratories could use it without

13  paying any license fees?

14  A.   Yes.  And we were processing towards that.

15  Q.   Now, you might remember that the Judge inquired earlier

16  about whether anyone -- I think he was inquiring of

17  Dr. Willis, whether anyone had actually used or showed

18  interest in the innovation in the patent.

19       Do you have knowledge whether anyone has shown interest

20  in the patent?

21  A.   Have shown interest, I cannot recall exactly which

22  department or which person, per se, but at least two national

23  laboratories -- scientists from two national laboratories have

24  shown interest in this.

25            MR. NASH:  Your Honor, may I hand the witness what

1    I've marked as Defendant's Exhibit Number 11?

2              THE COURT:  Yes, sir.

3    BY MR. NASH:

4    Q.   Dr. Nayak, do you recognize this document?

5    A.   Yes.

6    Q.   What is it?

7    A.   This is a property settlement agreement from our divorce.

8    Q.   From whose divorce?  From your divorce?

9    A.   Yes.

10   Q.   If you would -- and is this the divorce that you'd

11   previously testified about?

12   A.   Yes.

13             MR. NASH:  Your Honor, I would move to admit

14   Defendant's Number 11.

15             MS. FANNIN:  No objection, Your Honor.

16             THE COURT:  Exhibit 11 will be admitted.

17   BY MR. NASH:

18   Q.   If you would, sir, please turn to paragraph 7 of this

19   document, which is at page 9.  Do you see that?

20   A.   Yes.

21   Q.   Would you please read the very first sentence of

22   paragraph 7?

23   A.   "ScienceTomorrow, LLC, wife shall retain all ownership

24   interest in ScienceTomorrow, LLC, as realized exclusive

25   ownership rights of any and all intellectual property

1    associated with ScienceTomorrow, LLC, free and clear of any

2    claim [indiscernible] now or in future.

3    Q.   So, Dr. Nayak, when you signed this property settlement

4    agreement, did you understand that to mean that you would have

5    no further rights in the patent that we've been talking about?

6    A.   That's correct.

7    Q.   And no rights at all in ScienceTomorrow either?

8    A.   Yes.  I also had a noncompetition agreement along with

9    this.  That means I cannot compete with ScienceTomorrow.

10    Q.   I see.  Dr. Nayak, were you paid for your work on

11    *Phase II* of the SEM project?

12    A.   Yes, when I was working full time, I got three -- I think

13    three months' salary, I don't exactly remember, but probably

14    two or three months' salary.

15    Q.   All right.  And then were you paid when you went back

16    again in September of 2016?

17    A.   Yes, I got some consulting fee and some reimbursement for

18    travel as well as instrument I gave them.

19    Q.   ScienceTomorrow paid you for a piece of equipment?

20    A.   Yes.

21    Q.   All right.  Do you recall in total how much you were paid

22    on *Phase II*?

23    A.   My salary was initially three or four months, I don't

24    exactly remember.  It was about $10,000 or $11,000.

25    Q.   Per month?

*SUBHADARSHI - Direct*                                                    88

1    A.   Per month.

2    Q.   Okay.

3    A.   And during the second duration where I was consulting

4    with them, I think I got about $16,000.  $10,000 or $12,000

5    towards consulting fee and the rest as expenses.

6    Q.   All right.  Was this payment that you were paid at a

7    market rate?

8    A.   It was actually less than what I used to make in the

9    previous jobs.

10   Q.   Back when you worked at Intel?

11   A.   Yes.

12   Q.   Okay.  Did you receive any other benefits from the

13   *Phase II* grant money other than those that you just described?

14   A.   No.

15   Q.   Do you have any current affiliation with ScienceTomorrow?

16   A.   No.

17   Q.   And do you have any current affiliation with your

18   ex-wife?

19   A.   No.

20   Q.   All right.  Dr. Nayak, I want to switch gears now and ask

21   you about a company called Qmetry, okay?

22   A.   Yes.

23   Q.   Before I ask you about that, we heard that you developed

24   a scientific interest in scanning electron microscopes through

25   your work and through your education.  Did you also develop a

1    scientific interest in environmental issues?

2    A.   Yes.

3    Q.   And so you then started a business called Qmetry?

4    A.   Yes.

5    Q.   Was that after you left ScienceTomorrow?

6    A.   Yes.

7    Q.   All right.  What was your plan regarding Qmetry's role in

8    addressing environmental issues?

9    A.   I was looking into ways I can help -- use my skills to

10   help alleviate environmental issues.  So that is when I came

11   across this PFAS project being sought by EPA.

12   Q.   All right.  And we've heard that PFAS are a contaminant

13   that can be a problem in soil.  Did you think about that

14   problem and come up with an idea for remediation?

15   A.   Yes.

16   Q.   What was your idea?

17   A.   So this PFAS was known as perfluoroalkyl substance.

18   Q.   Stop.  Let me stop you right there.  You're going to have

19   to spell that for the court reporter.

20   A.   P-e-r-f-l-u-o-r-o-a-l-k-y-l, substance.

21   Q.   Okay.

22   A.   And so the prefix "per" means all, alkyl are

23   hydrocarbons, so basically means all the hydro and hydrocarbon

24   is replaced by fluorine and fluorine happens to be the most

25   electronegative element in the entire [indiscernible] table.

*SUBHADARSHI - Direct*                                                                  90

1   What it means, this fluorine sucks electron away from carbon

2   and shields this molecule, and because of that, you can now

3   connect or bond two very different incompatible chemicals at

4   both ends.  And also because the electron cloud shields the

5   carbons and it's very hard to destroy it.

6        It's been much like body fat, there's too much of it,

7   it's harmful and it's hard to get rid of.  In fact, it's so

8   hard to get rid of, it's called forever chemical, but when it

9   goes into any animal or plant bodies it adheres or it sticks

10  to any organ that is -- that is surface sensitive, like kidney

11  and liver.

12       In fact, the company that invented this, 3M, it realized

13  that it's so toxic that they did not commercialize this, but

14  other companies went with it and commercialized, and it's

15  everywhere now because it was not regulated until 2020 in the

16  U.S.  It's everywhere.  Including our tap water.

17       So obviously, when I was working in Intel, that time we

18  had a -- we had a mandate to comply our product with Stockholm

19  Convention.  Stockholm Convention was --

20  Q.   Let me stop you right there, Doctor, you are getting a

21  little far afield.  And I know you're passionate about this,

22  but let me just ask you to abbreviate this a bit.  So PFAS are

23  bad; right?

24  A.   Yes.

25  Q.   They can be toxic?

1    A.   Yes.

2    Q.   Right, and they are really hard to get rid of?

3    A.   Yes.

4    Q.   Okay.  Is that the long and the short of it?

5    A.   Yes.

6    Q.   Okay.  So what was your idea about how to get rid of

7    them?  Did you come up with an innovation?

8    A.   Yes.  I approached this from the first principle.  I

9    looked at how it is made.  It is made through electrochemistry

10   and I used same electrochemistry method to break it.

11   Something that makes it can only break it.  And that is the --

12   along with some practical knowledge that I had about soil and

13   dealing with soil in earth moving while working at

14   Caterpillar.  I came up with the design that we can use this

15   electrode or this machine to oxidize or destroy these

16   chemicals on site without having to go through logistic

17   nightmares.

18   Q.   Okay.  So your innovation was an instrument that used

19   electricity, among other things, that could destroy these PFAS

20   in the soil on site; is that right?

21   A.   Yes.

22   Q.   Rather than having to dig up all the soil and transport

23   it somewhere else and do the job there?

24   A.   Yeah.

25   Q.   Okay.  And did you make a proposal then to get some

SUBHADARSHI - Direct                                              92

1    research and development money to further this idea?

2    A.   Yes.

3    Q.   All right.

4              MR. NASH:   Your Honor, may I hand, please, the

5    witness what I've marked as Defendant's Number 12?

6              THE COURT:   Yes, sir.

7    Q.   Dr. Nayak, do you know what this document is?

8    A.   Yes.

9    Q.   What is it?

10   A.   It's a *Phase I* proposal we submitted to EPA for funding

11   for PFAS remediation in soil.

12   Q.   Is this the proposal that we heard Ms. April Richards

13   testify about earlier today?

14   A.   Yes.

15   Q.   This is the proposal that resulted in $100,000 worth of

16   money coming to Qmetry?

17   A.   Yes.

18   Q.   Is that right?  Okay.  And, of course, the Judge is aware

19   that you have pled guilty to certain falsehoods in this

20   proposal, and you've already been sentenced for that; correct?

21   A.   Yes.

22   Q.   So let me ask you this.  Did the fact that the proposal

23   contains falsehoods impact your work on this project?

24   A.   Not at all.

25   Q.   Did your work proceed as you had planned and hoped that

1    it would?

2    A.   Yes.  I mean, the proposal was defective but when we

3    actually did work, we -- like any other scientific research

4    work, it went through.

5    Q.   Okay.  So this proposal was made, it looks like in --

6    well, let me ask it to you this way.  Yeah.  The proposal was

7    made in December of 2017, according to this document.  Does

8    that sound right?

9    A.   Yes.

10   Q.   And this document is multi pages.  Does it set out all

11   the work that you planned to do?

12   A.   On a high level.

13   Q.   On a high level?

14   A.   Yeah.

15   Q.   And it sets out your idea and how you think it might

16   work?

17   A.   Yes.

18   Q.   Right?

19   A.   Yes.

20   Q.   And you prepared this proposal?

21   A.   Yes.  And the other thing is -- other part of the

22   proposal is also looking at what other people have done and to

23   look at their result and make logical deviation from other

24   result how ours will process.

25              MR. NASH:  Your Honor, I would move to admit

*SUBHADARSHI - Direct*                                              94

1    Defendant's Exhibit Number 12.

2              THE COURT:  All right.

3              MS. FANNIN:  No objection, Your Honor.

4              THE COURT:  Exhibit 12 will be admitted.

5    BY MR. NASH:

6    Q.   Okay.  So we heard that this application was made in

7    December of 2017; correct?

8    A.   Yes.

9    Q.   And then we heard from April Richards that the

10   performance period for this project was October of 2018

11   through March of 2019.  Is that your memory?

12   A.   Yes.  There was unusual delay in decision making for this

13   proposal.  There's usually take three months, but in this case

14   it took almost a year or ten months because there was change

15   in EPA.  EPA hired a new administrator.

16   Q.   Well, but those are preauthorization delays.  Let me ask

17   you about the delays once the grant was given.  So April

18   Richards says that work was to begin in October of '18 and end

19   in March of '19.

20   A.   That's correct.

21   Q.   Did that work get delayed?

22   A.   Yes.

23   Q.   Why did it get delayed?

24   A.   There was a government shutdown in December, 2018, and as

25   a result, I did not get any money until late February, I

SUBHADARSHI - Direct                                        95

1    believe.  Everything was delayed.  And because I did not have

2    cash and other resources, I could not perform some of the

3    work.  More importantly, I couldn't hire anybody with the

4    uncertainty in cash flow.  I didn't have resources to hire

5    anybody who could help me in this work.

6    Q.   All right.  But at some point did the work on this

7    project commence and proceed?

8    A.   That's correct.

9    Q.   And we heard from Jonathan Snyder.  Was he one of the

10   people that you hired to work on this project?

11   A.   Yes.

12   Q.   And was there another person you hired before Mr. Snyder?

13   A.   Yes.

14   Q.   Now, you're going to have to spell this person's name for

15   the court reporter.

16   A.   Hozzat, H-o-z-z-a-t, Savari, S-a-r-v-a-r-i.

17   Q.   So Mr. Savari was the person that you hired to work with

18   you prior to Mr. Snyder?

19   A.   Yes.

20   Q.   And what were Mr. Savari's credentials?

21   A.   He was a recent Ph.D. from the University of Kentucky.

22   Q.   What was his area of specialty?

23   A.   Electrical engineering.

24   Q.   All right.  So tell the Court about the work that you and

25   Savari and Snyder did on *Phase I* of this PFAS project.

SUBHADARSHI - Direct                                                    96

1  A.   *Phase I*, we built a benchtop setup in which we pass some

2  specific kind of electricity, like pulse electricity with

3  appropriate chemical environment on a very small scale to

4  destroy this chemicals.  These chemicals are only in low

5  concentration, like parts per trillion, so we had to pass bump

6  [indiscernible] up to get these molecules and destroy them.

7       And so once we run this experiment, we send this sample

8  to a third-party laboratories who do the independent testing

9  of this sample before and after to know and to find out how

10  much chemicals have been destroyed, and if they are destroyed

11  at all, and how much chemicals are destroyed.  So did that in

12  the *Phase I* on a small scale.

13  Q.   Did you, as you were doing these experiments and tests,

14  did you record your data?

15  A.   Yes.

16  Q.   And did the data -- what did the data show regarding

17  whether or not the efforts to destroy PFAS were successful or

18  not?

19  A.   Yes, there was reproducible data that shows that our

20  method was able to destroy chemical within 17 minutes of the

21  experiment.

22  Q.   I see.

23       MR. NASH:  Your Honor, may I approach?

24       THE COURT:  Yes, sir.

25  ///

*SUBHADARSHI - Direct*                                                      97

1    BY MR. NASH:

2    Q.   Dr. Nayak, please take a look at this document, and if

3    you recognize it, please tell us what it is.

4    A.   This was one of the bench-top setup.

5    Q.   Hold on.  Don't tell me what the photograph is.  What is

6    the document?

7    A.   The document is, I think, the final report that was

8    submitted to EPA as part of the *Phase I* project.

9    Q.   So this is your final *Phase I* report that describes the

10   results of your work?

11   A.   Yes.

12   Q.   Okay.  Now, and you prepared this report?

13   A.   Yes.

14        MR. NASH:  Your Honor, I would move to admit

15   Defendant's Exhibit 13.

16        MS. FANNIN:  No objection, Your Honor.

17        THE COURT:  Exhibit 13 will be admitted.

18   BY MR. NASH:

19   Q.   So now you can tell the Court, Dr. Nayak.  I see there's

20   at least a few photographs in this report, the first page and

21   on the fourth page.  What do those photographs depict?

22   A.   The first one was the setup for -- so the small white

23   container was the one which had the chemical in soil, and we

24   had the setup which was sending out certain pulsed electricity

25   for the chemical reaction to take place.  So this was the

1    setup for that.

2    Q.   I see.

3    A.   And the instrument on the right side was the power

4    supply.

5    Q.   And then there's some other photographs four pages in.

6    What did those photographs depict?

7    A.   So figure 2 is we had a special concrete electrode with

8    certain chemicals that could accelerate this reaction.  So

9    that was the electrode we built for this experiment.

10   Q.   All right.

11   A.   And the other pictures are showing the structures of the

12   surface of that electrode.

13   Q.   All right.  And does the remainder of the report contain

14   some charts and some graphs that represent your research and

15   what your research showed?

16   A.   Yes.

17   Q.   All right.  And this report was submitted to whom?

18   A.   To EPA.

19   Q.   All right.  So the people that you hired to work on this

20   project with you, were they paid?

21   A.   Yes.

22   Q.   And from what money?

23   A.   From the EPA contract money we got.

24   Q.   All right.  And the EPA contract money paid their salary,

25   did it also pay their taxes?

1    A.   And payroll taxes, yes.

2    Q.   Payroll taxes.  What other things was the EPA money used

3    to pay?

4    A.   For the facility, renting out the facility, to do the

5    third-party tests by external laboratories, also to buy all

6    the supplies, and some of the equipment.

7    Q.   Were you also paid?

8    A.   Yes, I was paid -- I was paid for four months.

9    Q.   For four months?

10   A.   Yes.

11   Q.   Do you remember how much you paid yourself per month for

12   those four months?

13   A.   I think about $10,000 per month.

14   Q.   Okay.  So you paid yourself around $40,000 of the

15   $100,000?

16   A.   I believe so.

17   Q.   The rest of the $100,000, was it spent on anything not

18   related to this research project?

19   A.   No.

20   Q.   Was all of the money, all of the $100,000 spent in

21   relation to the research of this project?

22   A.   Yes.

23   Q.   All right.  Now, you admitted in your plea agreement --

24   well, let me back up a step.  We heard April Richards say that

25   the project was supposed to end in March of 2019; correct?

1    A.   Yes.

2    Q.   Now, you admitted in your plea agreement that at the

3    ending point of the project, the March ending point, you still

4    had money, EPA money over $46,000 --

5    A.   Yes.

6    Q.   -- that was not spent.  That's correct, isn't it?

7    A.   Yes.

8    Q.   Now, what happened to that $46,000 plus that you had at

9    the ending date, the technical ending date of the project?

10    A.   That money was used to pay salary for Mr. Snyder, I think

11    part of that was used to pay my salary, do some laboratory

12    tests, the third-party laboratory tests, the facilities.

13    Q.   To be clear, did work continue on this project after the

14    March 2019 ending date?

15    A.   Yes.

16    Q.   So people were working on it and people were paid?

17    A.   Yes.

18    Q.   And supplies were purchased?

19    A.   Yes.

20    Q.   So again, did any of that $46,000, was any of that used

21    for any purpose other than this project?

22    A.   No.

23    Q.   All right.  And we heard Peter Willis talk about the fact

24    that you made some efforts to potentially patent this

25    innovation?

1    A.   Yes.

2    Q.   But ultimately didn't follow through with that?

3    A.   No, we ran out of money.

4    Q.   Okay.

5    A.   And I --

6    Q.   Go ahead.

7    A.   And the EPA or the SBIR money cannot be used for patent

8    expenses.

9    Q.   Okay.

10   A.   So that is --

11   Q.   Now, you didn't ultimately -- well, let me ask you this.

12   Some of the tests that you performed showed that the PFAS were

13   destroyed; correct?

14   A.   Yes.

15   Q.   I assume there were some other tests and experiments that

16   weren't so successful; is that right?

17   A.   There were some challenges.  It was taking long time for

18   the chemical reaction to take place, but they were not -- I

19   won't say they were failure, they just -- there are ways to

20   advance or improve those obstacles or overcome those obstacles

21   and that is the work I was proposing for *Phase II*.

22   Q.   I see.

23            MR. NASH:  Your Honor, may I approach?

24            THE COURT:  Yes, sir.

25   ///

*SUBHADARSHI - Direct*                                                          102

1    BY MR. NASH:

2    Q.   Dr. Nayak, take a look at this and tell us what it is, if

3    you recognize it.

4    A.   This was the nonperfectory part of the final report that

5    we submitted to the EPA, I believe.

6    Q.   Okay.  Earlier you heard Judge Reeves -- Chief

7    Judge Reeves asking questions about what information about

8    your work that the EPA had posted on their website.  Is this

9    the information they posted on the website?

10   A.   I believe so.

11   Q.   Did you go to that website personally?

12   A.   Yes.

13   Q.   And did you find this information on that website?

14   A.   Yes.

15   Q.   Very recently?

16   A.   Yes.

17   Q.   Okay.  This is your work, or at least a summary of your

18   work that EPA has posted on the public website?

19   A.   Yes.

20   Q.   All right.  And it looks like it describes the work that

21   you did?

22   A.   Yes.

23   Q.   Does it also describe some of your results?

24   A.   Yes.

25   Q.   And it lists you as somebody who can be contacted?

1  A.   Yes.  And in fact I was contacted by people.

2  Q.   Okay.  It lists some of your conclusions?

3  A.   Yeah.

4  Q.   All right.  And you mentioned -- now, Chief Judge Reeves

5  was interested in -- with his questions -- about whether there

6  were any disclaimers.  There is, in fact, a disclaimer to some

7  extent at the end of this document; correct?

8  A.   Yes.

9  Q.   On the very last page?

10  A.   Yes.

11  Q.   But it also, it lists you as the person that can be

12  contacted if any individual wants to discuss this or

13  understand it?

14  A.   Yes.

15  Q.   And you said some people have reached out to you?

16  A.   Yes.

17  Q.   Okay.  Dr. Nayak, my last area of questioning here,

18  switch gears again.  You mentioned earlier that your

19  current -- you're currently employed as a DoorDash driver and

20  that you have two jobs, the second job working at Panera

21  restaurant?

22  A.   Yes.

23  Q.   Is that right?  Obviously those are not jobs that utilize

24  your qualifications?

25  A.   No.

*SUBHADARSHI - Direct*                                                104

1    Q.   Have you attempted to find jobs that utilize your

2    qualifications?

3    A.   Yes.

4         MR. NASH:  Your Honor, last exhibit, may I approach

5    the witness?

6         THE COURT:  Yes.

7    BY MR. NASH:

8    Q.   Dr. Nayak, what is this multipage document that I've

9    handed you?

10   A.   This is sample of some of the jobs I have applied and

11   some of the responses I got over a year or so.

12   Q.   So these are emails that indicate jobs you've tried to

13   get in your area?

14   A.   Yes.

15   Q.   So engineering-type jobs and science-type jobs?

16   A.   Yes.

17   Q.   Do you have -- this isn't all the jobs that you've tried

18   to get, but this is a sample of them?

19   A.   Yes.

20   Q.   In this particular sample, do you have an estimate of how

21   many jobs this shows that you've applied for?

22   A.   I don't remember.

23   Q.   Does a couple dozen sound right?

24   A.   Yeah.

25   Q.   All right.  And the time frame of these emails that

1    you've sent out, May of last year all the way through February

2    of this year?

3    A.   Yeah.

4    Q.   Okay.  You've applied to these jobs.  Have you been

5    offered any jobs?

6    A.   No.

7    Q.   All right.  And do you plan to keep trying?

8    A.   Yes.

9    Q.   All right.  Pursuant to your plea agreement, is it true,

10   Dr. Nayak, that you are excluded from any federal programs for

11   at least five years?

12   A.   Yes.

13   Q.   Okay.  So does that limit, to some extent, the types of

14   jobs you can work on?

15   A.   Yes.

16   Q.   Now, also, at the beginning of this case, did the

17   government seize your bank accounts?

18   A.   Yes.

19   Q.   Do you remember about how much money they seized?

20   A.   It was less than $9,000.

21   Q.   Less than $9,000?  Was that all the money that you had?

22   A.   Yes.  I have an has and IRA account.

23   Q.   So you have an has account, what is that, a health

24   savings account?

25   A.   Health saving account.

SUBHADARSHI - Direct                                                    106

1    Q.   And you have an IRA account?

2    A.   Yeah.

3    Q.   Do you know how much combined you have in those?

4    A.   About $12,000.

5    Q.   How much?

6    A.   12.

7    Q.   Okay.  Do you still have those?

8    A.   I believe so.

9    Q.   Do you have -- other than those, do you have any other

10   accounts?

11   A.   No.

12   Q.   Do you own any assets?

13   A.   I have a car and maybe hundred of books.

14   Q.   You have what?

15   A.   Couple of hundred of books.

16   Q.   Okay.  The car, what kind of car is it, what year?

17   A.   Hybrid Camry, 2014.

18   Q.   Do you use that for your DoorDash job?

19   A.   Yes.

20   Q.   Okay.  Do you have any other significant assets other

21   than just, you know, personal items?

22   A.   No.

23   Q.   Okay.  Do you own the place where you live?

24   A.   No.

25   Q.   Are you living with a friend?

1    A.   Yes.

2    Q.   Are you paying rent?

3    A.   Yes.

4    Q.   Always?  Every month?

5    A.   Yes.

6    Q.   After you pay your bills each month, do you have much

7    money left over?

8    A.   No.

9    Q.   Do you have any bills that you would consider to be

10   nonessential?

11   A.   No.

12   Q.   What about your cats?

13   A.   I do have two cats.

14   Q.   So other than that?

15   A.   They are very little.

16   Q.   All right.  So in conclusion, Dr. Nayak, you've talked a

17   lot about the work that you've done, you've heard that the

18   government is wanting some very significant amount of

19   restitution from you.  What is your position about restitution

20   in regards to the work that you've done?

21   A.   I think the government got values for the money they

22   spent on me -- or on us.  Ultimately the goal of this funding

23   is to advance the frontier of science.  And both the project,

24   I have no doubt that we accomplished that goal, advancing the

25   frontier of science in two very different fields.

1        From that point of view, I believe that government got

2    values for their money and some more.

3    Q.   So you were paid to do research, or you were given money

4    to do research, and are you testifying that you did the

5    research that you were paid to do?

6    A.   Yes.

7    Q.   And you got results?

8    A.   Yes.

9    Q.   And you gave those results to the government?

10   A.   Yes.

11   Q.   And in addition, there was a patent that was generated?

12   A.   Yes.

13   Q.   That the government has some rights to; is that correct?

14   A.   Yes.  Yes.

15   Q.   Okay.

16           MR. NASH:  Your Honor, that's all the questions I

17   have for Dr. Nayak.

18           THE COURT:  All right.  Thank you.

19       Ms. Fannin.

20           MS. FANNIN:  Yes, Your Honor.

21                          CROSS-EXAMINATION

22   BY MS. FANNIN:

23   Q.   Good afternoon, Mr. Nayak.  Mr. Nayak, on direct,

24   Mr. Nash highlighted a couple of exhibits and I want to review

25   some items within these exhibits with you this afternoon.

1    A.   Okay.

2    Q.   Okay.  The first place I'm going to start, I'm going to

3    go in reverse order here.  I want to call your attention to

4    the *Phase I* proposal for the QSED project.  So I'm going to go

5    back to the beginning and move through these exhibits.  And

6    you testified that this was submitted in 2012.  Now, do you

7    have this in front of you, or do you need a copy?

8    A.   Yes.

9    Q.   Okay.  I would like you to move to what has a number at

10   the bottom of USA-00002580 of that document.  Specifically it

11   says the project performance site location, part of the

12   application.

13   A.   Yes.

14   Q.   Are you there with me?

15   A.   Yes.

16   Q.   And in that project/performance site location there, what

17   is the designated site for this project in this application

18   that you submitted?

19   A.   University of Tennessee.

20   Q.   Okay.

21   A.   There are two sites.  One was primary location on

22   ScienceTomorrow, and one site location -- one was University

23   of Tennessee.

24   Q.   Thank you.  Now, there was some talk about a co-PI.

25   You've worked on a number of SBIR projects prior to

*SUBHADARSHI - Cross*                                                                    110

1   ScienceTomorrow and this EPA Qmetry project with the PFAS;

2   correct?

3   A.   Yes.

4   Q.   You're aware there's only ever one PI?

5   A.   That's correct.

6   Q.   Okay.

7   A.   Every agency treat differently and NSF is very strict

8   about that, but other agencies don't really enforce that.

9   Q.   You said which one was strict?

10  A.   NSF, National Science Foundation.  So they are basically

11  the parent organization who came up with this SBIR program.

12  Q.   And so the NSF, if we're looking at this like a diagram,

13  the NSF is the one who promulgates the program and then the

14  agencies that implement this program within their own agencies

15  fall under the guidance, so to speak, of NSF?

16  A.   I don't know exactly how it works, but for me, NSF is the

17  gold standard, if you will.

18  Q.   Okay.  And if you look towards the front of this

19  document, when we're looking at the applicant information,

20  you're listed as the project director/principal investigator,

21  and Ms. Agrawal is also listed; correct?

22  A.   Yes.

23  Q.   She's listed in a different capacity as the authorized

24  representative?

25  A.   Yes, yes.

1   Q.   Okay.  Now, in this introductory information, however, I

2   don't see the name Dr. Joy anywhere.

3   A.   So the way it works, it identifies the university, so the

4   University of Tennessee, Knoxville, is identified.  Dr. Joy

5   was with UTK then so that [indiscernible].  When we say

6   secondary site of performance, that is Dr. Joy's lab.

7   Q.   But with respect to the responsibility -- the responsible

8   party who reports to the agency under any given SBIR program,

9   that would be who?

10   A.   Small business.

11   Q.   Correct.  And who was that in this particular case?

12   A.   ScienceTomorrow.

13   Q.   And who were the individuals who operated

14   ScienceTomorrow?

15   A.   Myself and Dr. Agrawal.

16   Q.   Did anyone else in that company have any authority to

17   report any information to, in this case, the Department of

18   Energy?

19   A.   No.

20   Q.   And you also mentioned that you had a hand in the

21   technical aspect of this proposal?

22   A.   Yes.

23   Q.   Did you mean that you did that to the exclusion of other

24   things in here, or did you also have a hand in entering the

25   information in this proposal?

1    A.   My primary goal was -- primary role was the technical

2    part.  That is what I like to do, and that is what I think I'm

3    most capable of doing.  But I have -- I try to be useful,

4    so ...

5    Q.   Okay.  So I want to turn your attention to the budget

6    that's in here.  This is on 2581.

7         Who created this budget?

8    A.   Most likely it was Dr. Agrawal.

9    Q.   Do you recall helping figure out these numbers?

10   A.   I might have, I don't exactly remember.

11   Q.   And these numbers at the top, the number one and number

12   two, the amount says for -- I'm looking at salary and fringe.

13   How much is in this budget for you and how much is in this

14   budget for Ms. Agrawal?

15   A.   I don't recall.

16   Q.   You can reference the document.  If you could just read

17   at the top of that same page, 2581.

18   A.   Yeah.  Yeah, it was 43,800 for me and 16,000 for

19   Dr. Agrawal.

20   Q.   And that was for a nine-month duration?

21   A.   I believe so.

22   Q.   Okay.  I'm going to move your attention to the *Phase II*

23   application now.  I'm looking at Defense Exhibit 3 alpha,

24   page 2643.  That's the third page of the document so you don't

25   have to go too far.

*SUBHADARSHI - Cross*                                                    113

1      Again, here I just want to point out, Dr. Joy is not

2   listed as a principal investigator, and then the following

3   page he's not listed in any of this preliminary information as

4   an authorized representative, either; correct?

5   A.   Dr. Joy was not ScienceTomorrow.

6   Q.   And there's a budget in this proposal as well; correct?

7   A.   There should be, yeah.

8   Q.   And who would have created that budget in *Phase II*?

9   A.   Dr. Agrawal.

10  Q.   You've testified that your primary responsibility or

11  where you felt you could have the most benefit was on the

12  technical side?

13  A.   Yes.

14  Q.   Let me ask you about finances of the company.  In *Phase

15  I*, did you ever control the bank accounts of ScienceTomorrow?

16  A.   We had joint control.

17  Q.   Did you make payments in those bank accounts to vendors?

18  A.   I might have.

19  Q.   What about in *Phase II*?

20  A.   I might have until August 2000.

21  Q.   Okay.  At any point did you lose access to those bank

22  accounts?

23  A.   After 2018, August.

24  Q.   So you had access to all those bank accounts up until

25  when?

1    A.   2018, August.  I believe so, it was around that time.

2    Q.   And in both of these proposals, the tasks that you

3    proposed to do include a collaboration with UTK; correct?

4    A.   Yes.

5    Q.   In fact, a subcontract is proposed in both cases, in

6    *Phase I* and *Phase II*.  The first for 45,000 or thereabouts --

7    don't hold me to the number -- and in the second there's a

8    subcontract proposed that's in the application anyway, of

9    $300,006; correct?

10   A.   Yes.

11   Q.   And to your knowledge, in the time period that you had

12   access to all those bank accounts, was any money ever sent to

13   UTK?

14   A.   No.  I had -- at the end of *Phase I*, I met Dr. Joy and

15   asked him to initiate the invoice and he told me, "Don't worry

16   about it, you can use the money better than I can."

17   Q.   So there was never an invoice that came out of UTK?

18   A.   That's correct.

19   Q.   For ScienceTomorrow to pay?

20   A.   That's correct.

21   Q.   To your knowledge?

22   A.   To my knowledge, yes.

23   Q.   And in the time that you were at ScienceTomorrow?

24   A.   Yes.

25   Q.   And you saw no payments go out of any of those bank

1    accounts to UTK?

2    A.   I didn't see any.

3    Q.   Okay.  So is it fair to say that despite having proposed

4    that certain people would do some things on the project, that

5    changed in the course of *Phase I* and *Phase II* and you did most

6    of that work?

7    A.   Dr. Joy was involved in both phases until I was there.

8    Some logistic made us to change a few things, but he was

9    involved until I was there.

10   Q.   Okay.  And when you say involved, how involved was he?

11   A.   SEM was his field, so ...

12   Q.   On this particular project though, what did he do?  What

13   did he actually do?

14   A.   One example was, like, took out detectors that we build

15   and essentially broke his SEM to put that detector in his SEM

16   and collected.  So it was maybe few days, but it was the goal

17   of the project.

18   Q.   And when did that occur?

19   A.   I don't exactly remember.  It was towards the end of

20   2013, I believe.

21   Q.   So that was for *Phase I*?

22   A.   Yeah, towards the end of *Phase I*.

23   Q.   Did you physically go to UTK and use that location site

24   during your time in *Phase II*?

25   A.   Just before *Phase II* started, yes.

1   Q.   Before *Phase II* started?

2   A.   Like at the very beginning of *Phase II* and Dr. David Joy

3   came to here in *Phase II*.

4   Q.   And what did he do here, and what do you mean by here?

5   A.   Our facility was in University of Kentucky in that

6   building, so he with his graduate student and postdoc came,

7   visited us, did experimental work and that, yeah.

8   Q.   Who was the postdoc?

9   A.   I don't remember the names, Dr. David Joy's postdocs,

10  along with Dr. Joy.

11  Q.   And they were there for how long?

12  A.   I don't recall.

13  Q.   Was it a day?

14  A.   It was probably a couple of days, I don't exactly

15  remember.

16  Q.   But he never invoiced you for that work?

17  A.   No.

18  Q.   Okay.  Do you have Defense Exhibit 4 in front of you?

19  These are the photos of the items that you identified

20  previously.

21  A.   Yes.

22  Q.   If you'll follow along with me, I know you said you did a

23  number of these, right?  And it's hard to put a specific

24  number on, but I'd like to talk about time frame and value.

25       So if we're looking at Defendant Exhibit Number 4, you

SUBHADARSHI - *Cross*                                                    117

1     said these are the wafers; correct?

2     A.   The bottom one, yeah.

3     Q.   Okay.  And these items, it looks like there's a number of

4     items in here.  Can you tell me when you developed these or

5     purchased these approximately?

6     A.   Actually the wafers we got early in *Phase I*.  We were

7     trying to modify and reuse the same circuit on different

8     forms, continuously modifying it.  It's very hard to give you

9     a specific timeline for that.

10    Q.   Are these actually uniquely identifiable?  I mean, you're

11    just looking at pictures here --

12    A.   Yeah.

13    Q.   -- but if you could look at the actual physical things,

14    would you be able to identify each one?

15    A.   Under a microscope, yes.

16    Q.   Okay.  And approximately how much, I mean, it looks like

17    there are a number of wafers in here, if I'm looking at the

18    stack on the right, and I assume that --

19    A.   The box is 25.

20    Q.   25?  Okay.  So for 25 wafers, approximately how much does

21    that cost?

22    A.   I don't remember, but probably like 2,500 or something

23    around there.

24    Q.   You don't have to be specific, ballpark is fine.

25    A.   It's just that, I mean, wafers is just silicon.  That has

SUBHADARSHI - *Cross*                                                118

1    very little cost or value.

2    Q.   Okay.

3    A.   It's the circuit that we build upon it makes it more

4    expensive than gold.

5    Q.   But these were obtained in *Phase I*?

6    A.   So the wafers that persist in *Phase I*, but we used those

7    wafers, we continued using those wafers and those circuits

8    through *Phase II*.  At least until I was involved.

9    Q.   Okay.  And who were these -- where do you get the wafers

10   from?

11   A.   Pardon me?

12   Q.   Where do you purchase the wafers?

13   A.   Somewhere online, I don't exactly remember.  It just said

14   the company name, Silicon Materials, Inc., but that would be

15   one of the several wafers we purchased.

16   Q.   Okay.  And then I'm going to turn you to Defendant's

17   Exhibit 5 and ask you the same questions.  Did you help create

18   this, and when did that occur?

19        If it's not identifiable or this could be a fungible

20   thing, then just let me know that.

21   A.   I mean, they look similar on a microscale, I could

22   probably tell under microscope if I see the SEM images, but

23   it's just impossible for me to tell --

24   Q.   Sure.

25   A.   -- which particular sample I'm looking at just from this

1    light image.

2    Q.   And you testified that you did create these while you

3    were with ScienceTomorrow?

4    A.   Or something like this.

5    Q.   Okay.

6    A.   I can't exactly say this one.

7    Q.   Yeah, I know, not these specifically, I understand.

8    A.   Yeah.

9    Q.   Did you do that in *Phase I* or *Phase II*?

10    A.   We had elementary design in *Phase I* and we advanced that

11    in *Phase II*.   This do look like *Phase II* to me, but I can't be

12    certain.

13    Q.   Okay.  And I'm going to ask you the same question.

14    Approximately how much do items like these cost?

15    A.   So, okay.  Now, from wafer to circuit, when we build the

16    circuit we didn't have facility, so we had to rent the

17    facility from someplace.  One of the facilities that we rented

18    out was University Maryland, College Park, Nanofabrication

19    Center, but I don't know which facility this particular

20    exhibit used.  But when we rent out that process from there,

21    depending on the complexity and duration, it costs like, I

22    don't know, 5,000 to 15,000, somewhere like that.

23    Q.   So it's the facility's costs that are more expensive than

24    anything?

25    A.   Yeah.  Yeah.

1    Q.   Let's move on to Defendant's Exhibit 6.  I'm going to

2    walk you through all of these.  Is this the same type of thing

3    or is this something developed after?

4    A.   They do look next generation of samples.

5    Q.   Okay.  And what about for this, is this the same thing?

6    This would have been --

7    A.   Yeah.

8    Q.   -- *Phase II* more than likely?

9    A.   Yeah, but looks like *Phase II*, but I can't be certain.

10   Q.   Sure.  And would you say the same thing for the

11   development of this, the cost to do something like this, the

12   facility's cost would be the most --

13   A.   Yeah, most significant.

14   Q.   And then Exhibit 7, Defendant Exhibit 7, this is a wafer

15   pulled out, it looks like?

16   A.   It was after the circuit was printed on the wafer.

17   Q.   And just to be clear, that's not your hand; right?

18   A.   No, I don't think so.

19   Q.   And this is after some work has been performed on --

20   A.   On the wafer.

21   Q.   -- on Defendant Exhibit 4?

22   A.   Yes.

23   Q.   Okay.  And approximately how much, in your education and

24   experience, would it cost to produce an item like this?

25   A.   I can't tell.  It could be anything from $100 to

1    $100,000.  It depends on the nanoscale complexity of the

2    circuit, which I cannot see from this particular image.

3    Q.   So you're saying that the act of imprinting on this wafer

4    costs that much money?

5    A.   Could.  On an Intel microchip it costs millions of

6    dollars to print.

7    Q.   So what vender would you pay to get this accomplished?

8    A.   It depends on what level of complexity we're looking for.

9    There were universities -- University of Maryland, for

10   example, they --

11   Q.   University of what, I'm sorry?

12   A.   Maryland.

13   Q.   Yes.

14   A.   Maryland College, for example, that we used in *Phase I*,

15   they had limited facilities and they're partly subsidized or

16   discounted, so that could be a few thousand dollars.  But if

17   you go out to where commercial fab, we call it fab,

18   fabrication facilities, we call it fab.

19   Q.   But it sounds like a facility that you're familiar with

20   is University of Maryland?

21   A.   That is the one I work closely in *Phase I*, and that's why

22   it come to me first, but there are many commercial fabs around

23   the world including IBM also does that in large scale, but we

24   can't afford IBM.

25   Q.   Understood.  And Defendant Exhibit 8, same question, did

1  you create this type of item in here, and if so, when did that

2  happen?

3  A.   In this looks like a *Phase II* activity.  In *Phase I*, we

4  did not mount the detector onto a substrate.

5  Q.   Um-hmm.

6  A.   This is the little square, black square within the green

7  square is the detector or the silicon, which is mounted on the

8  green substrate.  That was part of *Phase II* activities, so

9  this does look like *Phase II*.

10 Q.   And did you physically take part of that activity in

11 *Phase II*?

12 A.   I don't think so, exactly.

13 Q.   So you recognize it?

14 A.   Yeah, I recognize this.  I've used it, but I don't

15 remember actually making this.

16 Q.   Okay.  Thank you.  That's what I was wanting to get at.

17 So then proceeding to the next few photos, you don't have a

18 memory of actually -- although you recognize this work because

19 of your scientific background and experience --

20 A.   No, I have used them.

21 Q.   I know you've used them.

22 A.   I pictured them.

23 Q.   But did you work on them in *Phase II* for ScienceTomorrow

24 is my question?

25 A.   When I was doing the consulting I think in 2016.

*SUBHADARSHI - Cross*                                                    123

1    Q.   Okay.

2    A.   That is when I have used them, worked on them.

3    Q.   I see.  Okay.  Thank you.  But prior to your departure,

4    you had not done this?  This would have been while you were

5    working as a consultant?

6    A.   When I was in the beginning, I might have designed this,

7    but it takes couple --

8    Q.   But you didn't place it on here and do that portion;

9    correct?

10   A.   Yeah.

11   Q.   And then Defendant Exhibit 9, same thing.  This is just

12   adding some connectors here.  You wouldn't have done that

13   during -- because I assume this is in chronological order,

14   Exhibit 9, this device would have come after this?

15   A.   I actually might have done -- I don't exactly remember.

16   I might have done this one.  This is the configuration.  We

17   put the detector inside the microscope to collect the

18   secondary electron.  This looks like my way of doing it, so I

19   might have actually done this one.

20   Q.   Okay.  And just to be clear, that little cap on top, that

21   only serves a purpose to protect that green square?

22   A.   Yeah.

23   Q.   Okay.

24   A.   It was actually to keep it stable inside the microscope,

25   because there is a vacuum starts; so when the vacuum starts,

1   it tends to fall.  I think it was a Band-Aid solution to that.

2   Q.   And approximately how much did the materials cost that

3   we're looking at?

4        You knew I was going to ask you that, didn't you?

5   A.   Material has very little implication on this.

6   Q.   Fair to say it was of a de minimis value compared to a

7   $999,000 contract or grant?  Fairly small amount?

8   A.   It's not the material but it's the function that we are

9   trying to get.

10  Q.   No, I understand, I'm just asking about the purchase of

11  the actual material that then you develop --

12  A.   Lot of work, yeah.

13  Q.   -- the actual physical material --

14  A.   Yeah.

15  Q.   -- that cost is, for all of these things that we've

16  looked at, under $50,000?

17  A.   That way if you say we go to sand to get silicon, sand is

18  free, so it would be -- it's not --

19  Q.   Did you use sand to make your own silicon in this

20  project?

21  A.   I mean, you could.

22  Q.   Okay.

23  A.   I didn't.

24  Q.   It's okay, we don't have to --

25  A.   I'm saying that putting the value of the project in terms

1    of material is like that.

2    Q.   I understand.

3    A.   So --

4    Q.   And then this item as well, you said, you identified this

5    as something that you had used, but again, is this something

6    you can actually identify from this photo?

7    A.   It looks similar to something I have used, but it may or

8    may not be the same component I was recalling.

9    Q.   Thank you.  Did you manage payroll?

10   A.   No.

11   Q.   You had mentioned that everything that was reported, the

12   results reported were all accurate with respect to your time

13   at ScienceTomorrow.  When you say the results reported, do you

14   mean anything that was reported to a DOE SBIR personnel?

15        What do you mean by, everything I reported was correct

16   during that time period?

17   A.   DOE did not require a report filing, but we did make a

18   presentation to the DOE program managers.

19   Q.   And when did you do that?

20   A.   I don't remember, that was --

21   Q.   Was that in *Phase I*?

22   A.   Most likely.

23   Q.   So to the best of your -- go ahead.

24   A.   And also we made the same presentation to Dr. Joy because

25   he was not just part of the team, he was also a field expert.

*SUBHADARSHI - Cross*                                                      126

1    Q.   I'm sorry.  You did what with Dr. Joy?

2    A.   I shared this information or data with Dr. Joy.

3    Q.   Okay.  You shared the --

4    A.   For the peer review --

5    Q.   I see.

6    A.   -- process.

7    Q.   But as far as *Phase II*, because as you just mentioned,

8    only annual reports were actually required in the technical

9    side?

10   A.   Yeah, I believe so.

11   Q.   During that time that you were at ScienceTomorrow, there

12   was never a report provided in *Phase II*; correct?

13   A.   Yeah, I was gone.

14   Q.   All right.  And it's your testimony that total you

15   received $26,000 for *Phase II*.  10,000 in three months' salary

16   and 16K, or thereabouts, in consultant fees, if I could be

17   permitted to just generalize that way?

18   A.   It was 10,000 per month.

19   Q.   Oh, so -- oh, I'm sorry.  So that's 30 plus 16, so that's

20   46?

21   A.   I don't exactly remember.

22   Q.   It's okay if it's not precise --

23   A.   Yeah.

24   Q.   -- but that's your testimony today, it's thereabouts, I

25   understand.

1   A.   Yeah, it could be like a lot different.

2   Q.   Sure.  Okay.  Now I want to talk about Qmetry, so shift

3   gears a little bit.  I understand you encountered some delays

4   due to the government shutdown?

5   A.   Part of it.

6   Q.   However, did you ever request a no-cost extension for

7   your project?

8   A.   No, I did not.

9   Q.   You understood that --

10  A.   I did mention when I met Ms. Richards, April Richards, I

11  did tell her about impending government shutdown and she said,

12  we'll work with you on that.

13  Q.   I'm sorry, she said what?

14  A.   We'll work with you on that.

15  Q.   Okay.  And then did you ever communicate that you were

16  having problems or suffering delay?

17  A.   Yes.

18  Q.   Prior to the start of the project?

19  A.   No, in April 2019.

20  Q.   Okay.  And then the project began?

21  A.   So the project started in October but I could not process

22  in full swing because -- not just cash [indiscernible] but

23  also the uncertainty.  I didn't know -- there was a lot of

24  news around that, but I didn't know how it was going to impact

25  if I had somebody and cannot pay, that would be very difficult

1   situation.  So because of that uncertainty related to

2   shutdown, I couldn't do much of the work.

3   Q.   But you understand that in order to get paid from the EPA

4   on this contract you had to submit invoices; correct?

5   A.   Yes, monthly.

6   Q.   And you had to incur that cost before you could be

7   reimbursed; correct?

8   A.   Yes, but I need to plan that ahead.

9   Q.   So are you saying you invoiced before you actually

10  incurred the cost so you could sort of advance what you

11  needed?

12  A.   No, I spent the money, sent the invoice, and then the

13  government shutdown happens.  So I spend the money from my

14  credit card, from my personal credit card.

15  Q.   Which credit card company was that?

16  A.   There are two or three different credit cards.

17  Q.   But just generally, was it a City Bank card?

18  A.   Bank of America, CT, Chase, American Express.

19  Q.   Okay.  And then let me ask you this, in this time frame,

20  were you receiving any other income besides --

21  A.   No.

22  Q.   -- the potential -- okay.

23  A.   I had a farm, but I was --

24  Q.   You had a what?  I'm sorry.

25  A.   I had a farm, but it was, like, I was starting a farm.

1   Q.   Oh, okay.

2   A.   So I was getting some money, a little bit, but not enough

3   to support a full-fledged technology business.

4   Q.   So let's just look at 2019, we'll do it that way.   In

5   2019, is it fair to say the only income that you -- the only

6   money that you had coming in was from the EPA, except for a

7   small amount that might have been generated from a farm?

8   A.   Yeah, farm was also producing food for me, so that I

9   didn't account for.

10  Q.   And approximately how much did you -- and I know I'm

11  asking you a detailed question, but ballpark, in 2019, how

12  much money did your farm generate for you to use?

13  A.   I have no recollection and I cannot --

14  Q.   $20,000?

15  A.   I cannot put a value for --

16  Q.   I don't --

17  A.   -- I consumed, so --

18  Q.   I mean the tangible funds that you were then able to

19  spend on something else, not something you were able to eat,

20  but, like, if you sold a tomato --

21  A.   Yes, less than $10,000.

22  Q.   Less than $10,000, okay.  And you testified on direct

23  that $9,000 was seized from your bank accounts much later;

24  correct?

25  A.   Yeah.

1   Q.   And I'd like to show you what's been marked as Government

2   Exhibit 4 for identification.  Take a moment to look that

3   over.  Especially read that first paragraph, Section 8 at the

4   top.

5   A.   Yeah.

6   Q.   Do you recognize that document?  I know it's not in

7   color.

8   A.   Yes.  Yes.

9   Q.   What is that document?

10  A.   It's the bank account.

11  Q.   Which bank account?

12  A.   University of Kentucky Federal Union, Qmetry bank

13  account, I believe.

14  Q.   And look at page 2 and just look at those transactions on

15  there.

16  A.   Yeah.

17  Q.   Do those look familiar?

18  A.   Yes.

19  Q.   This is the bank account you received EPA funds into?

20  A.   Right.

21  Q.   And that you expended them from?

22  A.   Yes.

23  Q.   Okay.  And now I want you to look at the balance on that

24  account.

25  A.   Yes.

1    Q.   Front page.

2    A.   Yes.

3    Q.   How much -- how much does that read?

4    A.   58,200.

5    Q.   And now I want you to look at the statement date on that,

6    it's on the second page on the top.  You may -- if you've

7    looked at your bank account electronically, you maybe know

8    where to find it.  What's the date on that?

9    A.   11/17/2018.

10   Q.   2000 what?

11   A.   18.

12   Q.   18?

13   A.   Yes.

14   Q.   I think -- look -- are you sure about that?

15   A.   I can't see.  It's too small for my vision.

16   Q.   In that first paragraph does that put you in the time

17   frame of when you submitted that information?

18   A.   2019, is it?

19   Q.   So November of 2019 you had $58,000, approximately, in

20   your business bank account that had not been spent yet;

21   correct?

22   A.   It was spent, so my CPA --

23   Q.   You mean accrued?

24   A.   My CPA explained something like cash versus accrual

25   later, so it was spent, not just withdrawn from the account.

SUBHADARSHI - *Cross*                                                132

1    Q.   But you testified that in 2019 -- and later in 2019 you

2    paid all of your employees from those unspent funds?

3    A.   Yeah.

4    Q.   And when did you pay them?

5    A.   I don't remember.

6    Q.   Okay.  But you paid Jonathan Snyder before he left;

7    correct?

8    A.   Yes.

9    Q.   And you paid him with EPA funds?

10   A.   Yes.

11   Q.   After the project period had ended?

12   A.   Yes.

13   Q.   And before that bank statement?

14   A.   Yes.

15   Q.   And there was still $58,000 left as of November of 2019?

16   A.   I don't remember if Snyder was paid before or after this,

17   but he was paid from the EPA account.

18   Q.   How much did you pay Mr. Snyder?

19   A.   I don't exactly remember, it was below market rate, I

20   think it was about $3,000 a month.

21   Q.   3,000 a month?

22   A.   I think so.

23   Q.   And he was there for?

24   A.   Three months.

25   Q.   Three months?  Okay.

1          MS. FANNIN:  If I could retrieve the exhibit, Your

2     Honor?

3          Your Honor, move to admit Government Exhibit 4 if there

4     is no objection.

5          MR. NASH:  No objection.

6          THE COURT:  United States Exhibit 4 will be admitted.

7     BY MS. FANNIN:

8     Q.  Now, I want to move your attention to Defendant Exhibit

9     Number 13.  This is the final report that you submitted in the

10    Qmetry project.  Do you have that in front of you?

11    A.  Yes.

12    Q.  And I'm going to call your attention to the period

13    covered by this report, it's a short period, and is that --

14    why is that?

15    A.  It's the last month of the official project period.

16    Q.  So is the information --

17    A.  So -- go ahead.

18    Q.  Is the information contained in here meant to -- does

19    this report summarize the work that was only done March 1st of

20    2019?

21    A.  No.

22    Q.  Okay.  Just explain that, if you don't mind.

23    A.  The project was -- the report was submitted late and this

24    being the final report.

25    Q.  Um-hmm.

1    A.    The contents, all the information we have collected until

2    the date of submission, so this was very close to the *Phase II*

3    proposal submission.  So even officially the project was over,

4    there's normal practice in scientific community that we try to

5    put as much information possible and until the last minute and

6    that is what I was trying.

7    Q.    Okay.  It doesn't have a submission date.  When was this

8    submitted, approximately?

9    A.    I think it was submitted in May, sometime May 20th or

10   something like that.

11   Q.    Okay.  So within a month or --

12   A.    Maybe June, yeah.

13   Q.    Within a month or two after the close of project period?

14   A.    Yes.

15   Q.    And this is supposed to be representative of all of the

16   scientific results --

17   A.    Until then.

18   Q.    -- that you accomplished on the *Phase I* Qmetry PFAS

19   project?

20   A.    Until then, yeah.

21   Q.    Okay.  I want to call your attention to Defendant's

22   Exhibit 12, this is the application, your proposal,

23   essentially.  And in the back of this document at US the last

24   three numbers are 296, it is almost three quarters of the way

25   through the document.  Let me know when you're there.

1    A.   Yeah.

2    Q.   Do you recognize this form?

3    A.   Yes.

4    Q.   What is this?

5    A.   It is the presentation and certification for *Phase I*

6    proposal.

7    Q.   And what do you understand that this document holds you

8    to with respect to providing truthful information in this

9    application?

10   A.   Yes.

11   Q.   All right.  And so I know you've already pled guilty

12   to --

13   A.   Yes.

14   Q.   -- to the items, I understand that.  But the reason I ask

15   you this is because, on direct you had asked if -- you were

16   asked whether the fact -- whether the delay in your work --

17   you said there was no impact on the work that you did even

18   though the end and the other items that were listed in here

19   that perhaps didn't exactly go that way were listed, but

20   wouldn't you say that part of your work, part of your product,

21   is only as valuable as you represent that it will be?

22   A.   No, because one is all the work I did were peer reviewed

23   by my colleagues even though D'Angelo didn't, we had other

24   peer review, and that loose soil part of the project was the

25   soil test that was done by third-party laboratory, which I had

1   no control over.  And entire scientific process, scientific

2   advances regulated and monitored through peer review, even --

3   Q.   So you're saying that your work was just as good as what

4   you proposed D'Angelo was going to do?

5   A.   That is correct.

6   Q.   So then why did you propose that it would be her doing

7   it?

8   A.   Exactly for the same reason, peer review.  Better peer

9   review will always help your project.  She will probably have

10  different ideas how to approach this.

11  Q.   Do you agree that from the EPA's perspective, the fact

12  that you proposed that D'Angelo would do this work had more

13  value than if you had entered this proposal with only your

14  name on it?

15  A.   Science is not a celebrity process, it is done by -- it

16  is the vigorous produce-ability of the action, so who does it

17  has less importance.

18  Q.   So are you saying the certification, that everything in

19  here is true?

20  A.   No, I have pled guilty to things which I am --

21  Q.   I hadn't actually finished, I'm sorry.  So you're saying

22  that the certification that everything is true doesn't really

23  matter in the end if something changes that you'd certified to

24  be true?

25  A.   I can't say --

137

1  Q.   There's no value to that?

2  A.   I can't answer that question, it's above my pay grade.

3  Q.   That's okay, I understand.

4        MS. FANNIN:  One second, Your Honor, give me time to

5  collect my thoughts in case I have one more question.

6        THE COURT:  Yes, ma'am.

7  BY MS. FANNIN:

8  Q.   Just to be clear, you never actually changed, you never

9  actually submitted for a change on any of these tasks; right?

10 A.   I did not.

11       MS. FANNIN:  No further questions, Your Honor.

12       THE COURT:  All right.  Thank you.

13     Mr. Nash.

14       MR. NASH:  Nothing further.

15       THE COURT:  Thank you.  You may step down.

16     Mr. Nash, do you have additional witnesses --

17       MR. NASH:  No, sir.

18       THE COURT:  -- you'll be calling?  All right.  I

19 would like for the parties to briefly summarize their

20 position, but before I do that, I'm anticipating that the

21 parties may wish to file some short briefs on the issues that

22 are represented to the Court, and I'm assuming that you may

23 need the transcript from today's proceeding in order to do

24 that; is that fair?

25       MS. FANNIN:  I'm prepared to proceed today, but if

138

1    the Court would like me to brief, I'm happy to do that, Your

2    Honor.

3            THE COURT:  I think it will be necessary based on

4    some of the legal issues that may be presented.  Let me

5    understand the parties' position, or let me summarize, if I

6    can, what I understand the parties' position to be.

7         I understand the United States is taking the position

8    that regardless of whether there were services performed under

9    the various phases of these projects, that if there were

10   material misrepresentations made, and the parties, or at least

11   the defendant in this case has acknowledged that there were

12   false representations made to obtain these grants, if that

13   occurs, then it does not matter whether the work was actually

14   performed.  That any amounts of money that were paid would be

15   or should be ordered in restitution.

16        That's the gist of the submissions that were made, the

17   victim impact statements that were made.

18        Conversely, I understand the defendant's position to be

19   that there may have been misrepresentations made in getting

20   the grants awarded, but if the work was actually performed,

21   and the government may receive some benefit from it, because

22   number one it would be speculation as to the value to begin

23   with, but number two, the government did receive value, for

24   example, with the patent, they do have some subrogated rights

25   under the patent, it was actually issued.  Then, in that

139

1    circumstance, the only restitution that the Court should

2    consider would be funds that directly related to

3    misrepresentations.

4        Am I incorrect on the parties' positions?

5        MS. FANNIN:  I would only just clarify that the

6    government, of course, is speaking for the victim in this

7    case.

8        THE COURT:  I'm sorry, seeking?

9        MS. FANNIN:  The government is speaking for the

10   victim in this matter.  With respect to the EPA, they do ask

11   for the whole amount.  With respect to the DOE, there is a

12   little give there, where --

13       THE COURT:  Well, we've got this declaration from

14   Mr. Oliver who apparently is too busy to appear here today and

15   explain and be cross-examined on what he submitted.  But I, in

16   looking through this submission quickly, it's my understanding

17   that the DOE was essentially requesting the full amount, am I

18   I --

19       MS. FANNIN:  They were.  He just added one clause at

20   the very last paragraph, Your Honor.  I believe, if I can pull

21   it up here, he just said he defers to the Court given his

22   inability --

23       THE COURT:  Well, the DOE suffered a loss of

24   $999,266, which is the full amount of the DOE SBIR *Phase II*

25   grant, but then defers to the Court on the award.

140

1     Well, it's hard for me to make that determination in

2     terms of deference if I'm not able to ask him questions about

3     the submission.

4          MS. FANNIN:  I understand, Your Honor.

5          THE COURT:  Now, I would think that almost a million

6     dollars in dispute is worth at least showing up for a short

7     hearing, but apparently the DOE doesn't feel that way.  I

8     guess, it's not that significant.

9          MS. FANNIN:  If I may proffer, Your Honor?

10         THE COURT:  Yes, ma'am.

11         MS. FANNIN:  There was some difficulty with the

12    underlying calculations and how to calculate, how to possibly

13    value --

14         THE COURT:  Exactly.  That's all the more reason that

15    he needs to be here.  All the more reason.

16         MS. FANNIN:  And one more thing, Your Honor, he's

17    also going to be testifying in the sister case and he had some

18    reservation about appearing as a result, and it was the DOE's

19    choice to submit a declaration, Your Honor, that's --

20         THE COURT:  You do understand that him not being here

21    today, it certainly weakens the government's position on

22    behalf of the victims in the case?

23         MS. FANNIN:  Yes, Your Honor.

24         THE COURT:  All right.  Mr. Nash, did I correctly

25    summarize your position?  I don't mean to put words in your

141

1    mouth, but the hour is getting late and I wanted to see what

2    we needed perhaps to -- what we needed to brief on this issue.

3         MR. NASH:  So, yes, Your Honor, I mean, basically our

4    position is under the law they are allowed restitution

5    equivalent to their pecuniary loss, which is up to you to

6    decide.  But they are not allowed to have a windfall.  They

7    are not allowed to get more than their pecuniary loss.

8         And so it's our position that if they got the work that

9    they bargained for, and they got the results, and they got the

10   patent, and they got the data, that on top of that received

11   the full amount of both contracts, would be a windfall.

12        And so we believe that any restitution determination

13   should take into account the full measure of the value that

14   the government received.

15        THE COURT:  And that's the problem is determining the

16   value received, because services -- or there was work

17   performed under these projects.  I don't think there's any

18   question about that.  The question for me to decide is if I do

19   agree with your position, what is the value?  How do I

20   quantify the value of the services that were provided?

21        MR. NASH:  And that is a tough issue.  And, you know,

22   with a lot of these sentencing, you know, this is essentially

23   a sentencing issue.  And when you look at things like amount

24   of loss for guideline, you know, a lot of that requires just

25   the best estimate that the Court can arrive at.

1     We did cite, and I will in our brief if you require one,

2  we cited a couple of cases in our *ex parte* motion for the

3  subpoenas, where people had been hired, had performed the

4  work, but some of it had been fraudulent.  And courts there --

5  one court went 20 percent of the salary was the restitution;

6  another court was 25 percent of the salary.

7     So they are using sort of percentage estimations in those

8  cases.  And those cases, we think, are somewhat analogous.

9          THE COURT:  Yes, Ms. Fannin.

10         MS. FANNIN:  Your Honor, the other difficulty that I

11 failed to mention, I could proffer that Mr. Oliver had a very

12 difficult time deciding what loss to attribute to Mr. Nayak

13 personally because he left the company.  It was very unclear

14 how much loss to assign to him.  So he went with the fact that

15 there were lies upon which he obtained the money to begin with

16 and fell back on that principle is what the United States

17 would proffer on his behalf.

18         THE COURT:  Again, all the more reason for him to be

19 here so he could respond to some of my questions as well as

20 those of counsel.

21     Do the parties want to submit briefs on this issue?  If

22 you do, I'll give you time to do that.

23     What's the position of the government?

24         MS. FANNIN:  The government would -- doesn't want to

25 submit a brief, Your Honor.  I don't believe there's anything

1    I could add.

2          THE COURT:  All right.  Mr. Nash, would you like to

3    submit a brief?

4          MR. NASH:  If I could perhaps maybe limit it to five

5    pages --

6          THE COURT:  That will be fine.

7          MR. NASH:  -- something like that.  And I don't know

8    that I necessarily need the transcript.  If Your Honor could

9    give maybe 14 days to do that or something, I could have

10   hopefully a very concise and to the point brief.

11         THE COURT:  That will be fine.  The defendant will be

12   given 14 days to submit a brief.  I have taken extensive

13   notes, but I did have a difficult time understanding some of

14   the testimony, quite frankly.  So I would assume that you will

15   not have sufficient time to get a transcript within 14 days,

16   but I will give you 14 days to submit your brief, and then I

17   will take it under advisement and issue an opinion on this

18   issue.

19        I do want to look at some of the legal issues presented

20   on restitution.  Keeping in mind, of course, that restitution

21   is a completely separate issue.  Sometimes it's analogous to a

22   fine in a case.  And there are ways in which an individual who

23   may defraud a company, for example, but provide services to

24   the company, can be penalized in terms of a fine.  But there

25   may not be restitution that's ordered if services are, in

1   fact, provided.  So I'll be looking at those issues in the

2   meantime.

3       As much as the government doesn't want to submit a brief,

4   it's not required to, and the matter will be submitted upon

5   either the 14-day period or the submission of the defendant's

6   brief on these issues.

7       One other matter, Mr. Nash, as you were giving me these

8   exhibits, I was assuming these were my copies and not the

9   official exhibit for the clerk.

10          MR. NASH:  Well, I had a copy that was at the witness

11  stand, Your Honor, and then I gave a copy to Your Honor, so

12  either one I suppose.

13          THE COURT:  I actually marked on some of mine, that's

14  why I wanted to make sure --

15          MR. NASH:  Well, there should be a complete set.  If

16  not, I can make sure, after we adjourn, I can give a set to

17  the Court.

18          THE COURT:  Looks like there is a set there so, all

19  right.

20      Any other matters that we can take up this afternoon?

21          MS. FANNIN:  Nothing from the United States, Your

22  Honor.

23          THE COURT:  Anything else, Mr. Nash?

24          MR. NASH:  No, Your Honor.

25          THE COURT:  All right.  Thank you.  We will be in

145

1    recess.

2          (Proceedings concluded at 4:42 p.m.)

3                          - - -

4                C E R T I F I C A T E

5          I, ELAINE S. HABERER, RPR, certify that the
     foregoing is a correct transcript from the record of
6    proceedings in the above-entitled case.

7

8    _/s/ Elaine S. Haberer_              May 30, 2022_
     ELAINE S. HABERER, RPR              Date of Certification
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

146

INDEX

**GOVERNMENT'S WITNESSES**

APRIL RICHARDS
Direct Examination.............................. Page 4
Cross-Examination............................... Page 13
Redirect Examination............................ Page 21


**DEFENSE WITNESSES**

PETER WILLIS
Direct Examination.............................. Page 28
Cross-Examination............................... Page 39
Redirect Examination............................ Page 47

JONATHAN SNYDER
Direct Examination.............................. Page 53
Cross-Examination............................... Page 59

SUBHADARSHI NAYAK
Direct Examination.............................. Page 62
Cross-Examination............................... Page 108


- - -

**GOVERNMENT'S EXHIBITS**


| Exhibit | Description | Identified | Admitted |
| --- | --- | --- | --- |
| 1 | Manny Oliver declaration | 3 | 3 |
| 2 | Economic impact statement | 3 | 3 |
| 3 | Economic impact statement | 3 | 3 |
| 4 | Bank Statement | 130 | 133 |


**DEFENSE EXHIBITS**


| Exhibit | Description | Identified | Admitted |
| --- | --- | --- | --- |
| 1 | Economic impact statement | 3 | 3 |
| 2 | Patent publication | 33 | 33 |

1                              INDEX CONTINUED

2       **DEFENSE EXHIBITS**

3       **Exhibit**          **Description**          **Identified** **Admitted**
        3-A      Phase II proposal                    67          69
4
        3-B      Phase I proposal                     71          74
5
        4 - 10   Photographs                          75          79
6
        11       Property settlement agreement        86          86
7
        12       Phase I proposal                     92          94
8
        13       Phase I final report                 97          97
9
        15       Emails searching for work           104          --
10

11

12                                  - - -

13

14

15

16

17

18

19

20

21

22

23

24

25